**EXHIBIT 5**

```
                                  Page 1
 1      IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF GEORGIA
 3               ATLANTA DIVISION
 4                   - - -
 5   ROBERT LANG,         : CIVIL ACTION
             Plaintiff,   :
 6                        :
           V.             :
 7                        :
     SIG SAUER, INC.,     : NO.
 8         Defendant.     : 1:21-cv-04196-CAP
 9                   - - -
10              October 28, 2022
11                   - - -
12       Oral deposition of JAMES TERTIN, held
13   in the offices of Saltz Mongeluzzi & Bendesky
14   P.C., 1650 Market Street, 52nd Floor,
15   Philadelphia, Pennsylvania 19103, commencing
16   at 2:14 p.m. on the above date, before Teresa
17   M. Beaver, a Federally-Approved Professional
18   Reporter and Notary Public.
19                   - - -
20
21          ESQUIRE DEPOSITION SOLUTIONS
                 1835 Market Street
22                   5th Floor
           Philadelphia, Pennsylvania 19103
23                (215) 988-9191
24
```

```
                                  Page 2
 1   A P P E A R A N C E S :
 2
         SALTZ MONGELUZZI & BENDESKY P.C,.
 3       BY:  DANIEL L. CEISLER, ESQUIRE
         1650 Market Street
 4       52nd Floor
         Philadelphia, Pennsylvania  19103
 5       dceisler@smbb.com
         Counsel for the Plaintiff
 6
 7       LITTLETON PARK JOYCE UGHETTA &
         KELLY LLP
 8       BY:  KRISTIN E. DENNISON, ESQUIRE
         201 King of Prussia Road
 9       Suite 220
         Radnor, Pennsylvania  19087
10       Kristen.dennison@littletonpark.com
         Counsel for the Defendant
11
                     - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                  Page 3
 1             I  N  D  E  X
 2   WITNESS                              PAGE
 3   JAMES TERTIN
 4       BY MS. DENNISON                    5
         BY MR. CEISLER                    44
 5       BY MS. DENNISON                   47
 6
 7
 8          E  X  H  I  B  I  T  S
 9   MARKED         DESCRIPTION          PAGE
10   Exhibit 1      Expert Report of James  5
                    Tertin
11
     Exhibit 2      Transcript of the       8
12                  Deposition of Robert
                    Lang
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                  Page 4
 1
 2           DEPOSITION SUPPORT INDEX
 3
 4
 5   Direction to Witness Not to Answer
 6   Page     Line                 Page     Line
 7    38       17
 8
 9
10   Request For Production of Documents
11   Page     Line                 Page     Line
12    10       21                   20       21
13
14
15   Questions Marked
16   Page     Line                 Page     Line
17   None
18
19
20
21
22
23
24
```



Page 5

1   MS. DENNISON: Let's mark this as
2 Number 1, your report in the Lang case.
3       - - -
4       (Deposition Exhibit 1, Expert
5 Report of James Tertin, was marked for
6 identification.)
7       - - -
8       JAMES TERTIN, after having been
9 duly sworn, was examined and testified as
10 follows:
11      - - -
12      EXAMINATION
13      - - -
14 BY MS. DENNISON:
15   Q.   Good afternoon, Mr. Tertin.
16   A.   Good afternoon.
17   Q.   We are here again; this time to
18 discuss the discharge incident involving
19 officer -- involving Robert Lang and the
20 report you issued in this case.
21      Is that your understanding as to
22 why we're here this afternoon?
23   A.   Yes.
24   Q.   Okay. In front of you I have

Page 6

1 marked as Exhibit 1 a September 29th, 2022
2 report issued by you to Saltz Mongeluzzi, Re,
3 Robert Bryan Lang verse Sig Sauer, Inc.
4      Is this your report authored in
5 this matter?
6   A.   Yes.
7   Q.   On Page 19 there is a signature.
8 It looks like a computerized signature, but
9 does that represent your acknowledgement of
10 this report?
11   A.   Yes.
12   Q.   All right. Let's start with, I
13 gave you instructions this morning. I won't
14 repeat the instructions. We'll do our best
15 between Mr. Ceisler and I to remind you of the
16 affirmative yeses or nos.
17      I'll just go ahead with the
18 deposition itself.
19      Was the trigger on Robert Lang's
20 P320 pistol pulled to cause it to discharge?
21   A.   I didn't see it happen, but I
22 would say yes.
23   Q.   And that was based on your
24 evaluation and analysis of this matter?

