## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

ROBERT LANG,                        *
                                    *
            Plaintiff,              *
                                    *
    v.                              *        1:21-CV-04196-ELR
                                    *
SIG SAUER, INC.,                    *
                                    *
            Defendant.              *
                                    *

_____

## ORDER

_____

Presently before the Court are Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. The Court sets forth its reasoning and conclusions below.

## I.    Background

On December 11, 2018, Plaintiff Robert Lang's day began as usual. He showered, brushed his teeth, got dressed, placed his gun—a P320 pistol—into its holster, and clipped the holstered gun to his belt inside his waistband. Trial Tr. vol. 3 at 523:19–23; 524:15–16; 525:12–16. Then, he went to work, and at the end of the day, he came home to his wife and child. Id. at 525:22–25. After greeting them, he normally removed his holstered gun from his belt and stored it in a safe. Id. at 526:1–

8. However, that day, according to Plaintiff, when he reached down to remove his holstered gun, the gun unexpectedly fired as his index finger touched the clip of his holster. See id. at 528:12–16; 530:10–22. The bullet shot through his right thigh, causing him to experience "one of the most severe pains" he had ever experienced in his life. Id. at 531:21–532:4. Subsequently, Plaintiff initiated this lawsuit, alleging various claims against the manufacturer of his gun, Defendant Sig Sauer. See generally Compl. [Doc. 1-2]. In short, Plaintiff claims the P320 is defectively designed because it does not include a tabbed trigger and because Defendant failed to provide adequate warnings to its customers about the P320's risk of unintended discharges.[1]

Put simply, a tabbed trigger refers to a trigger with a projection or "tab" located on the face of the main trigger that needs to be pulled rearward simultaneously with the main trigger to fire the weapon. A tabbed trigger may be placed in the center of the main trigger, so that if the main trigger is pulled on the side, top, or bottom, the gun will not fire. Here, the crux of Plaintiff's claims is whether a tabbed trigger would have prevented the unintentional discharge of Plaintiff's P320 and his resulting injuries. In other words, was it reasonably foreseeable that the absence of a tabbed trigger on the P320 would result in

---

[1] At the summary judgment phase, the Court entered judgment in favor of Defendant on each of Plaintiff's claims to the extent that any claims were based on Defendant's failure to equip the P320 with a manual thumb safety. [Doc. 46 at 39–40].

Plaintiff's injuries? <u>See</u> Trial Tr. vol. 6 at 1029:6–25. The answer to that question depends, in part, on the design of the trigger and how and where the trigger on Plaintiff's gun was pulled on December 11, 2018.[2] The Parties agree that something caused the trigger to pull; however, they dispute what caused the trigger to pull. The Court summarizes the relevant trial testimony below.

### A.    Plaintiff's Testimony

Plaintiff testified that his gun was fully holstered when it fired, and his finger did not pull the trigger. In fact, it would have been impossible for him to do so because the trigger is fully covered and out of reach when the gun is holstered. <u>See</u> Trial Tr. vol. 3 at 506:1–2, 12–16; 537:11–12, 23–25; 538:9–14. Plaintiff also testified that the bullet "stovepiped" when it fired—which means that the bullet casing was jammed or "stuck" in the ejection port after the bullet fired. <u>Id.</u> at 531:1–4. Despite regular use, Plaintiff's P320 had never stovepiped before. <u>See id.</u> at 506:23–507:6.

### B.    Mr. Watkins's Testimony

Defendant's expert, Mr. Derek Watkins, testified that based on his inspection of Plaintiff's gun and holster, "the evidence in the holster is pretty conclusive that

---

[2] For instance, was the trigger pulled on the side or tip of the trigger, so that if the gun had included a tabbed trigger, the tab would not have been pulled and the gun would not have fired? Or was the was the trigger pulled squarely on its face, such that the gun would have discharged with or without a tabbed trigger?

the gun was discharged while partially withdrawn from the holster." Trial Tr. vol. 5 at 829:12–17. Mr. Watkins opined that it was "not possible" for Plaintiff's gun to have fired and caused the damage he observed on the holster while the gun was fully in the holster.[3] Id. at 998:21–24. Mr. Watkins based his opinion on two grounds. First, something must have pulled the trigger for the gun to fire. Id. at 830:8–9. Second, the damage to the holster was "localized onto one side of the holster." Id. at 833:21–25. According to Mr. Watkins, for the bullet to cause the off-center damage to the holster, the barrel of the gun had to be angled towards one side of the holster at the time of discharge. Id. If the gun had been fully holstered, the damage would not have been one-sided. See id. at 839:9–23. As a result, Mr. Watkins testified that there was no physical evidence in this case indicating that the trigger on Plaintiff's gun was pulled by anything other than Plaintiff's finger. Id. at 828:12–16. He also testified that there was no evidence of anything around Plaintiff's gun and holster that could have potentially contacted the trigger to pull it other than Plaintiff's fingers. Id. at 882:5–13.

## C.    Mr. Tertin's Testimony

Unlike Mr. Watkins, Plaintiff's expert, Mr. James Tertin did not examine Plaintiff's holster. Instead, Mr. Tertin, testified that it was his understanding that

---

[3] Mr. Watkins also testified that the holster was loose enough for Plaintiff's gun to fall out when turned upside down. Trial Tr. vol. 5 at 964:23–965:12.

Plaintiff's gun was fully holstered, and that as Plaintiff put his hand on the butt of the gun, it fired. Tertin Trial Dep. at 20:4–22 [Doc. 161-1]. He further explained that the fact that Plaintiff's gun stovepiped when it fired is "very significant" because stovepiping "indicate[s] that the gun was in the holster when it fired," thus corroborating Plaintiff's testimony.[4] Id. at 60:7–21.

Mr. Tertin testified that although he did not know what actuated the trigger, he did not think it was Plaintiff's finger. See id. at 81:13–82:16. Instead, Mr. Tertin explained that "we know that [Plaintiff's] pistol fired while it was in his holster, while he was taking it off. What caused that to fire, was it an object, was it the holster flexing as he was removing it, hitting the trigger on either side? We don't know." Id. at 64:16–22. Regardless of what contacted the trigger, Mr. Tertin testified that Plaintiff's pistol unintentionally firing would have been "highly improbable" with a tabbed trigger because "it would be nearly impossible for some object to get into

---

[4] Mr. Tertin explained that "stovepiping" is what a consumer would call a "jam." Tertin Trial Dep. at 59:2–5. When a user fires a pistol, the slide moves rearward, extracting a case from the chamber, and then ejecting the case from the firearm. Id. at 59:5–14. When a stovepipe occurs, the case does not cleanly eject, and the slide closes on it. Id. According to Mr. Tertin, a common cause of a stovepipe is that something slows the slide down so that it does not move back quickly enough or with enough force to eject the case. Id. at 59:16–19. Mr. Tertin explained that Plaintiff's gun may because the gun was holstered when it fired, and the holster supplies friction to both sides of the gun's slide as it moves rearward, causing it to slow down so that the fired case would not hit the ejector hard enough to be ejected. Id. at 60:7–21. However, Mr. Tertin did not inspect Plaintiff's holster. Id. at 71:14–17. Mr. Tertin acknowledged that other reasons, besides being in a holster, can cause a gun to stovepipe. Id. at 75:13–76:4.

that holster, turn the required amount, which is nearly 90 degrees, to squarely hit that tab and fire the pistol." Id. at 63:22–64:6.

Mr. Tertin also testified that he "truly believe[s]" that a tabbed trigger would have prevented Plaintiff's unintentional discharge "[a]ssuming [the] trigger was contacted on the side by . . . a foreign object or something." Id. at 64:7–13. Setting that assumption aside, Mr. Tertin acknowledged that he did not have an opinion about whether the object that pulled Plaintiff's trigger squarely contacted the front face of the trigger because there is "no way" he could determine that. Id. at 66:4–11. Consequently, Mr. Tertin could not "tell the jury the trigger was not pulled on the front face of the trigger" with absolute certainty. Id. at 66:12–15.