Page 7

1   A.   Yes.
2   Q.   We agreed earlier today that the
3 P320 pistol cannot discharge without trigger
4 actuation; correct?
5   A.   Yes, we did.
6   Q.   All right. I don't have a copy
7 of the Notice of Deposition pulled out for
8 this case. It's going to be similar to the
9 one I showed you this morning.
10      Do you recall seeing a Notice of
11 Deposition in this matter?
12   A.   Yes.
13   Q.   And that Notice of Deposition had
14 an identical Exhibit A to it, to the one that
15 I showed you this morning, asking for copies
16 of file materials.
17      Did you bring any file materials
18 with you today?
19   A.   No.
20   Q.   Okay. Now, we have the report
21 and did you also inspect this pistol?
22   A.   Yes.
23   Q.   Okay. Now, you have a number of
24 materials reviewed listed here. They appear

Page 8

1 to be identical to the materials listed in
2 your report authored in Slatowski.
3      Could you take a look at, except
4 for -- except for the Immigration and Custom
5 Enforcement document production. You reviewed
6 that in connection with the Slatowski report
7 and that is not part of your Lang report, but
8 other than that, would you agree that the
9 materials listed are the same?
10   A.   Yes.
11   Q.   Did you review the deposition of
12 Robert Lang?
13   A.   Yes.
14   Q.   And we can mark this as Exhibit
15 2.
16      - - -
17      (Deposition Exhibit 2, Transcript
18 of the Deposition of Robert Lang, was marked
19 for identification.)
20      - - -
21 BY MS. DENNISON:
22   Q.   Exhibit 2 is a copy of the
23 deposition transcript of Robert Lang.
24      When did you review that?



Page 9

1  A.  I would guess yesterday.  I get
2  so much literature.  That's my best
3  recollection.
4  Q.  Now, you were retained on behalf
5  of Robert Lang to provide certain opinions in
6  this matter; is that correct?
7  A.  Yes.
8  Q.  Who retained you?
9  A.  SM&B.
10  Q.  Saltz Mongeluzzi?
11  A.  Yes.
12  Q.  When were you retained in the
13  Lang matter?
14  A.  Earlier this year.
15  Q.  Do you remember if it was the
16  same time as the Slatowski matter or before or
17  after?
18  A.  I don't recall that timeline
19  there.
20  Q.  Is your hourly rate for the Lang
21  matter 200 an hour?
22  A.  Yes.
23  Q.  And that applies to all of your
24  work except trial testimony, which is 250 an

Page 10

1  hour; is that correct?
2  A.  Yes.
3  Q.  How much have you billed for your
4  work in the Lang matter to date?
5  A.  That, I don't recall.
6  Q.  You've sent invoices to Saltz
7  Mongeluzzi for your work in this matter;
8  correct?
9  A.  Yes.
10  Q.  Approximately how many invoices
11  have you sent to Saltz Mongeluzzi in the Lang
12  matter?
13  A.  Four, I believe.
14  MR. CEISLER:  I'll represent to
15  you that these cases are being billed as Sig
16  Sauer cases rather than individual cases.
17  Those four invoices are the same for all the
18  cases.
19  MS. DENNISON:  Okay.
20  BY MS. DENNISON:
21  Q.  And I will request a copy of the
22  invoices, those four invoices.
23  MR. CEISLER:  We're getting them
24  pulled.

Page 11

1  BY MS. DENNISON:
2  Q.  Now, when you provide your
3  invoices, do you differentiate the time spent
4  on let's say preparing the Lang report versus
5  the Slatowski report?
6  A.  No.  It's just straight time,
7  working on the Sig matter.
8  Q.  Do you provide a description of
9  the work that you are doing?
10  A.  Yes.
11  Q.  So, when you prepared the report
12  that's in front of you, that's marked as
13  Exhibit 1 in the Lang case, would your
14  description in this report say prepare report
15  in the Lang matter?
16  A.  Yeah, it will be on there.
17  Q.  Now, for this case, were you
18  asked to do the same thing in this case as you
19  were asked to do in the Slatowski matter?
20  A.  Pardon?
21  Q.  Were you asked to do the same
22  thing in this case as in the Slatowski matter?
23  A.  Yes.
24  Q.  And that was as identified on

Page 12

1  Page 2 of your report?
2  A.  Yep.
3  Q.  To analyze the adequacy and
4  sufficiency of the safety mechanisms on Robert
5  Lang's P320 X Carry pistol?
6  A.  Yes.
7  Q.  And this report is 19 pages long.
8  Does this contain all of the opinions that you
9  intend to give in this case?
10  A.  Yes.
11  Q.  Does this report, along with your
12  50 years of experience in the industry,
13  contain all of the bases for your opinions?
14  A.  Yes.
15  Q.  Have you done any work since you
16  issued this report besides meeting with
17  Mr. Lang's attorneys yesterday and reviewing
18  some additional material?
19  A.  I've continued to research Sig
20  pistols.
21  Q.  Since the date of this report?
22  A.  Yes.
23  Q.  Okay.  What kind of research have
24  you done into Sig pistols?



Page 13

1    A.    Same thing that's outlined in
2  this report.
3    Q.    But you've indicated that you've
4  continued to research since this report.  So
5  have you learned anything new since you
6  authored this report?
7    A.    No.
8    Q.    And when you say research, what
9  does that mean?  What specifically have you
10  researched?
11   A.    Safety and functionality.
12   Q.    And how have you performed that
13  research?
14   A.    Same as outlined here.  Measured
15  trigger pulls, measured weights.
16   Q.    Anything else that you would
17  consider to be research into safety and
18  functionality into the P320 pistol?
19   A.    No.  I haven't cut any apart
20  lately.
21   Q.    All right.  Do you currently have
22  any plans to do any additional work before
23  trial, other than what may later be requested
24  by your attorney?