### D.    Dr. Vigilante's Testimony

Plaintiff's other expert, Dr. William Vigilante, largely testified about the risk-hazard analysis he conducted regarding the P320's design. See Trial Tr. vol. 4 at 680:14–684:2–4. For example, he explained how various types of inadvertent contact can cause a P320 trigger to acuate due to its lack of a tabbed trigger. He described that

> any pressure along the sides, along the top of the front, the bottom of the front, [or] the center of the front [of the P320 trigger], can result in the trigger actuating and discharging unintentionally. So the number of objects and scenarios where that could happen is innumerable. Certainly a finger grazing along the side of it can actuate it, where[as] it won't on a Glock [which has a tabbed trigger]. Certainly a piece of clothing has a higher likelihood of actuating [a P320 trigger] compared to a gun with a tabbed trigger. Any other foreign object that can

potentially get exposed to the trigger or come in contact with the trigger along the sides, the top, the front, the bottom, it doesn't really matter, it has [a] pretty (sic) likelihood of actuating it.

Id. at 702:20–703:9.

Dr. Vigilante demonstrated that the tip of a pencil can be used to cause a P320 trigger to actuate by pressing on the side, top, or bottom of the trigger. Id. at 703:24–704:3; 705:10–19; 706:1–14. He explained that a person's finger does not need to have direct contact on the face of a P320 trigger to actuate it. Id. at 696:14–16. Rather, one can actuate a P320 trigger "with pressure just on the side. Either side, one side. . . . So this means there's significantly more area of the trigger that is potentially exposed to inadvertent contact that can result in the trigger actuating, resulting in the round firing" and that creates an increased "risk of an inadvertent or accidental discharge." Id. at 696:16–697:2.

Like Mr. Tertin, Dr. Vigilante, did not examine Plaintiff's holster in this case, and he did "not reach[] an opinion as to what actuated the trigger, whether it was a foreign object or pressure on the side of the trigger from the holster and movement in the holster." Id. at 717:21–24; 719:8–13. He did however, testify that there were several possibilities for what occurred during the incident: either (1) an object contacted the trigger and moved upwards toward the grip; (2) a stationary object contacted the trigger and the gun moved downward onto it; (3) pressure was applied to the trigger by the side of the holster while the gun was moving rearward; or

(4) pressure was applied to the trigger by the side of the holster while the gun was moving forward.[5] Id. at 715:10–12; 716:9–21. He also testified that he believed that Plaintiff's P320 stovepiped because the gun was holstered when it discharged, causing friction on the slide; however, Dr. Vigilante did not conduct any testing to confirm his belief. Id. at 713:15–24.

Ultimately, based on Plaintiff's testimony about his gun being fully holstered and the police report related to Plaintiff's injuries (which also stated that the gun discharged within its holster), Dr. Vigilante, testified that "if the tabbed trigger safety was included on the Sig P320, . . . the subject incident most likely would not have occurred." Id. at 674:12–20; 709:3–4; 734:9–22.

## II.    Procedural History

This case was tried before a jury from June 11, 2024, through June 20, 2024. [Docs. 165–71]. The jury returned a verdict in favor of Plaintiff, which included the following findings:

- The P320 was defectively designed at the time it left Defendant's control because it did not possess a tabbed trigger, and the defective design caused harm to Plaintiff.

---

[5] Dr. Vigilante explained that the side of the holster can bend inwards and contact the side of the trigger. Trial Tr. vol. 4 at 717:25–718:10. However, he did not measure or conduct any testing to confirm whether any portion of Plaintiff's holster could in fact contact the trigger. Id. at 718:23–719:6.

- The P320 was defective because adequate warnings about the possibility of unintended discharges were not provided, and the absence of such warnings caused harm to Plaintiff.

- Defendant was negligent for selling the P320 without a tabbed trigger, and Defendant's negligence in the sale of the P320 caused harm to Plaintiff.

- Defendant was negligent for failing to warn customers of the risk of the P320 unintentional discharging, and Defendant's failure to warn customers of the risk of unintended discharges caused harm to Plaintiff.

[Doc. 131-1]. The jury awarded Plaintiff $2,350,963.43 in damages, which included:

| $50,963.43 | Stipulated past medical expenses |
|---|---|
| $1,610,000.00 | Past pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |
| $690,000.00 | Future pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |

[Id.] The Court entered judgment reflecting the jury verdict on June 24, 2024. [Doc. 133].

Defendant thereafter filed three motions: Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. Each motion has been fully briefed and is ripe for the Court's review. The Court begins with Defendant's Renewed Motion for Judgment as a Matter of Law.

### III.    Renewed Motion for Judgment as a Matter of Law

### A.    Legal Standard

Under Federal Rule of Civil Procedure 50, "[a] party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to find'" for the non-moving party. Chaney v. City of Orlando, Fla., 483 F.3d 1221, 1227 (11th Cir. 2007); Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). "Regardless of timing, however, in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney, 483 F.3d at 1227.

Thus, in ruling on Defendant's renewed motion under Rule 50(b) after the jury has rendered a verdict, this Court's sole consideration is to assess whether the jury's verdict is supported by sufficient evidence. Id.; see also Lipphardt, 267 F.3d at 1186. "Judgment as a matter of law for a defendant is appropriate, 'when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim.'" Cadle v. GEICO Gen. Ins. Co., 838 F.3d 1113, 1121 (11th Cir. 2016) (quoting Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1149 (11th Cir. 2005)). In assessing a

motion under Rule 50, the Court must review the evidence adduced at trial in the light most favorable to the non-movant. <u>Chaney</u>, 483 F.3d at 1222–23.

## B. Discussion

The Court first addresses Defendant's arguments related to Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger and then addresses Defendant's arguments related to Plaintiff's claim that the P320 is defective due to inadequate warnings.

1. <u>Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger.</u>

Defendant contends there is no legally sufficient evidentiary basis for a reasonable jury to find that the lack of a tabbed trigger on Plaintiff's P320 proximately caused Plaintiff's injuries.[6] Specifically, Defendant argues that the causation opinions of Mr. Tertin and Dr. Vigilante should have been excluded at trial as unreliable, and thus, no reasonable juror could have found in Plaintiff's favor because the evidence was insufficient to establish causation, an essential element of Plaintiff's claims.

---

[6] During trial, at the close of Plaintiff's case-in-chief, and again at the close of all evidence, Defendant moved for judgment as a matter of law, seeking: (1) to exclude the causation testimony and opinions of Plaintiff's experts, Mr. Tertin and Dr. Vigilante and, upon excluding that testimony, to dismiss Plaintiff's design defect claims for failure to establish causation; and (2) to dismiss Plaintiff's failure to warn claims as a matter of law for failure to establish causation. In its discretion, the Court denied Defendant's motions.

As a preliminary matter, the Court sets forth what expert testimony Plaintiff was required to present to the jury to prove his claims at trial. As summarized by the Eleventh Circuit,

> Under Georgia product liability law, a plaintiff must prove as part of his prima facie case that the defendant's product was the proximate cause of the injuries alleged. Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir.1985); Talley v. City Tank Corp., 158 Ga. App. 130, 279 S.E.2d 264, 269 (1981). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." Ogletree v. Navistar Int'l Transp. Corp., 245 Ga. App. 1, 3–4, 535 S.E.2d 545 (2000). In product liability cases, proof of causation generally requires reliable expert testimony which is "based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury." Rodrigues v. Georgia–Pacific Corp., 290 Ga. App. 442, 661 S.E.2d 141, 143 (2008) (emphasis added); see Maczko v. Employers Mut. Liab. Ins. Co., 116 Ga. App. 247, 157 S.E.2d 44, 46 (1967) ("The testimony must show at least a probable cause, as distinguished from a mere possible cause"). In the alternative, expert testimony stated only in terms of a "possible" cause may be sufficient if it is supplemented by probative non-expert testimony on causation. Rodrigues, 661 S.E.2d at 143.

Wilson v. Taser Int'l, Inc., 303 F. App'x 708, 715 (11th Cir. 2008). An opinion that is "suggestive only of the possibility of a causal relationship" between a product and alleged injuries "is deficient in showing with any certainty the probability" of proximate cause. See Maczko, 157 S.E. 2d at 47.