Page 14

1    A.    Other than what's requested by
2  the attorney, no.
3    Q.    Has anything occurred since you
4  issued your report in this matter on September
5  29th, 2022 that changes or modifies any of
6  your opinions?
7    A.    No.
8    Q.    When you approached this
9  litigation with P320s, did you start with the
10  assumption that there was something wrong with
11  the P320 or was it a blank slate?
12   A.    This one was not a blank slate
13  because I had previous history.
14   Q.    Can you explain that?
15   A.    I had already worked on the
16  Slatowski gun and looked at some in Florida.
17  So, I knew what the case was about at this
18  point.
19   Q.    All right.  Did that lead you to
20  approach this case believing that there was
21  something wrong with the P320 pistol that
22  caused Mr. Lang's accident?
23   A.    Remained objective.
24   Q.    Tell me what you did to

Page 15

1  investigate Mr. Lang's accident.
2    A.    Took his gun, analyzed it,
3  inspected it externally for wear, abuse.  Any
4  external scratches, marks, disassembled it,
5  pulled the barrel out, measured the head space
6  and checked the function of the disconnector,
7  checked the function of the firing pin block
8  lever, pulled the fire control unit out of the
9  gun, fully inspected it and then reassembled
10  it, test fired it with no ammo, just for
11  function.
12   Q.    Okay.  And did you find anything
13  functionally wrong with the gun?
14   A.    No.
15   Q.    Did you find any evidence of
16  broken or abused parts in the gun?
17   A.    No.
18   Q.    Now, you've talked about the
19  disconnector.
20         Do you understand what the
21  disconnector is in the P320?
22   A.    Yes.
23   Q.    What is it?
24   A.    It resets the sear every time the

Page 16

1  gun is fired, brings it into the upward
2  position so it can, in turn, catch the striker
3  as the slide goes forward.
4    Q.    Now, when you take the P320 --
5  when you take the slide off of the P320 and
6  you take the P320 apart, do you have to press
7  the trigger to do that?
8    A.    You know, I don't recall.
9    Q.    Do you recall whether that's
10  something you have to do with other pistols
11  when you take them apart?
12   A.    Normally no.
13   Q.    Now, you already indicated you
14  read Mr. Lang's deposition.  Did you speak
15  with Mr. Lang directly about the incident?
16   A.    No.
17   Q.    Did you read any depositions of
18  Mr. Lang's wife or any of the first responders
19  who were at the scene?
20   A.    I don't recall that I did.
21   Q.    Did you speak or correspond with
22  any of Mr. Lang's doctors regarding the
23  accident, his injuries or his treatment?
24   A.    No.  No.  I'm primarily focused



Page 17
1  on the gun.
2      Q.    Did you speak with Mr. Vigilante,
3  Mr. Hicks or any other experts or consultants
4  retained by Mr. Lang about how the accident
5  occurred?
6      A.    No.
7      Q.    Did you speak with anyone other
8  than your attorneys -- I'm going to rephrase.
9           Did you speak with anyone else
10 other than Mr. Lang's attorneys about how the
11 accident occurred?
12     A.    No.
13     Q.    On Page 2 to 3 you list the
14 incident scenario.
15          Where did you obtain the
16 information that you have listed under Section
17 4?
18     A.    From Mr. Lang's attorneys.
19     Q.    Did you inspect Mr. Lang's
20 holster?
21     A.    No.  That's outside my scope as
22 well.  I'm not a holster forensics guy.
23     Q.    Do you have an opinion as to what
24 actuated Mr. Lang's trigger?

Page 18
1      A.    I do not have an opinion other
2  than that something actuated the trigger.
3      Q.    And do you believe that the
4  trigger was fully actuated to cause Mr. Lang's
5  pistol to discharge?
6      A.    I didn't see it.  I wasn't there.
7  I read the reports and I can only speculate --
8      Q.    However --
9      A.    -- as to what really happened.  I
10 would assume that it was fully actuated to
11 fire.
12     Q.    And that's based on the work that
13 you did in this case; is that correct?
14     A.    Correct.
15     Q.    And we previously discussed that
16 you did some testing on P320 that you
17 purchased to try to get it to discharge while
18 partially actuated and you were unable do so.
19 Is that correct?
20     A.    Yep.  Yes.
21     Q.    And from that, you were of the
22 opinion that for the P320 to discharge, the
23 trigger must be fully actuated.  Is that
24 correct?

Page 19
1      A.    Correct.
2      Q.    And did you determine in this
3  case whether it was Mr. Lang's finger or a
4  foreign object that fully actuated his
5  trigger?
6      A.    No.  Again, that's outside my
7  scope.  I just looked at the gun.
8      Q.    Did you make any determination as
9  to whether whatever actuated Mr. Lang's
10 trigger contacted the trigger squarely on?
11     A.    No.
12     Q.    And so you will not render an
13 opinion then as to where on the trigger the
14 foreign object or finger pressed it to cause
15 full actuation; correct?
16     A.    That's correct.
17     Q.    All right.  On Page 3, you
18 discuss your inspection of the subject
19 firearm.  You indicate that you inspected the
20 P320 X Carry pistol on September 28th, 2022.
21          Is that correct?
22     A.    Yes.
23     Q.    And the pistol was sent to you to
24 inspect in this instance; is that correct?