Defendant argues the evidence adduced at trial was insufficient because Plaintiff's experts' causation testimony was unreliable and therefore should have been excluded. The standard for "reliable expert testimony" is governed by Federal

12

Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals., Inc., 509 U.S. 579 (1993). Previously, at the summary judgment phase, Defendant argued that Mr. Tertin and Dr. Vigilante's opinions that the P320's lack of a tabbed trigger caused Plaintiff's injuries must be excluded due to lack of a reliable foundation. [See, e.g., Doc. 46 at 20–21]. Defendant contended, in part, that Plaintiff's experts could not reliably testify that a tabbed trigger would have prevented Plaintiff's gun from firing because they did not know exactly what caused the gun to discharge. [See id. at 26]. The Court was unpersuaded and denied Defendant's motion to exclude Plaintiff's experts' testimony, finding that Plaintiff's experts adequately explained the bases for their opinion about the relationship between the lack of a tabbed trigger and Plaintiff's unintended discharge. [Id. at 27].

The Court declines to reconsider its ruling that Plaintiff's experts were qualified to provide expert testimony in this case. As previously explained, Plaintiff's experts "d[id] not need to identify the causes of the [i]ncident with certainty to testify regarding the same." [Id. at 29]; see Waters v. AIG Claims, Inc., 608 F. Supp. 3d 1120, 1135 (M.D. Ala. 2022) ("[A]n expert is not required to address all alternative theories, nor would an expert's failure to do so be a sufficient basis for exclusion[.]"); Diaz v. Carnival Corp., 544 F. Supp. 3d 1352, 1358 (S.D. Fla. 2021) (observing that "absolute certainty on causation is not required" for an expert to testify regarding the same); Whelan v. Royal Caribbean Cruises Ltd., 976 F. Supp.

2d 1328, 1332 (S.D. Fla. 2013) (noting than "an expert need not rule out all possible alternative causes" or "decide on one cause in particular to the exclusion of all others"). Instead, the proper remedy to Defendant's critiques of Plaintiff's experts' testimony was to allow Defendant to vigorously cross-examine Plaintiff's experts and for the Court to carefully instruct the jury on Plaintiff's burden of proof, as was done at trial. See Daubert, 509 U.S. at 596.

Here, Defendant's expert opined that Plaintiff's gun was partially unholstered when it discharged, and that there was no evidence to conclude that anything other than Plaintiff's finger actuated the trigger. In contrast, Plaintiff's experts relied on Plaintiff's testimony and other facts suggesting that the gun was fully holstered when it discharged and that Plaintiff's finger did not pull the trigger. As a result, based on the likelihood that the trigger was pulled by a foreign object or the holster itself, Mr. Tertin concluded that it would have been "highly improbable" for Plaintiff's gun to have fired if it included a tabbed trigger. Put differently, although Mr. Tertin did not offer an opinion on precisely where or how the trigger was pulled, he essentially testified that it was "highly improbable" that it was pulled squarely on its face from within the holster. Viewing the evidence in the light most favorable to Plaintiff, this

is a legally sufficient evidentiary basis for a jury to find for Plaintiff.[7] See Chaney,
483 F.3d at 1222–23, 1227; Wilson, 303 F. App'x at 715 ("In product liability cases,
proof of causation generally requires reliable expert testimony which is 'based, at
the least, on the determination that there was *reasonable probability* that the
negligence caused the injury.'" (emphasis in original)). It was the province of the
jury to weigh the credibility of the Parties' conflicting testimony and choose what
testimony to credit. See Wilson, 303 F. App'x at 715 ("As a general rule, issues of
causation are for the jury to resolve and should not be determined by a trial court as
a matter of law except in plain and undisputed cases."). Accordingly, the Court
denies Defendant's renewed motion as to Plaintiff's design defect claim.

2.   Plaintiff's claim that the P320 is defective due to inadequate
     warnings about the possibility of unintended discharges.

Defendant argues that Plaintiff's defect claim based on inadequate warnings
also fails as a matter of law due to insufficient evidence of causation. As summarized
by the Eleventh Circuit, "[i]n standard products liability cases premised on a failure
to warn, Georgia law insists that a plaintiff show that the defendant had a duty to

---

[7] Defendant relies on Guinn v. AstraZeneca Pharamcy to argue that Plaintiff's experts were
required to provide a reasonable explanation as why "any alternative cause suggested by the
defense" was not the sole cause of Plaintiff's injuries. [See Doc. 151 at 14] (citing 602 F.3d 1245,
1253 (2010)). However, Defendant takes Guinn out of context. In that case, the Eleventh Circuit
was discussing the requirements to offer expert testimony based on the scientifically accepted
methodology of differential diagnosis—a methodology not applicable here. See Guinn, 602 F.3d
at 1253.

warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury." <u>Dietz v. Smithkline Beecham Corp.</u>, 598 F.3d 812, 815 (11th Cir. 2010). A manufacturer can breach its duty to warn by "failing to provide an adequate warning of the product's potential risks." <u>Brown v. SharkNinja Operating, LLC</u>, No. 1:22-CV-2896-MLB, 2024 WL 4269671, *11 (N.D. Ga. Sept. 20, 2024) (quoting <u>Wilson Foods Corp. v. Turner</u>, 460 S.E.2d 532 (Ga. Ct. App. 1995)).

"A breach of a duty to warn, however, must also be the cause of the injury about which the plaintiff complains, and the plaintiff must present evidence supporting a reasonable inference" that an adequate warning of the product's potential risks would have prevented the plaintiff's injuries. <u>R & R Insulation Servs., Inc. v. Royal Indem. Co.</u>, 705 S.E.2d 223, 233 (Ga. Ct. App. 2010). Put differently, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." <u>Id.</u> "While proximate cause is an issue of fact normally reserved for the jury, Georgia law provides that the court may decide questions of proximate cause as a matter of law when the evidence is 'plain and undisputed.'" <u>Hubbard v. Bayer HealthCare Pharms. Inc.</u>, 983 F.3d 1223, 1232 (11th Cir. 2020) (citation omitted).

At trial, Plaintiff argued that Defendant was negligent because it failed to warn its customers of the P320's "unreasonable risk" of unintended discharges. <u>See, e.g.</u>,

Trial Tr. vol. 6, 1062:4–9. By its instant motion, Defendant claims that Plaintiff

failed to present any evidence on the essential element of causation—specifically,

Defendant contends that there was no evidence adduced at trial that had Defendant

provided additional or different warnings, then Plaintiff would have done something

different that would have prevented the incident. [Doc. 151 at 20]. Plaintiff disagrees

and points to the following evidence:

- Plaintiff testified that prior to buying his P320 he "spent a lot of time on the company's website," "read reviews of the product" on various "gun-selling websites," and watched "many" videos and reviews about the gun on YouTube. Trial Tr. vol. 3 at 518:7–10.

- Plaintiff testified that he saw Defendant's advertising that the P320 "won't fire unless you want it to" and its "safety-without-compromise" promise. Id. 518:14–519:1. Plaintiff explained that based on that advertising, he felt that he "could trust" that the P320 "was going to be a safe one to carry." Id. at 519:3–6. He also testified that his impression was that the P320 was "being touted as one of the safest striker-fired pistols on the market to carry." Id. at 568.

- Plaintiff further testified that he did "not really" consider any other conceal-carry weapons when he was shopping because "based on what [he] saw on the website and in the reviews," the P320 "seemed like a very safe gun for [him] to carry. So [he] he chose the 320." Id. at 519:16–520:1.

Viewing this evidence in the light most favorable to Plaintiff, the Court finds

that there is sufficient evidence to prove causation for Plaintiff's failure to warn

claim. See Chaney, 483 F.3d at 1222–23, 1227. Drawing all inferences in Plaintiff's

favor, a reasonable jury could find that had Defendant adequately warned Plaintiff

that its design of the P320 created a heightened risk on unintended discharge,

Plaintiff would not have purchased the P320 and thus would not have been injured by it. [Doc. 162 at 19]. Accordingly, the Court denies Defendant's motion in its entirety. [Doc. 151].

## IV. Motion for New Trial

### A. Legal Standard

Federal Rule of Civil Procedure 59 provides that the Court "may on motion, grant a new trial on all or some of the issues" after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Granting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." Ewing v. Carnival Corp., No. 23-10883, 2024 WL 2764391, at *5 (11th Cir. May 30, 2024) (cleaned up).