Page 20
1      A.    Correct.
2      Q.    Did you take photographs of your
3  inspection?
4      A.    No.
5      Q.    Did you take any photographs
6  during your inspection?
7      A.    I don't recall.
8      Q.    Okay.  Did you record your
9  inspection?
10     A.    I recorded it on paper, yes.
11     Q.    Did you videotape your
12 inspection?
13     A.    No.
14     Q.    And when you say you recorded
15 your inspection on paper, was that on -- did
16 you take notes?
17     A.    Yes.
18     Q.    Do you still have a copy of those
19 notes?
20     A.    I believe I do.
21          MS. DENNISON:  I would request a
22 copy of those notes from his inspection.
23          THE WITNESS:  That would be
24 transcribed into a typewritten page rather



Page 21

 1  than hand notes.
 2  BY MS. DENNISON:
 3      Q.   Do you dictate the notes as you
 4  go?
 5      A.   No.  I write them myself.
 6      Q.   You hand write them and then you
 7  transfer them into a written format.  Is that
 8  what you're saying?
 9      A.   Yes.
10      Q.   And then what do you do with the
11  handwritten notes?
12      A.   Throw them.
13      Q.   And then you just keep the typed
14  version saved; correct?
15      A.   Correct.
16      Q.   How many notes did you take
17  during your inspection of the Lang pistol,
18  whether you can tell me if it's one page of
19  paper, two pages?
20      A.   One page.
21      Q.   What did you note during the
22  inspection?
23      A.   I did my usual, measured the
24  poundage for the free travel, poundage to pull

Page 22

 1  the pistol from a set point to fire, the depth
 2  of the sear, which would be the sear
 3  engagement with the striker and my basic
 4  poundage pull.  I guess I already said that.
 5      Q.   You measured a total of six
 6  pounds of trigger pull weight required to pull
 7  the trigger from rest point to break point?
 8      A.   Correct.  One and a half and four
 9  and a half.
10      Q.   All right.  So, when you say one
11  and a half and four and a half, you've got one
12  and a half pounds of trigger pull weight
13  required to move the trigger from the rest
14  point to the set point which is when the
15  trigger bar first makes contact with the sear.
16      A.   The striker makes contact with
17  the sear, yes.  Excuse me.  You're right.
18  Trigger bar.
19      Q.   The trigger pull weight from the
20  set point to the break point you measured as
21  four and a half pounds and that is the time
22  for the -- or the weight required for the
23  pistol to go from that set point to where it
24  discharges; correct?

Page 23

 1      A.   Yes.
 2      Q.   You have videos from those
 3  measurements; is that correct?
 4      A.   Yes.
 5      Q.   Then you note that the slide on
 6  this gun would not easily close into full
 7  battery?
 8      A.   Yes.
 9      Q.   Can you explain that to me?
10      A.   The slide on this gun, if you
11  pulled it back, and let it go forward slowly,
12  would not lock up.  It had to be slammed shut
13  in a fully-opened position by releasing the
14  slide lock.
15      Q.   I may need to take that back a
16  second.  It's been a long day already.
17           So, when you pull the slide back,
18  were you trying to guide it back into place or
19  did you pull it back and then let go?
20      A.   If you pull it back and let go,
21  it would go into full battery.
22      Q.   It would not?
23      A.   It would.
24      Q.   If you pull it back, it goes into

Page 24

 1  full battery?
 2      A.   Correct.
 3      Q.   If you pull it back and you
 4  slowly tried to bring the slide back to full
 5  battery, you had a problem?
 6      A.   Yes.
 7      Q.   Okay.  And can you explain what
 8  it was that would happen?
 9      A.   The barrel would not lock up into
10  the slide.
11      Q.   Even if you pulled it or tried to
12  push it back?
13      A.   You had to give it a sharp rap on
14  the back of the slide to get it into full
15  battery.
16      Q.   Does that mean anything to you?
17      A.   Yes.
18      Q.   What does that mean to you?
19      A.   It's defective.
20      Q.   How so?
21      A.   Guns don't normally work that
22  way.
23      Q.   Do you have any information as to
24  whether Mr. Lang's gun left the factory that



Page 25

1  way?
2      A.   I have no information on that.
3      Q.   Have you ever seen that happen
4  with any other guns?
5      A.   Yes.
6      Q.   Did you ever determine the cause
7  of that occurrence on any other guns?
8      A.   Yes.
9      Q.   What was the cause or causes that
10  you determined on other guns?
11      A.   In 1911, it's a link, usually.
12  This gun doesn't have a link.  It simply has a
13  take-down pin that the barrel rocks on so I'm
14  assuming that was it.
15      Q.   You're assuming what was it?
16      A.   The take-down pin.
17      Q.   The take-down pin?
18      A.   That's what locks the barrel.
19      Q.   Okay.  And did you look at the
20  take-down pin on this gun?
21      A.   No.  That was beyond the scope of
22  what I was hired to do.  That was just an
23  observation when I looked at it.  So I didn't
24  attempt to repair it or examine it.