"A losing party may also move for a new trial under Rule 59 on the grounds that 'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)). Thus, under Rule 59, a court may "in its discretion, grant a new

trial 'if in the court's opinion, the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence" which prevented the court from entering judgment as a matter of law under Rule 50. Id (quoting Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir.1984)) (cleaned up). Although a court cannot weigh evidence when confronted with a Rule 50 motion, in a motion for a new trial under Rule 59, the court "is free to weigh the evidence." Id. (citation omitted) "When independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." Id. (cleaned up).

As relevant here, an evidentiary error is not a basis to set aside a verdict if it "do[es] not affect any party's substantial rights." Fed. R. Civ. P. 61. "If one cannot say, with fair assurance, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1465 (11th Cir. 1994) (alterations accepted). The Eleventh Circuit has held that "the factors to consider in determining whether . . . substantial rights were affected [include] the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Id.

Various evidentiary issued raised by Defendant's motion implicate Federal Rules of Evidence 401, 402, and 403. It is axiomatic that for evidence to be admissible, it must be relevant to a claim or a defense asserted by the parties. See Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Civ. P. 402. Even relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**B.    Discussion**

Defendant argues that the Court's following decisions constituted evidentiary errors: (1) the Court's denial of Defendant's motion *in limine* to exclude evidence of Defendant's Voluntary Upgrade Program [Doc. 149 at 12–15]; (2) the Court's denial of Defendant's motion *in limine* to exclude evidence referring to the P320 as a "double action" pistol [Id. at 16–17]; and (3) the Court's denial of Defendant's request for sanctions following Plaintiff's improper question to Defendant's expert about his total compensation in other unintended discharge cases. [Id. at 18–20]. The Court addresses each in turn.

1. <u>Evidence of the Voluntary Upgrade Program</u>

A year prior to the manufacture of Plaintiff's P320 pistol, Defendant implemented a "Voluntary Upgrade Program," which included a design enhancement of a prior version of the P320 pistol. At the time, the P320 pistol "met and exceeded" various industry safety standards, which included standards that tested whether the gun was "drop safe"—i.e., whether the gun did not unintentionally discharge when dropped. [<u>See</u> Doc. 149 at 3]. However, the United States military and a private company called Omaha Outdoors independently tested the P320 and determined that it discharged when dropped at certain angles that were not included in the testing parameters defined by industry standards. Subsequently, Defendant reengineered certain components of the gun and offered the Voluntary Upgrade Program to allow P320 purchasers to "enhance" the drop safety of their P320s at no cost. [<u>Id.</u>] Plaintiff's P320 and all subsequent P320s include the upgraded design. [<u>Id.</u>]

Prior to trial, Defendant moved *in limine* to exclude evidence related to the Voluntary Upgrade Program as irrelevant and unfairly prejudicial. [Doc. 61]. Defendant argued that the evidence was irrelevant because it is undisputed that Plaintiff's P320 did not discharge from being dropped and that Plaintiff's P320 contained the upgraded design. Defendant also argued that the evidence was unfairly prejudicial because Plaintiff would attempt to use the evidence "to improperly

suggest to the jury that something is wrong with the P320" and that evidence of an unrelated alleged defective condition was likely to cause the jurors to "become confused and mistakenly associate the unrelated design enhancement with Plaintiff's alleged defect." [Id. at 61 at 5]. Plaintiff responded that the Voluntary Upgrade Program proves (1) Defendant's "capability to recognize and respond to dangerous defects of its products"; (2) Defendant's "ability to remedy a potential harm, even when it is not forced to do so"; and (3) Defendant's "reluctance to recall the P320." [Doc. 69 at 2–3]. Plaintiff stated that to the extent any risk of prejudice or confusion existed, such risk could be mitigated with limiting instructions. [Id.] Defendant replied that it has never suggested that it is incapable of identifying and remedying defects in its products and that evidence of the Voluntary Upgrade Program "would be duplicative and unfairly prejudicial." [Id. at 1–2].

At the pretrial conference, the Court denied Defendant's motion and found that Plaintiff could introduce evidence about the Voluntary Upgrade Program. See Pretrial Conf. Tr. at 77:1–18; 85:2–87:20 [Doc. 178]; [see also Doc. 91]. The Court based its decision on Defendant's representations that Defendant may introduce some evidence related to drop safety at trial; however, the Court noted that if Defendant's evidence "changes, and there's another objection," the Court would

change its ruling.[8] Id. at 87:15–20; see also id. at 87:8–12. Defendant did not request any limiting instructions related to the issue. At that time, the Court also granted Plaintiff's motion *in limine* to preclude evidence of the P320's compliance with industry standards, which related to certain testing data that Defendant had not produced in discovery because it was purportedly irrelevant to Plaintiff's defect theory at the time. Id. at 86:24–87; [Doc. 53].

At trial, Plaintiff referenced events related to the Voluntary Upgrade Program during opening statements, telling the jury that:

> We'll prove that Sig knew of another problem involving the P320 trigger and didn't want to fix it. Sig knew, you'll hear, that the gun could fire if it was dropped. But they tried to hide it from the public. Now, you'll hear that when the public found out about it through [an] Omaha Outdoors report, Sig Sauer scrambled.

---

[8] During the pretrial conference, the Court asked Defendant why it wanted to introduce evidence related to drop safety, given that it was undisputed that this is not a drop safety case. See Pretrial Conf. Tr. at 81:16–82:3. Defendant stated that a "a lot depends on where we go with respect to that argument, as to the purpose of a tabbed trigger." Id. at 81:14–25. According to Defendant, "the only way drop safety comes into the case is, again, our position that a tabbed trigger is put on by other manufacturers to allow them to pass drop testing. And that's the purpose of a tabbed trigger. That's why they used it. And the 320 didn't need it." Id. at 82:14–83:3. In response, Plaintiff argued that if Defendant could argue that the P320 did not need a tabbed trigger because it is drop safe, Plaintiff should be able to introduce evidence of the Voluntary Upgrade Program to (1) show that the P320's design initially failed to "stop drop fires" and (2) prevent the jury from believing the gun is "drop fire proof." Id. at 84:1–14. The Court said that it did not want "this to become a drop case, because it's not." Id. at 85:12–14. However, the Court stated, if Defendant were to introduce limited evidence about the gun's purported drop safety, doing so may open the door for Plaintiff to introduce limited evidence about the Voluntary Upgrade Program based on "how far the door is opened, if it is, in fact." Id. at 85:12–22. Defendant appeared to agree, responding that "a lot of [this] depends on how this evidence come comes in and how far the door is opened, if at all," while also noting that Plaintiff's gun was manufactured after the upgrade, and no evidence had been presented that the post-upgrade pistol had any defect related to drop safety. Id. at 85:24–86:9.

Trial Tr. vol. 2 at 277:8–13; see also id. at 296:10–13 ("They did not want to issue that first recall. And, ladies and gentlemen, they don't want to issue another one. Rather than protect its customers, you'll hear that Sig is more concerned about protecting itself."). Plaintiff's counsel further argued, "You'll hear that they lied about the P320. . . . You'll hear that they told the public that the gun was drop safe when it wasn't." Id. at 291:19, 292:2–3.

After opening statements and outside of the presence of the jury, Defendant argued that Plaintiff's opening statement opened the door for Defendant to introduce evidence that the P320 exceeded industry standards for drop safety.[9] See id. 371. Because Plaintiff described the Voluntary Upgrade Program as a "recall" and told the jury that Defendant lied to the public about the P320 being "drop safe when it wasn't," Defendant argued that it would be significantly prejudiced if it could not

---

[9] Defendant did not otherwise raise any objection regarding the nature of Plaintiff's substantive discussion of the Voluntary Upgrade Program despite that the fact that Plaintiff had arguably departed from the Court's ruling that permitted Plaintiff to introduce limited information about the Voluntary Upgrade Program if Defendant opened the door by introducing evidence about the gun's drop safety. See supra n.9. It is not this Court's place to speculate on a Party's trial strategy, but the Court nevertheless notes "there are a number of good reasons why skilled trial counsel may make a tactical decision" not to raise a specific objection. See Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993). Here, it may have been Defendant's view that it was more strategic to argue that the door had opened for it to introduce evidence of the P320's compliance with industry standards than to object or seek curative instructions related to Plaintiff's statements about the Voluntary Upgrade Program. See id. at 1128–29 (noting that trial counsel may choose not to object at trial when an "improper argument may open the door to a response that will be of more value than a sustained objection" and explaining that timely objections are required because counsel may not later claim error only when the result of their strategic choices is "unsatisfactory").

explain that the Voluntary Upgrade Program was, in fact, voluntary because the P320 met and exceeded industry safety standards related to drop safety.[10] Id. at 371–72. The Court agreed, finding that Plaintiff had opened the door and Defendant was permitted to ask questions about industry standards. Id. at 380:16–18.