Page 26

1      Q.   And do you have any opinions as
2  to whether that notation that the gun would
3  not easily close into full battery played any
4  role in Mr. Lang's discharge event?
5      A.   That, I don't know.
6      Q.   Did you look at that?
7      A.   No.
8      Q.   Do you plan to offer any opinions
9  in that regard?
10      A.   No.
11      Q.   Okay.  The content of your report
12  in this case is very similar to the content in
13  the Slatowski report; is that correct?
14      A.   That's correct.
15      Q.   Section -- under your analysis,
16  section a, single action versus double action
17  pistols, is there anything different in this
18  report than in your Slatowski report?
19      A.   Not to my knowledge.
20      Q.   Under B, the P320 functions as a
21  single action striker fire pistol, is there
22  anything different in Section B than in the
23  Slatowski report?
24      A.   Not to my knowledge either.

Page 27

1      Q.   If you go to Section C of the
2  Lang report, is there anything different in
3  Section C in the Lang report than in the
4  Slatowski report?
5      A.   No, not to my knowledge.
6      Q.   If we go to Section D, design
7  defect of the internal safety.  Is there
8  anything different in this section of your
9  report than in the Slatowski report?
10      A.   No.
11      Q.   Okay.  Section E, type of manual
12  safeties.  Is there anything different in this
13  section of your report than in the Slatowski
14  report?
15      A.   No, not to my knowledge.
16      Q.   I think there is one difference.
17  I'm not trying to trip you up.  I want to make
18  sure we have it noted.
19           On Page 15 of the Slatowski
20  report, you have noted that I have also
21  reviewed a document from ICE stating that the
22  number of unintended discharges increased
23  dramatically after ICE approved the P320 use.
24           I don't think you have that in

Page 28

1  the Lang report.  Am I correct about that?
2      A.   I believe you're correct.
3      Q.   So, that would be one difference.
4           Then warnings, is there anything
5  different in your lack of warnings section
6  between the Slatowski report and the Lang
7  report?
8      A.   No.
9      Q.   G is the Glock striker fired
10  system.  Is there anything different in the
11  Lang report from the Slatowski report?
12  Section G?
13      A.   No.
14      Q.   There is one, 17, you just add
15  where you say in the Lang report, For those
16  reasons, a Glock is far safer striker-fire
17  pistol than the P320.
18           You've added in the ICE document
19  into 17 on the Slatowski document.
20           Then you have in your conclusions
21  in your report, you have 18 conclusions in
22  Slatowski and 17 conclusions in Lang.
23           Can we agree that the first 17
24  conclusions are identical between the two a



Page 29

1 reports other than the substitution of
2 Mr. Lang's name from Mr. Slatowski's name?
3     A.   Other than his name in Number 12,
4 yes.
5     Q.   Would it be fair to say that the
6 reports in the two cases, Slatowski and Lang
7 are identical, except for the incident
8 scenarios and the addition of -- sorry, the
9 incident scenario, the inspection of the
10 subject firearm and any discussion of that ICE
11 document?
12     A.   Yes.
13     Q.   Would it be fair to say that the
14 discussion that we went through with the
15 Slatowski report on all of your opinions would
16 be the same as those in the Lang report?
17     A.   Yes.
18     Q.   Now, when you read Mr. Lang's
19 report, did you review the portion of his
20 report when he indicated that he did not want
21 a manual safety, an external manual thumb on
22 his P320?
23     A.   I did.
24     Q.   Did you also review his testimony

Page 30

1 that when he had a manual safety on his Smith
2 & Wesson M&P, he typically left the manual
3 safety off?
4     A.   Yes.  Have you ever looked at one
5 of those safeties?
6     Q.   I have.  But my question is --
7     A.   Okay.
8     Q.   My question is simply he left it
9 off of the M&P; is that correct?
10     A.   Yes.
11     Q.   And he indicated that he did not
12 see that thumb safety as necessary on the M&P.
13         Do you recall that?
14     A.   I don't recall that.
15     Q.   That would be Page 75 and 76 of
16 his deposition.
17         Do you want to take a look?
18         MR. CEISLER:  Let's take a look.
19 BY MS. DENNISON:
20     Q.   Specifically, that line is Line
21 11 and 12 on Page 76.
22     A.   I got it.  What was your question
23 again?
24     Q.   I was just noting or asking you

Page 31

1 if you saw that Mr. Lang testified that he
2 left off his manual safety on his M&P because
3 he didn't see it as necessary?
4     A.   Yes.
5     Q.   You agree that at the time that
6 Mr. Lang's P320 X Carry pistol discharged, he
7 was attempting to remove it in the holster
8 from the belt?
9     A.   Yes.
10     Q.   Do you have any information as to
11 whether any portion of the pistol had been
12 removed from the holster at the time that the
13 gun discharged?
14     A.   No, I don't.
15     Q.   You did not review or inspect the
16 holster to see if any damage to the holster
17 that might give you any indication as to where
18 the pistol was seated in the holster at the
19 time of discharge?
20     A.   No.  That's outside my scope.
21     Q.   Mr. Lang testified he did not
22 touch the trigger, nor could he have done so
23 while it was in his holster.
24         Are you rendering any opinions as

Page 32

1 to whether Mr. Lang's finger did or did not
2 touch the trigger?
3     A.   No.  The only opinion I would
4 render is that if it had had some sort of
5 manual safety, that accident would not have
6 happened.
7     Q.   Well, let's break that down.
8         If it had a manual safety, a
9 thumb safety, can we agree that if we take
10 Mr. Lang's deposition testimony on Pages 75
11 and 76 as true, he would typically have left
12 the manual safety turned off on the P320?
13         MR. CEISLER:  Objection.
14         THE WITNESS:  I can't agree to
15 that.  I would have left it off on a Smith &
16 Wesson, also.
17 BY MS. DENNISON:
18     Q.   Okay.  Well, have you spoken with
19 Mr. Lang?
20     A.   No.
21     Q.   And you agree that he talked
22 about the fact that a manual safety, he
23 believed it slowed him down and that he would
24 typically leave it off?