After that, Plaintiff called Defendant's engineer, Mr. Sean Toner, as his first witness. Plaintiff elicited the following testimony about the events leading up to the Voluntary Upgrade Program:

- In February 2017, the United States military tested the P320s to determine if they were drop safe. Id. at 413:21–414:4. The military tested the pistol in ways that were "above and beyond" the military's protocol for drop safety, and they determined that the P320 unintentionally fired when dropped at a certain angle that Defendant had not tested. Id. at 414:1–13. The military asked Defendant "to see" if Defendant could improve the P320. Id. Defendant then gave the military a P320 with a redesigned firing mechanism. Id. at 414:19–24. Defendant also began working on a "production solution" for all of its guns related to the issue. Id. at 416:21–24. Meanwhile, between February 2017 and August 2017, Defendant continued to sell the original, unmodified version of the P320 to the public. Id. at 414:22–25.

- Separately, in August 2017, Omaha Outdoors identified another drop fire issue with the P320. After that, Defendant "accelerated their timeline" to offer the public "the enhanced version" of the P320 through the Voluntary Upgrade Program. Id. at 416:1–417:15. Mr. Toner was unsure of the exact time frame

---

[10] Defendant's arguments were also partly based on Plaintiff's use of a demonstrative during Plaintiff's opening statement that the Parties had conferred about. It was Defendant's understanding that Plaintiff planned to show the entire document during his opening statement; however, Plaintiff only showed the headline of the document, which stated, "Sig Sauer issues voluntary upgrade of P320 pistol." The rest of the document, which Defendant had assumed would be shown, stated that the P320 met various industry standards for drop safety, thus arguably opening the door to Defendant to introduce evidence related to those standards. See Trial Tr. vol. 2 at 300:6–304:21. Based on the Parties' prior agreement about the document, the Court initially denied Defendant's request to discuss the safety standards in its opening statement but permitted Defendant to raise the issue again after opening statements. See id. at 302:15–21.

between Omaha Outdoors's testing and Defendant's announcement of the Voluntary Upgrade Program, but Mr. Toner testified that "it was pretty quick." Id. at 428:15–17.

During closing arguments, Plaintiff's counsel relied on the Voluntary Upgrade Program to argue that Defendant "recalled their trigger once, but only after the public learned it wasn't safe. They didn't do it on their own. They didn't even do it when they were told the first time. It was when the public learned." Trial Tr. vol. 6 at 1045:2–5. Plaintiff's counsel told the jury that Defendant "continued selling a dangerous gun to the public for six months and then issued a voluntary recall. They continued selling a bad gun to the public in 2017, in February until August." Id. at 1060:19–22. Plaintiff's counsel concluded his initial closing statement by telling the jury that "the reason we need to do this, Sig will not change unless they are told to. And you will have that chance to tell them." Id. at 1069:5–7.

In Defendant's closing argument, Defendant's counsel told the jury:

> This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components. it had everything the military had in the internal components. it had all of that. If he wanted it with a manual safety, he could have gotten it.

Id. at 1080:1–8.

Plaintiff's counsel then again relied on evidence related to the Voluntary Upgrade Program in his rebuttal closing:

Sig still doesn't get it. Do not let history repeat itself. If the military forces them to change the trigger, they'll fix an unintended discharge problem for the military. When a gun seller warns the public, and only after the public knows, Sig Sauer will fix an unintended discharge problem for the public. . . .

The public could not count on Sig Sauer to fix a safety concern that they knew could injure or kill. They kept selling the gun anyway knowing it could unintentionally discharge, for six months and injure a user or an innocent bystander, an adult or a child. They continued to sell it until they were called out in public. . . .

They have proven when it comes to looking out for its customers, you cannot count on Sig. And, ladies and gentlemen, we are now counting on you. We're counting on you to provide a loud and just verdict that Sig Sauer can hear all the way up in New Hampshire.

Id. at 1103:5–10; 1106:25–1107:5; 1108:14–18.

By its instant motion for a new trial, Defendant argues that the Court's decision to admit evidence about the Voluntary Upgrade Program was in error and caused substantial prejudice to Defendant. [Doc. 149 at 12]. Defendant asserts that the evidence was irrelevant, because even if evidence of the Voluntary Upgrade Program showed that Defendant possessed the "capability" to quickly implement a design change related to a now-resolved drop safety issue with the P320, such evidence bears no relevance to Plaintiff's present design defect claims related to a tabbed trigger. And even if it were relevant, such testimony should have been excluded due to the risk of confusing the jury and as unfairly prejudicial.

In response, Plaintiff contends the Voluntary Upgrade Program is relevant as "direct evidence" that Defendant is "capable of recognizing defects with its products

and taking action to fix them." [Doc. 163 at 4]. Plaintiff also claims that Mr. Toner's testimony that Defendant made changes to the P320 related to the Voluntary Upgrade Program "pretty quick" could show the jury that Defendant should have recognized and remedied the risk of unintended discharges while doing additional testing on the P320. [Id.] In reply, Defendant argues that Plaintiff's characterization of the use of the Voluntary Upgrade Program at trial is a "mastery of revisionist history" because Plaintiff never used evidence of the Voluntary Upgrade Program to show that Defendant had the ability to recognize defects in its products and fix them. [Doc. 177 at 1]. Instead, Plaintiff used evidence of the Voluntary Upgrade Program "as a tool to invoke fear in the jury, telling the jury that if it did not 'send a message'" to Defendant because the Voluntary Upgrade Program "shows that [Defendant] will not fix a problem unless the public demands it." [Doc. 177 at 2].

Upon review and consideration, the Court concludes that it was not an error to deny Defendant's motion to preclude evidence of the Voluntary Upgrade Program. Rule 401 broadly defines relevant evidence as evidence that "has *any* tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); see United States v. Macrina, 109 F.4th 1341, 1349 (11th Cir. 2024) ("The standard for what constitutes relevant evidence is a low one." (citation omitted)). Here, the Voluntary Upgrade

Program evidences the feasibility of Defendant modifying the P320's trigger, which is relevant to the risk-utility analysis of Plaintiff's design defect claim.

Further, Federal Rule of Civil Procedure 403 does not require the exclusion of the Voluntary Upgrade Program. "'Rule 403 is an "extraordinary remedy' that the district court 'should invoke sparingly, and the balance should be struck in favor of admissibility.'" <u>Macrina</u>, 109 F.4th at 1349 (citation omitted). Under Rule 403, the Court "look[s] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." <u>Id.</u> Here, Plaintiff readily testified that he never dropped his P320; thus, there was little likelihood of confusion between Plaintiff's alleged defect and the drop safety issue that precipitated the Voluntary Upgrade Program. To the extent Defendant argues that evidence of the Voluntary Upgrade Program was unfairly prejudicial because Plaintiff's counsel used it to craft a "send a message" theme throughout Plaintiff's opening statement and closing arguments, Defendant did not object to Plaintiff's remarks or seek a curative instruction during trial.[11]

---

[11] The Court notes that Defendant moved *in limine* to preclude any commentary or suggestion regarding "sending a message" to Defendant or the community before trial. [Doc. 63 at 12]. The Court denied Defendant's motion, noting that it was lacked specificity for the Court to consider in the abstract and would have to be considered in the context in which the evidence was offered. Pretrial Conf. Tr. at 103:7–18; <u>see</u> <u>Roberts v. AAA Cooper Transportation, Inc.</u>, No. 2:17-CV-00232-RWS, 2021 WL 9031229, at *2 (N.D. Ga. Aug. 27, 2021). Defendant did not raise the issue again.