Page 33

1  A. Yes.
2  Q. And that he did not want a thumb
3  safety on the P320?
4  A. Yes.
5  Q. And as we sit here right now, you
6  can't say one way or the other whether
7  Mr. Lang would have engaged a manual safety if
8  it had one on his P320?
9  A. No.
10  Q. And if he did not have a manual
11  safety engaged on his P320, even if it would
12  have been equipped with one, this accident
13  still would have occurred. Is that right?
14  A. Well, don't forget, my definition
15  of a bladed trigger is also a manual safety.
16  Q. Do you agree that the P320 should
17  have been equipped with a manual safety and
18  bladed trigger?
19  A. I would say that this accident
20  would have been highly improbable.
21  Q. If it was equipped with both?
22  A. Both or either.
23  Q. If it was equipped with just the
24  manual safety and Mr. -- if it was equipped

Page 34

1  with just a thumb safety and Mr. Lang left it
2  off like he did with his Smith & Wesson, we
3  can agree that this accident still would have
4  happened; correct?
5  A. Yes.
6  Q. And we can agree, I believe, that
7  if this P320 was equipped with a bladed
8  trigger, and Mr. Lang's finger or some other
9  object got squarely on that trigger and pulled
10  it, this accident still would have happened?
11  A. I can agree that under that super
12  improbable circumstance, yes.
13  Q. Okay. What basis do you have to
14  say that that is a super improbable
15  circumstance?
16  A. He's pulling the gun up.
17  Q. Okay.
18  A. For a bladed trigger to be
19  disengaged, it needs to be pushed in. He's
20  pulling it the opposite direction.
21  Q. And you've never heard of a
22  situation where somebody is pulling a trigger
23  or a gun out of the holster that that index
24  finger curls in and up on the trigger itself?

Page 35

1  A. No, I have not.
2  Q. Okay. Do you also agree that if
3  somebody is pulling a trigger up and out, that
4  if something is caught in that trigger, as he
5  pulls it up and out, right around that
6  trigger, right around squarely on that
7  trigger, do you disagree that that would cause
8  it to discharge?
9  A. Again, he's pulling it the wrong
10  direction.
11      If something were caught on that
12  trigger, for a trigger to fire, it has to be
13  pulled in toward the grip. If something was
14  caught on that trigger, he's pulling it the
15  opposite direction. So, no, I wouldn't agree
16  to that.
17  Q. We can agree -- that's your
18  opinion that it's improbable. But we can
19  agree that if his finger or another object got
20  squarely on the trigger and depressed it, that
21  this accident would have occurred even with
22  the tabbed or bladed trigger?
23  A. Highly improbable, yes.
24  Q. We've already discussed that the

Page 36

1  Glock, which has that tabbed trigger, that you
2  have not investigated other accidents or
3  unintended discharges with that pistol;
4  correct?
5  A. No, I haven't.
6  Q. Have you investigated unintended
7  discharges with Smith & Wesson's trigger?
8  A. No.
9  Q. Have you investigated accidental
10  discharges with any manufacturer's bladed or
11  tabbed trigger?
12  A. No.
13  Q. Your opinion that it's highly
14  improbable that this gun could be accidentally
15  discharged if it had a tabbed or bladed
16  trigger is based solely on your understanding
17  of how a bladed trigger works. Is that
18  correct?
19  A. And normal physics, yes.
20  Q. Okay. When you say normal
21  physics, you're talking about the direction of
22  movement in Mr. Lang's case in particular;
23  correct?
24  A. And the requirement to be square



Page 37

1  on that blade in order to deactivate it.
2      Q.   Have you ever done any testing as
3  to where exactly a finger or an object needs
4  to be on that bladed trigger to cause it to
5  discharge?
6      A.   No.
7      Q.   Do you have any opinion of
8  whether it's possible for somebody to
9  misperceive an accident when they -- let me
10  ask that again.
11           Do you have any opinion or
12  understanding as to whether it's possible for
13  somebody to misperceive how an incident such
14  as getting shot with an accidental discharge
15  occurred?
16           MR. CEISLER:  Objection.  You can
17  answer.
18           THE WITNESS:  I don't -- say that
19  again, please.
20  BY MS. DENNISON:
21      Q.   Sure.  Do you have any opinion as
22  to whether an individual may misperceive how
23  an incident such as an accidental discharge
24  when they've been shot has occurred?