Even if the testimony at issue was erroneously admitted, a new trial should be granted only if Defendant shows that its substantial rights were affected. See Fed. R. Civ. P. 61; Pearson v. Fulton Cnty., Georgia, No. 1:08-CV-3758-WCO, 2011 WL 13183218, at *10 (N.D. Ga. Sept. 23, 2011), aff'd sub nom. Fulton Cnty., Ga. v. Pearson, 502 F. App'x 816 (11th Cir. 2012). To determine whether a party's substantial rights were affected, the Court considers "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Ad-Vantage Tel., 37 F.3d at 1465.

Here, the Voluntary Upgrade Program did not implicate a "closely disputed question." See Ewing, 2024 WL 2764391, at *1. Rather, it is entirely undisputed that Plaintiff's P320 did not contain any alleged defects related to drop safety or the Voluntary Upgrade Program. Indeed, Plaintiff himself testified that he never saw any materials about the Voluntary Upgrade Program and that he never dropped his P320. Trial Tr. vol. 3 at 567:14–568:3, 577:8–12. Further, Plaintiff's counsel never argued or suggested that Plaintiff's P320 was defective due to any drop safety concerns related to the Voluntary Upgrade Program. It is also undisputed that Plaintiff used a post-upgrade P320 pistol—which is a fact that Defendant highlighted during closing arguments. See, e.g., Trial Tr. vol. 5 at 1080:1–8 ("This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary

Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components.").

Further, and as discussed above, to the extent Defendant argues that its substantial rights were implicated by Plaintiff's counsel's focus on the Voluntary Upgrade Program to urge the jury to improperly "send a message" to Defendant with its verdict, Defendant did not object to Plaintiff's counsel's "send a message" theme during trial or seek a curative instruction. In light of the Eleventh Circuit's reluctance "to set aside a jury verdict because of an argument made by counsel during closing arguments" and the "general rule" that "a timely objection is necessary to bring to the district court's attention errors in counsel's arguments," the Court finds that Defendant has failed to meet its burden to show that its substantial rights were affected by Court admitting evidence of the Voluntary Upgrade Program. See F.D.I.C. v. Stahl, 89 F.3d 1510, 1519–20 (11th Cir. 1996); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128 (11th Cir. 1993).

### 2.    Evidence of references to the P320 as a "double action" pistol

Plaintiff reviewed various materials before purchasing his P320; however, none of those materials identified the P320 as a double action pistol. Nevertheless, Plaintiff elicited testimony about instances when Defendant's marketing materials and Defendant's lead engineer referred to the P320 as a double action pistol rather

than a single action pistol. Defendant contends that the Court's decision to allow such testimony was an evidentiary error that affected Defendant's substantial rights.

As relevant here, Plaintiff's initial trial exhibit list was filed on November 30, 2023. [Doc. 48-11]. Apparently, Defendant took issue with the overbreadth of Plaintiff's list and "raised the issue with Plaintiff's counsel several times." [Doc. 149 at 6]. However, Defendant did not raise the issue with the Court. On May 30, 2024, Plaintiff provided a draft of what eventual became Plaintiff's final exhibit list, and by that time, the March 27, 2024 deadline for filing motions *in limine* had passed. [See Doc. 122-5]. A week and a half later, on June 11, 2024, after jury selection, Defendant informed the Court that, based on Plaintiff's updated exhibit list, Defendant anticipated that Plaintiff would improperly seek to introduce evidence of materials identifying the P320 as a double action pistol. The Court indicated that any requests to preclude evidence were untimely but permitted Defendant to file a motion for the Court's consideration. See Trial Tr. vol. 1 at 229:11–232:2. The Court expressed concern that Defendant had not previously raised the issue despite filing various other motions *in limine* between May 31, 2024 and June 11, 2024. See id.

The next day, on the morning of opening statements, Defendant filed its Motion to Preclude References to Materials Identifying the P320 as a Double Action Pistol. [Doc. 122]. After confirming that Defendant had been aware of the issues

raised in the motion since May 30, 2024, the Court denied Defendant's motion and opening statements commenced. See Trial Tr. vol. 2 at 263:12–15.

By its instant motion, Defendant contends that the Court erred by allowing Plaintiff to introduce evidence referring to the P320 as a double action pistol because it was irrelevant and used as an "inflammatory attack" on Defendant's credibility, thus warranting a new trial. [Doc. 149 at 17]. The Court disagrees for at least three reasons. First, the Court acted within its discretion by denying Defendant's motion as untimely. See United States v. Fernetus, 838 F. App'x 426, 432–33 (11th Cir. 2020) ("The district court acted within its discretion in denying [the defendant's] motion on timeliness grounds, and we will not consider the merits of his motion to suppress at this stage."). Second, regardless of timeliness, the evidence was relevant to explaining the Defendant's design choices of the P320 and the credibility of Defendant's design engineer. And third, even assuming it was an error to admit this evidence, the Court discerns no basis to find that Defendant's substantial rights were affected. Accordingly, the Court is unmoved by Defendant's argument to grant a new trial on this basis.

3. <u>Plaintiff's question to Defendant's expert about his total compensation in unintended discharge cases.</u>

Prior to trial, the Court granted Defendant's motion *in limine* to preclude evidence of other unintended discharge incidents at trial after extensive briefing on the issue. [Doc. 104]. During trial, in violation of the Court's ruling, Plaintiff's

counsel asked Mr. Watkins, "How much money has your company billed to date with respect to Sig Sauer unintended discharge cases?" Trial Tr. vol. 5 at 974:25–975:3. Defendant objected, and the Court heard the Parties outside of the presence of the jury. The jury reentered, and the Court stated:

> Ladies and gentlemen, I'll remind you just briefly, from the beginning, during my preliminary instructions, I said the following: if I should sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate what the answer might have been, nor should you draw any inferences or conclusions from the question itself. And so I have sustained an objection, and we'll move forward to the next question.

See id. at 987:11–23. Plaintiff's counsel then asked Mr. Watkins, "Sir, how much has your company billed to date in its litigation work for Sig Sauer?" Id. He responded, "I don't know. I do not know," and Plaintiff's counsel continued to cross-examine him. Id.

Defendant contends that the Court's curative instruction was inadequate and compounded the prejudice of Plaintiff's violation of the Court's ruling that prohibited evidence of other unintended discharge cases. Defendant argues that the Court should have instead prohibited Plaintiff from asking Mr. Watkins about *any* compensation that he had received from Defendant in any other matter besides this case, which was the sanction Defendant requested during trial. [See Doc. 149 at 18–19]; Trial Tr. vol. 5 at 981:11–15.

The Court is unmoved by Defendant's arguments. The Court presumes "that jurors follow the instructions" given by the Court, and so the Court presumes that the jurors followed the Court's instruction not to "draw any inferences or conclusions" from Plaintiff's question to Mr. Watkins. See Macrina, 109 F.4th at 1350. Additionally, as the Court said during trial, based on the Party's representations and the Court's observations during trial, the Court does not believe that Plaintiff's counsel intended to violate the Court's prior ruling when he asked the subject question. See Trial Tr. vol. 5 at 984:16–24. Finally, the Court identifies no other reason to conclude that Plaintiff's question or the Court's curative instructions caused Defendant substantial prejudice. As the Court explained to the Parties, although the Parties knew how much time and litigation effort was expended on the issue of other similar incidents of unintended discharges, the jury did not have such context and was unlikely to be swayed by a single stray reference to other unintended discharge cases. See id. at 982:15–23. Accordingly, the Court declines to grant a new trial based on its denial of Defendant's requested sanctions.

In sum, even considering the cumulative effect of these purported evidentiary errors, the Court finds that Defendant has not met its burden of showing that its substantial rights were affected during trial. Accordingly, the Court denies Defendant's motion for a new trial. [Doc. 149].

## V.   Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages

Lastly, Defendant moves for a new trial on damages, or in the alternative, remittitur, because the jury's award is excessive, Plaintiff's arguments incited the jury to award excessive damages, and the purported *per diem* award is punitive. [Doc. 150 at 10].