Page 38

1           MR. CEISLER:  Can I just please
2  ask you to confirm, do you mean expert opinion
3  or personal opinion?
4           MS. DENNISON:  I can confirm
5  that.  Personal opinion.
6           THE WITNESS:  I don't think a
7  person would misconceive the fact that he's
8  been shot, he or she has been shot.
9           However in that moment of trauma,
10  they are going to misperceive details that
11  happened immediately thereafter.
12  BY MS. DENNISON:
13      Q.   What about the specific details
14  of how the trigger or -- I'm sorry.  What
15  about the specific details of how the gun
16  discharged?
17           MR. CEISLER:  I actually am going
18  to object and instruct not to answer.  It's
19  just so, so far outside anything we're putting
20  him up for in terms of recollection of events
21  and memories.
22           MS. DENNISON:  Okay.
23  BY MS. DENNISON:
24      Q.   Now, when Mr. Lang purchased his

Page 39

1  P320 pistol, you'd agree with me that he had
2  options to purchase a P320 pistol that had a
3  manual safety; correct?
4      A.   Yes.
5      Q.   And he chose not to purchase one
6  of those; correct?
7      A.   Yes.
8      Q.   And Mr. Lang could have purchased
9  any model of pistol that had a manual safety
10  if he chose to do so; correct?
11      A.   Yes.
12      Q.   And Mr. Lang testified that he
13  did not want to purchase a pistol with a
14  manual safety; is that correct?
15      A.   Yes.  And wasn't that based on
16  his experience?
17      Q.   Well --
18      A.   His previous experience?
19      Q.   Regardless of whether it was
20  based on his previous experience or not, my
21  question is just he chose not to.  He did not
22  want to purchase a pistol with manual safety;
23  correct?
24      A.   Yes.

Page 40

1      Q.   Have you ever looked into how
2  frequently users experience an unintended
3  discharge when pulling a pistol out of a
4  holster?
5      A.   No.
6      Q.   Do you think that would be useful
7  information to understand when testifying that
8  it is highly improbable that a user would
9  accidentally pull the trigger while pulling a
10  pistol out of a holster?
11      A.   Do I think that data --
12      Q.   Yes.
13      A.   -- would be useful?
14      Q.   Yes.
15      A.   Possibly, however, how would you
16  get that data?
17      Q.   Well, I'm not the one who's been
18  in the firearms industry for 50 years.
19      A.   That's my point.  That's
20  unavailable.
21      Q.   Well, for instance, I mean you
22  could speak with people about it.  I've spoken
23  with police officers who talk about that
24  happening quite frequently.  I don't have the



Page 41

1 specific data, but is that something that you
2 would like to have looked into or researched
3 before stating that it is highly improbable
4 that a user would accidentally pull the
5 trigger while pulling a holster --
6     A.   No.
7     Q.   -- a pistol out of the holster?
8     A.   No.  My opinions are purely based
9 on examining these firearms, specifically
10 Mr. Lang's.
11     Q.   And there are published studies,
12 I believe, that are out there that could be
13 found that talk about the high instances of
14 unintended accidental discharges while either
15 drawing a pistol out of a holster or putting a
16 pistol back in a holster, but you have not
17 looked to see what's out there on that;
18 correct?
19     A.   I'm not hired to do that.
20     Q.   Okay.
21     A.   I would disagree.  I bet you
22 can't find that information.
23     Q.   I challenge you to go look for
24 it.

Page 42

1         Did you review any of Mr. Lang's
2 medical records?
3     A.   Only what was written in his
4 deposition and report.  None of his actual
5 medical records.
6     Q.   And when you talk about his
7 deposition and in his report, are you
8 referencing what he would have testified to?
9     A.   Yes.
10     Q.   And what we've marked as Exhibit
11 2?
12     A.   Yes.
13     Q.   You don't intend to give any
14 opinions in this case on his injury, his
15 recovery or his damages; correct?
16     A.   No.  Outside my scope.
17     Q.   Did you review any photographs in
18 this case of either Mr. Lang, his injuries or
19 his P320 pistol?
20     A.   No.
21     Q.   Are there any articles or
22 publications that you relied on in forming
23 your opinions in this case beyond what is
24 listed in your report?

Page 43

1     A.   No.
2     Q.   Did plaintiff's counsel provide
3 you with any facts or data that you considered
4 in forming your opinions outside of what is
5 set forth in your report?
6     A.   No.
7     Q.   Did plaintiff's counsel provide
8 you with any assumptions that you relied upon
9 in forming your opinions?
10     A.   No.
11     Q.   Are you rendering any opinions
12 about the design of the P320 other than that
13 you believe it should include a manual thumb
14 safety or a tabbed or bladed trigger?
15     A.   No.  Those two I believe, but no.
16     Q.   Do you have any opinions on the
17 fire control unit itself that you intend to
18 render at the time of trial?
19     A.   I have opinions on that, but
20 that's beyond anything that we've discussed.
21     Q.   And whether it's beyond anything
22 that we've discussed, what I mean is do you
23 plan on rendering any opinions on fire control
24 unit at trial?