### A.   Legal Standard

In addition to the above-discussed basis for granting a new trial under Rule 59(a)(1)(A), a party may move for a new trial on the grounds that "the verdict is against the weight of the evidence" or "the damages are excessive." McGinnis, Inc., 817 F.3d at 1254 (citation omitted). At this stage, the trial judge is "free to weigh the evidence." Id.

Alternatively, under Rule 59, a party may move to alter the judgment through a remittitur. Id. at 59(e). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999). "As a general rule, 'a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'" Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1266 (11th Cir. 2008) (citation omitted).

**B.      Discussion**

Defendant argues that the jury's verdict of $2,350,963.43 in compensatory damages is excessive, particularly because it is 46 times greater than Plaintiff's past medical expenses. [Doc. 150 at 1]. Defendant largely repackages its arguments raised in its Motion for a New Trial, arguing that various evidentiary errors—including admission of the Voluntary Upgrade Program, discussion of the P320 as a double action pistol, and the Court allowing Plaintiff's counsel to ask Defendant's expert questions about compensation—impermissibly swayed the jury and mandate a new trial on damages. See supra Part IV. However, for the same reasons discussed

above, Defendant has not met its burden to show that it is entitled to a new trial based on those purported errors.[12]

Thus, the only issue that remains is whether the jury's verdict exceeds "the outer limit of proof," in which case the Court must order a new trial or remit the verdict. See Rodriguez, 518 F.3d at 1266; see also Edwards v. Sears, Roebuck &

---

[12] Defendant appears to argue that it is entitled to a new trial if the damages award is found to be so excessive that it must be the result of passion or prejudice. [See Doc. 150 at 8]. However, Defendant relies on an Eleventh Circuit opinion that applies Florida law not at issue here. [Id.]; see Bravo v. United States, 532 F.3d 1154, 1161 (11th Cir. 2008). Thus, the Court need not elaborate upon its analysis discussed supra Part IV. Nevertheless, the Court notes that its conclusion is bolstered by its instructions to the jury, which were not objected to by either Party, that the jury's decision "must not be influenced in any way by either sympathy for or prejudice against any party." Trial Tr. vol. 6 at 1024:3–6; see United States v. Roy, 855 F.3d 1133, 1186 (11th Cir. 2017) ("[W]e must presume that juries follow their instructions." (emphasis added)); see also Cephus v. CSX Transportation, Inc., 771 F. App'x 883, 893 (11th Cir. 2019). Additionally, Defendant devotes much of its instant motion to objections related to Plaintiff's use of suggested per diem rates for the jury to calculate damages during closing arguments. Defendant argues that the Court failed to take necessary precautions so that Plaintiff would "not inflame the jury" with such per diem calculations. [See, e.g., Doc. 150 at 19]. However, Defendant did not object to Plaintiff's per diem calculations at trial and "thus failed to give the [C]ourt an opportunity to sustain the objection and provide immediately a curative instruction." See Cephus, 771 F. App'x at 895; see also Ruiz v. Wing, 991 F.3d 1130, 1141 (11th Cir. 2021) ("A party must raise an objection to errors in the opposing party's argument."); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993) ("Requiring timely objection prohibits counsel from 'sandbagging' the court by remaining silent and then, if the result is unsatisfactory, claiming error")). Further, while the Court is cognizant that it "must use care" to ensure that any argument for per diem damages will not "result in an excessive verdict," the Court provided such necessary "safeguards" here by twice instructing the jury that any argument by either Party's counsel was not evidence. Trial Tr. vol. 6 at 1024:20–24 ("As I said before, you must consider only the evidence that I have admitted in the case. . . . Anything the lawyers say is not evidence and is not binding on you" (emphasis added)); id. at 1134:1–10 (instructing the jury that "the arguments and anything the lawyers say is not evidence" after the jury requested to view the Parties' closing arguments and presentation slides during their deliberations); id. at 1024:3–4 ("your decision must be based only on the evidence presented here" (emphasis added)); see Showan v. Pressdee, 922 F.3d 1211, 1220 & n.8 (11th Cir. 2019); Roy, 855 F.3d at 1186; cf. Foradori v. Harris, 523 F.3d 477, 511 (5th Cir. 2008) ("[W]e have never held that a district court which allows an objected-to unit-of-time argument must sua sponte give an unrequested cautionary instruction in order to avoid reversible error.").

<u>Co.</u>, 512 F.2d 276, 283 (5th Cir. 1975)[13] (explaining that where there has been no "prejudicial error in the course of a trial," but the verdict is excessive, remittitur is the "proper remedy").

Under Georgia law,[14] "an award of damages is only excessive if it is 'so exorbitant and flagrantly outrageous as to shock the moral sense,' or if it is unsupported by the evidence." <u>Meader By & Through Long v. United States</u>, 881 F.2d 1056, 1060 (11th Cir. 1989) (quoting <u>Valdosta Housing Auth. v. Finnessee</u>, 287 S.E.2d 569, 571 (Ga. Ct. App. 1981)). The "moral sense" or "the 'conscience' to be considered is not the personal or individual conscience of any particular judicial officer; rather, it is the judicial conscience, which is always offended by jury verdicts that are so irrational as to be the apparent result of bias, corruption, or prejudice." <u>Rockdale Hosp., LLC v. Evans</u>, 834 S.E.2d 77, 81 (Ga. 2019). Moreover, when as here, a significant amount of an award is for pain and suffering damages, such award

> is governed by no other standard than the enlightened conscience of impartial jurors. And the defendant has a heavy burden . . . to establish that such a damage award is excessive. In particular, appellate courts should be hesitant to second-guess verdicts where the damage award is

---

[13] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. <u>See</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[14] In reviewing a compensatory damages award on a state law claim, the Court evaluates the propriety of the award under state law. <u>Kerrivan v. R.J. Reynolds Tobacco Co.</u>, 953 F.3d 1196, 1204 n.6 (11th Cir. 2020); <u>see also</u> <u>Faulkner v. W. Elec. Co.</u>, 98 F.R.D. 282, 283–84 (N.D. Ga. 1983) ("In the Eleventh Circuit the question of whether or not to grant a new trial or order remittitur in a diversity case is not governed solely by federal law, but instead presents a mixed issue of state and federal law.").

based in any significant part on pain and suffering. Therefore, for this Court to overturn the jury's verdict, it must be so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake by the jurors.

Georgia Trails & Rentals, Inc. v. Rogers, 855 S.E.2d 103, 116–17 (Ga. Ct. App. 2021). In determining whether a verdict is excessive, "it is appropriate to compare the award with awards in similar cases."[15] Meader, 881 at 1060 n.10.

Here, Defendant argues that the outer limit of the law necessitates a reduction of Plaintiff's pain and suffering award from $2,300,000 to $500,000, bringing the total jury award to $550,963.43. In support, Defendant cites various cases upholding pain and suffering awards that are approximately ten times plaintiff's past medical expenses or specific damages. [See Doc. 150 at 11–15]. However, the mere fact that some cases have upheld such awards does not necessarily create a ceiling for other pain and suffering awards or suggest that pain and suffering awards should be limited to a certain multiplier of specific damages. Indeed, the Court of Appeals of Georgia has outright rejected such a proposition. See Smith v. Crump, 476 S.E.2d 817, 821 (Ga. Ct. App. 1996) ("Under Georgia law, pain and suffering in the past,

---

[15] In Chrysler Group, LLC v. Walden, the Court of Appeals of Georgia stated that "no cases are exactly alike, so it may not be relevant to merely compare cases." 792 S.E.2d 754, 768 (Ga. Ct. App. 2016). The case was appealed, and the Georgia Supreme Court was poised to address whether the Court of Appeals "erred in failing to consider prior awards in similar cases to determine whether the remitted award of damages was excessive." See Chrysler Grp., LLC v. Walden, 812 S.E.2d 244, 248 (Ga. 2018). However, upon "review of the record and full briefing," the Supreme Court of Georgia "conclude[d] that this issue does not warrant [its] review." Id. at 255 n.6.

present, and future are measured by the enlightened conscience of a fair and impartial jury. There exists no rule or yardstick against which damages for pain and suffering are to be measured, as suggested by the appellant, who would have such damages as some multiple of special damage.").