Page 44

1     A.   If they ask me about it, I will.
2     Q.   Okay.  But it's certainly not
3 something that you have included in your
4 report; correct?
5     A.   No, it's not.
6         MS. DENNISON:  I don't have any
7 other questions for you on this one.
8         MR. CEISLER:  Okay.  I have one
9 or two.
10        MS. DENNISON:  Which means ten if
11 we go by the last time.
12            - - -
13        EXAMINATION
14            - - -
15 BY MR. CEISLER:
16    Q.   You were asked if you measure
17 wear on a bladed trigger, you had to press to
18 make the firearm discharge and you said you
19 hadn't tested it.
20    A.   I hadn't tested it.
21    Q.   And I just wanted to confirm, in
22 fact this may even be a question for Kristin
23 to allow to you clarify.
24        Did you mean on the trigger



Page 45

1  itself or on the blade?  Because a bladed
2  trigger has components that don't have a blade
3  on them.
4       A.    I interpreted that question to
5  mean the blade.
6            MR. CEISLER:  Is that what you
7  meant by that?
8            MS. DENNISON:  Yeah.  The blade
9  on the trigger.
10           THE WITNESS:  Yes.
11           MR. CEISLER:  Then that's not a
12 question.
13           MS. DENNISON:  We knew what we
14 were talking about.
15           MR. CEISLER:  I just want to make
16 sure the record is clear on that.
17           MS. DENNISON:  The record might
18 not have but we knew what we were talking
19 about.
20 BY MR. CEISLER:
21      Q.    Just another thing in clearing up
22 the record.
23            We talked about Smith & Wesson
24 manual safety versus a P320 manual safety.

Page 46

1       A.    Yeah.
2       Q.    Have you seen the M17 manual
3  safety?
4       A.    Yes.
5       Q.    What are your opinions -- what
6  are your thoughts on the M17's manual safety,
7  the thumb safety?
8       A.    Well, two, it's ambidextrous
9  which is handy for a left or right-handed
10 person and number two, it's functional.  It's
11 easy to get at and put on and off.
12      Q.    How does it compare to a Smith &
13 Wesson M&P manual safety?
14      A.    Light years' difference.
15      Q.    What are the differences?
16      A.    M&P is very small, a piece of
17 stamped metal and it's hidden within the grip.
18      Q.    When was the last time you tested
19 a Smith & Wesson M&P manual safety?
20      A.    This morning.
21      Q.    Is it possible someone might be
22 inclined to use an M17 manual safety but not a
23 Smith & Wesson manual safety?
24           MS. DENNISON:  Objection to form.

Page 47

1            THE WITNESS:  Yes.
2  BY MR. CEISLER:
3       Q.    Why would that be?
4            MS. DENNISON:  Objection to form.
5            THE WITNESS:  Because it's
6  functional and you can actually reach it
7  physically see the on and off.
8            MR. CEISLER:  That is it.  That
9  was more than two.
10           MS. DENNISON:  I knew better.
11              - - -
12           EXAMINATION
13              - - -
14 BY MS. DENNISON:
15      Q.    So, I have to ask, Mr. Tertin,
16 you tested the safety on a Smith & Wesson this
17 morning?
18      A.    Yes.
19      Q.    Okay.  When this morning?
20      A.    I would guess about 9:00.
21      Q.    Where were you?
22      A.    8:30 or 9:00.
23      Q.    Where were you when you tested
24 it?

Page 48

1       A.    Here.
2       Q.    Which --
3       A.    Having said that, I've looked at
4  these guns since they came out, but the last
5  time I saw one was here.
6       Q.    And why were you looking at that
7  manual safety this morning?
8       A.    To compare it.
9       Q.    To what?
10      A.    To an M17.
11      Q.    And so you were looking at the
12 Smith & Wesson manual safety to compare the
13 ease of use with the M17 manual safety?
14      A.    Correct.
15           MS. DENNISON:  I don't have any
16 other questions.  Thank you.
17           MR. CEISLER:  Thank you.
18              - - -
19           (Whereupon, the deposition
20 concluded at 3:04 p.m.)
21              - - -
22
23
24



Page 49

```
 1            C E R T I F I C A T E
 2
 3        I hereby certify that the proceedings
 4   and evidence noted are contained fully and
 5   accurately in the notes taken by me on the
 6   deposition of the above matter, and that this
 7   is a correct transcript of the same.
 8
 9
10
11
12
13   _____
14         Teresa M. Beaver
15
16
17        (The foregoing certification of this
18   transcript does not apply to any reproduction
19   of the same by any means, unless under the
20   direct control and/or supervision of the
21   certifying shorthand reporter.)
22
23
24
```

Page 50

```
 1   Reference No.: 8765276
 2
 3   Case:  ROBERT LANG V. SIG SAUER
 4
            DECLARATION UNDER PENALTY OF PERJURY
 5
          I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10
11        _____
12             James Tertin
13
14           NOTARIZATION OF CHANGES
15               (If Required)
16
17   Subscribed and sworn to on the _____ day of
18
19   _____, 20____ before me,
20
21   (Notary Sign)_____
22
23   (Print Name)                   Notary Public,
24
25   in and for the State of _____
```

Page 51

```
 1   Reference No.: 8765276
     Case:  ROBERT LANG V. SIG SAUER
 2
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   James Tertin
```

Page 52

```
 1   Reference No.: 8765276
     Case:  ROBERT LANG V. SIG SAUER
 2
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   James Tertin
```