Upon review and consideration, the Court finds no justification to set aside or remit the jury's verdict.[16] Moody v. Dykes, 496 S.E.2d 907, 912 (Ga. 1998) (noting that the threshold to set aside a jury verdict is "extremely high"). The jury made its award "in its enlightened conscience" and based upon proper evidence. Id. Although

---

[16] The Court acknowledges that the jury's award for past pain and suffering is strikingly similar to Plaintiff's counsel's *per diem* argument. Plaintiff's counsel suggested an award of $1,600,000 for past pain and suffering based on his suggested *per diem* calculations, which were partly tied to Defendant's expert's hourly rates. See Trial Tr. vol. 5 at 1066:18–22, 1067:13–1068:1. The jury awarded $1,610,000. In contrast, when it came to future pain and suffering, the jury deviated from Plaintiff's counsel's suggestion—awarding $690,000 instead of the suggested amount of $925,000. See id. at 1068:2–7. While the similarity of the verdict raises an inference that the jury's verdict was influenced by Plaintiff's counsel's argument, the Eleventh Circuit decisively instructs that the court "must" presume the jury followed the Courts instructions that nothing Plaintiff's counsel said was evidence and that the jury reached its verdict solely based on the admitted evidence in this case. See Roy, 855 F.3d at 1186–87 ("We can, should, and must presume that the jury followed [the court's] instructions[.]"); Trial Tr. vol. 6 at 1024:20–24; 1134:1–10 (the Court's instructions). This presumption is supported by the fact that the jury did not wholesale adopt Plaintiff's counsel's suggested verdict, but it instead awarded a lower amount of damages for future pain and suffering—which aligns with Plaintiff's testimony that many of his physical and emotional difficulties have improved over time. See, e.g., Trial Tr. vol. 3 at 554:1–16; 557:22–25; 559:5–13; 586:20–25. Thus, given the Court's instructions in this case, the Court concludes that the similarity between the Plaintiff's counsel's *per diem* closing argument and the jury's award does not render the verdict "so irrational as to be the apparent result of bias, corruption," or "gross mistake." See Rockdale Hosp., 834 S.E.2d at 81; Georgia Trails, 855 S.E.2d at 117; see also Showan, 922 F.3d at 1220 (noting that *per diem* arguments are governed by federal procedure and "the district court has complete discretion to disallow the argument or to allow it subject to safeguards").

the precise basis for the jury's decision can never be known, there is extensive

evidence supporting the jury's verdict. For example,

- The unintentional discharge left "a gaping hole on [Plaintiff's] right thigh." Trial Tr. vol. 3 at 531:24. He found the wound "when [his] finger dropped into" the hole, and he felt "one of the most severe pains" he had "ever felt in [his] life." Id. at 531:24–532:4. The jury saw a photo of the wound. [See Doc. 147-3]. The jury heard that the bullet in the gun "expanded" on impact "and tore the muscle and every bit of tissue and shot it out of the front of [his] thigh." Trial Tr. vol. 3 at 540:19–541:3. Yet despite the pain, Plaintiff was concerned not about himself, but "what could have happened" when his two-year old son came up to hug him moments before, and "that bullet could have been in his head." Id. at 532:18–24.

- Plaintiff's wife called 911, and Plaintiff waited what "felt like an eternity" for them to arrive. Id. at 536:12. The first responders took Plaintiff to the hospital, where he "suffered for a good bit" until "they were able to give pain medication to [him]." Id. at 539:14–24. And because "[t]here wasn't any tissue to suture," Plaintiff could do little but bandage the wound. Id. at 542:15–24. The pain "started getting worse and worse and worse." Id. at 544:1–2.

- Plaintiff was eventually discharged, but a few days later, he "spiked a 102-degree fever" and returned to the emergency room because he contracted sepsis. Id. at 545:4–11. The doctors "feared that [he] might not make it." Id. at 545:11. The bullet wound pain didn't "even compare to the pain of that infection," which Plaintiff testified felt like "a burning pain across [his] entire body that was just so relentless and never-ending. . . . [N]o matter what pain medication they gave [him], nothing would give [him] comfort." Id. at 545:13–19. He didn't sleep "for days" because it was so "unbearable." Id. at 545:19–20. He spent three days in the ICU and longer in the hospital in a "regular room" in the days leading up to Christmas. Id. at 545:22–23.

- Plaintiff wanted to get back home to spend Christmas with his son. His doctors ultimately agreed to let him leave if he went "to an outpatient infectious disease doctor to continue" antibiotic treatments. Id. at 546:3–8. Plaintiff also had to self-administer "high-powered IV antibiotics" to himself at home. Id. at 548:5–6. The antibiotics caused "throwing up, nausea, other stomach ailments that were pretty miserable on top of the pain." Id. at 548:21–22. Because of all this, Plaintiff was "physically unable to get" to enjoy Christmas

with his family, and he could not "experience Christmas at all in the way that [he] wanted to" or that his "son wanted [him] to be able to." Id. at 550:8–22.

- Plaintiff had a slow recovery. His wound "bled for six months . . . because of that severe infection that [he] contracted." Id. at 552:15–18. To help the wound heal, he had to undergo "debriding," "chemically burning any dead tissue from the surrounding area of the wound so that new tissue can begin to grow." Id. at 549:2–6. Plaintiff called it "one of the most excruciating things [he's] ever felt in [his] life" as his doctors "use[d] some sort of acid and literally just burn and boil that dead tissue." Id. at 549:8–11. And once his doctors used the acid, they "use[d] special tools [to] cut and scrape that burnt tissue off." Id. at 549:12–13. That went on "for weeks and weeks to try to get that wound to close up." Id. at 549:15–16. Plaintiff was "basically bedridden through that entire process" due to the pain. Id. at 549:25–550:1.

- While this went on, Plaintiff could not get around because he "couldn't bear hardly any weight on his leg." Id. at 551:2–10. He "couldn't drive," so his mother or wife had to take him to medical appointments. Id. at 551:6–7. He had to use crutches for six months. Id. at 551:18–20. He couldn't work, so his employer gave him a leave of absence. Id. at 551:11–17.

- After the crutches, Plaintiff started "doing physical therapy," and he "also went to using a cane" for a year after he got off crutches. Id. at 551:23–552:2. The injury changed "the way that [he] walk[ed] . . . pretty dramatically," because he "favor[ed] the other leg." Id. at 552:2–4. The change to his gait gave him "foot problems" and "pain associated with that as well." Id. at 552:4–7.

- Plaintiff also testified about the impact on his mental health. He "definitely suffered from PTSD" and "had extreme heightened anxiety." Id. at 553:9–10. He has "reoccurring nightmares constantly about that bullet striking [his] son." Id. at 554:10–11. Plaintiff still "struggle[s]" with nightmares, although they are "better now" and do not happen as often as they did in the beginning when he would have them "every single night for months and months and months." Id. at 554:11–16. Plaintiff's anxiety affected his work and "[l]oud noises would make [him] jump." Id. at 553:16–18. For "two years after the incident," he was unable to be "present there mentally for [his] son." Id. at 557:17–19. The incident "robbed [Plaintiff] of a lot of time with" his son. Id. at 557:14.

- Additionally, although Plaintiff testified that he no longer experiences any physical limitations as a result of the incident, he suffers nerve damage that "is never going to go away." Trial Tr. vol. 3 at 554:2, 586:20–25. This nerve damage includes "electrical pains" that "randomly shoot" "from the vicinity of [his] wounds all the way up into [his hip]" and "kind of feel" like he is "being struck again." Id. at 554:1–11, 559:11–13. Plaintiff also still has no "feeling on the actual wounds themselves." Id. at 556:17.

Thus, based on this evidence, the Court finds that the jury's verdict is not "so exorbitant and flagrantly outrageous as to shock the moral sense" or "create a *clear* implication of bias, prejudice, or gross mistake by the jurors." Meader, 881 F.2d at 1060; Georgia Trails, 855 S.E.2d at 117 (Ga. Ct. App. 2021) (emphasis added). Accordingly, the Court denies Defendant's motion. [Doc. 150].

## VI.    Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151].

**SO ORDERED**, this 6th day of February, 2025.

Eleanor L. Ross
United States District Judge
Northern District of Georgia