4months,APPEAL,AVEXH,CLOSED,ELRLC4,EXH,SUBMDJ

# U.S. District Court
# Northern District of Georgia (Atlanta)
# CIVIL DOCKET FOR CASE #: <u>1:21–cv–04196–ELR</u>

| | |
|---|---|
| Lang v. Sig Sauer, Inc. | Date Filed: 10/11/2021 |
| Assigned to: Judge Eleanor L. Ross | Date Terminated: 06/24/2024 |
| Case in other court:　　　State Court of Fulton County, | Jury Demand: Both |
| 　　　　　　　21EV005070 | Nature of Suit: 365 Personal Inj. Prod. |
| Cause: 28:1441 Petition for Removal– Product Liability | Liability |
| | Jurisdiction: Diversity |

**<u>Plaintiff</u>**

**Robert Lang**　　　　　　　　　　represented by　**Daniel Ceisler**
Saltz Mongeluzzi Bendesky P.C.
One Liberty Place
52nd Floor
1650 Market Street
Philadelphia, PA 19103
215–575–2965
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Preston Bonham , Sr**
Protentis Law LLC
5855 Sandy Springs Cir Ste 350
Atlanta, GA 30328
404–889–7835
Email: matt@protentislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nick T. Protentis**
Protentis Law LLC
5855 Sandy Springs Circle
Suite 350
Atlanta, GA 30328
404–835–5222
Email: NICK@PROTENTISLAW.COM
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W. Zimmerman**
Saltz Mongeluzzi Bendesky P.C.
One Liberty Place
52nd Floor
1650 Market Street
Philadelphia, PA 19103
215–575–3898

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan D. Hurd**
Saltz Mongeluzzi Bendesky P.C.
One Liberty Place
52nd Floor
1650 Market Street
Philadelphia, PA 19103
856–778–8888
Fax: 856–778–9405
Email: rhurd@smbb.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Sellers**
Bondurant Mixson & Elmore LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404–881–4186
Email: sellers@bmelaw.com
*ATTORNEY TO BE NOTICED*

**Naveen Ramachandrappa**
Bondurant Mixson & Elmore, LLP
1201 West Peachtree Street, N.W.
Ste 3900
Atlanta, GA 30309–3417
404–881–4151
Email: ramachandrappa@bmelaw.com
*ATTORNEY TO BE NOTICED*

**Robert A. Zimmerman**
Saltz Mongeluzzi & Bendesky
1650 Market Street 52nd Floor
Philadelphia, PA 19103
215–575–3898
Fax: 215–496–0999
Email: rzimmerman@smbb.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Sig Sauer, Inc.                     represented by  **Andrew D. Horowitz**
Drew Eckl & Farnham, LLP – ATL
Suite 3500
303 Peachtree Street NE

Atlanta, GA 30308
404–885–1400
Email: horowitza@deflaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Keith Gibson**
Littleton Joyce Ughetta Park & Kelly, LLP
4 Manhattanville Road
Suite 202
Purchase, NY 10577
212–404–5777
Email: keith.gibson@littletonjoyce.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan T. Woy**
Littleton Park Joyce Ughetta & Kelly, LLP
201 King of Prussia Road
Suite 220
Radnor, PA 19087
717–491–0891
Email: jwoy@vscplaw.com
*TERMINATED: 08/08/2024*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Kristen Elizabeth Dennison**
Littleton Joyce Ughetta & Kelly LLP
2460 N Courtenay Pkwy,
Suite 24
Merritt Island, FL 32953
321–574–0280
Fax: 321–574–4054
Email: kristen.dennison@littletonjoyce.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stevan Anthony Miller**
Drew Eckl & Farnham, LLP – ATL
Suite 3500
303 Peachtree Street NE
Atlanta, GA 30308
404–885–1400
Fax: 404–876–0992
Email: millers@deflaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2021 | 1 | NOTICE OF REMOVAL with COMPLAINT filed by Sig Sauer, Inc.. (Filing fee $ 402.00 receipt number AGANDC–11317537) (Attachments: # 1 Exhibit –A –S. Shawver Declaration, # 2 Exhibit –B –Complaint, # 3 Exhibit –C –Plaintiff's Summons, # 4 Exhibit –D –Acknowledgment of Service, # 5 Exhibit –E –Plaintiff's Demand, # 6 Exhibit –F –Notice of Filing Notice of removal, # 7 Civil Cover Sheet)(eop) Please visit our website at http://www.gand.uscourts.gov/commonly–used–forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 10/13/2021) |
| 10/13/2021 | 2 | *Defendant's* ANSWER to 1 NOTICE OF REMOVAL with Jury Demand by Sig Sauer, Inc.. Discovery ends on 3/14/2022.(Horowitz, Andrew) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 10/13/2021) |
| 10/13/2021 | 3 | Certificate of Interested Persons and Corporate Disclosure Statement by Sig Sauer, Inc. identifying Corporate Parent Sig Sauer US Holding LP, Corporate Parent L&O Finance GmbH, Other Affiliate Sig Sauer, Inc. for Sig Sauer, Inc.. (Horowitz, Andrew) (Entered: 10/13/2021) |
| 10/20/2021 | 4 | APPLICATION for Admission of Brian Keith Gibson Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11341627).by Sig Sauer, Inc.. (Attachments: # 1 Text of Proposed Order Proposed Order of Admission)(Horowitz, Andrew) Documents for this entry are not available for viewing outside the courthouse. (Entered: 10/20/2021) |
| 10/20/2021 | 5 | APPLICATION for Admission of Kristen Elizabeth Dennison Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11341632).by Sig Sauer, Inc.. (Attachments: # 1 Text of Proposed Order Proposed Order of Admission)(Horowitz, Andrew) Documents for this entry are not available for viewing outside the courthouse. (Entered: 10/20/2021) |
| 10/25/2021 | | APPROVAL by Clerks Office re: 4 APPLICATION for Admission of Brian Keith Gibson Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11341627).. Attorney Brian Keith Gibson added appearing on behalf of Sig Sauer, Inc. (nmb) (Entered: 10/25/2021) |
| 10/25/2021 | | APPROVAL by Clerks Office re: 5 APPLICATION for Admission of Kristen Elizabeth Dennison Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11341632).. Attorney Kristen Elizabeth Dennison added appearing on behalf of Sig Sauer, Inc. (nmb) (Entered: 10/25/2021) |
| 10/26/2021 | 6 | ORDER granting 4 Application for Admission Pro Hac Vice of Brian Keith Gibson. Signed by Judge Charles A. Pannell, Jr. on 10/26/2021. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(ayw) (Entered: 10/26/2021) |
| 10/26/2021 | 7 | ORDER granting 5 Application for Admission Pro Hac Vice of Kristen Elizabeth Dennison.. Signed by Judge Charles A. Pannell, Jr. on 10/26/2021. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(ayw) (Entered: 10/26/2021) |

| 11/09/2021 | 8 | Initial Disclosures by Sig Sauer, Inc..(Horowitz, Andrew) (Entered: 11/09/2021) |
|---|---|---|
| 11/10/2021 | 9 | JOINT PRELIMINARY REPORT AND DISCOVERY PLAN filed by Robert Lang. (Bonham, Matthew) (Entered: 11/10/2021) |
| 11/10/2021 | 10 | SCHEDULING ORDER – Upon review of the information contained in the Joint Preliminary Planning Report, the court orders that the time limits for adding parties, amending pleadings, filing motions, completing discovery, and discussing settlement are as stated in the completed form [Doc. No. 9 ] except as herein modified. This case shall proceed on an 8–month discovery track. Daubert motions with regard to expert testimony shall be filed no later than 30 days after the close of discovery. Signed by Judge Charles A. Pannell, Jr. on 11/10/2021. (tcc) (Entered: 11/10/2021) |
| 11/10/2021 | 11 | Initial Disclosures by Robert Lang.(Bonham, Matthew) (Entered: 11/10/2021) |
| 11/23/2021 | 12 | CERTIFICATE OF SERVICE *Local Rule 26.3* by Robert Lang.(Bonham, Matthew) (Entered: 11/23/2021) |
| 11/24/2021 | 13 | CERTIFICATE OF SERVICE *Regarding Discovery* by Sig Sauer, Inc..(Horowitz, Andrew) (Entered: 11/24/2021) |
| 01/07/2022 | 14 | CERTIFICATE OF SERVICE *of Discovery* by Sig Sauer, Inc..(Horowitz, Andrew) (Entered: 01/07/2022) |
| 01/14/2022 | 15 | CERTIFICATE OF SERVICE by Robert Lang.(Bonham, Matthew) (Entered: 01/14/2022) |
| 02/11/2022 | 16 | NOTICE to Take Deposition of Robert Lang filed by Sig Sauer, Inc. (Horowitz, Andrew) (Entered: 02/11/2022) |
| 02/11/2022 | 17 | APPLICATION for Admission of Jonathan Woy Pro Hac Vice (Application fee $ 150, receipt number BGANDC–11588091).by Sig Sauer, Inc.. (Attachments: # 1 Text of Proposed Order Proposed Order of Admission)(Horowitz, Andrew) Documents for this entry are not available for viewing outside the courthouse. (Entered: 02/11/2022) |
| 02/17/2022 | | APPROVAL by Clerks Office re: 17 APPLICATION for Admission of Jonathan Woy Pro Hac Vice (Application fee $ 150, receipt number BGANDC–11588091).. Attorney Jonathan Woy added appearing on behalf of Sig Sauer, Inc. (gas) (Entered: 02/17/2022) |
| 02/17/2022 | 18 | ORDER granting 17 Application for Admission of Jonathan Woy Pro Hac Vice. Signed by Judge Charles A. Pannell, Jr. on 2/17/2022. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(tcc) (Entered: 02/17/2022) |
| 02/17/2022 | | Clerk's Certificate of Mailing as to Jonathan Woy re 18 Order on Application for Admission PHV. (tcc) (Entered: 02/17/2022) |
| 07/01/2022 | 19 | Consent MOTION for Extension of Time to Complete Discovery by Robert Lang. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Extension of Discovery Period)(Bonham, Matthew) (Entered: 07/01/2022) |
| 07/01/2022 | 20 | ORDER granting 19 Motion for Extension of Time to Complete Discovery. Discovery ends on 11/18/2022. The parties are ORDERED to submit a detailed schedule outlining their plans for completing all discovery between now and November 18, 2022 within fourteen days of the date of this order. Signed by Judge |

| | | Charles A. Pannell, Jr. on 7/1/2022. (tcc) (Entered: 07/01/2022) |
|---|---|---|
| 07/15/2022 | 21 | RESPONSE re 20 Order on Motion for Extension of Time to Complete Discovery, *Schedule for Completing Discovery* filed by Robert Lang. (Bonham, Matthew) (Entered: 07/15/2022) |
| 07/15/2022 | 22 | ORDER – The court HEREBY APPROVES the schedule proposed by the parties [Doc. No. 21 ]. Signed by Judge Charles A. Pannell, Jr. on 7/15/2022. (tcc) (Entered: 07/15/2022) |
| 08/01/2022 | 23 | APPLICATION for Admission of Daniel L. Ceisler Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11965102).by Robert Lang. (Bonham, Matthew) Documents for this entry are not available for viewing outside the courthouse. (Entered: 08/01/2022) |
| 08/01/2022 | 24 | APPLICATION for Admission of Robert W. Zimmerman Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11965136).by Robert Lang. (Bonham, Matthew) Documents for this entry are not available for viewing outside the courthouse. (Entered: 08/01/2022) |
| 08/05/2022 | | APPROVAL by Clerks Office re: 24 APPLICATION for Admission of Robert W. Zimmerman Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11965136). Attorney Robert W. Zimmerman added appearing on behalf of Robert Lang (cdg) (Entered: 08/05/2022) |
| 08/05/2022 | | APPROVAL by Clerks Office re: 23 APPLICATION for Admission of Daniel L. Ceisler Pro Hac Vice (Application fee $ 150, receipt number AGANDC–11965102).. Attorney Daniel Ceisler added appearing on behalf of Robert Lang (cdg) (Entered: 08/05/2022) |
| 08/08/2022 | 25 | ORDER granting 23 Application for Admission of Daniel L. Ceisler Pro Hac Vice. Signed by Judge Charles A. Pannell, Jr. on 8/8/2022. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(tcc) (Entered: 08/08/2022) |
| 08/08/2022 | 26 | ORDER granting 24 Application for Admission of Robert W. Zimmerman Pro Hac Vice. Signed by Judge Charles A. Pannell, Jr. on 8/8/2022. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(tcc) (Entered: 08/08/2022) |
| 08/08/2022 | | Clerk's Certificate of Mailing as to Daniel L. Ceisler re 25 Order on Application for Admission PHV. (tcc) (Entered: 08/08/2022) |
| 08/08/2022 | | Clerk's Certificate of Mailing as to Robert W. Zimmerman re 26 Order on Application for Admission PHV. (tcc) (Entered: 08/08/2022) |
| 12/09/2022 | 27 | Joint MOTION for Extension of Time Extend Certain Deadlines by Sig Sauer, Inc.. (Horowitz, Andrew) (Entered: 12/09/2022) |
| 12/13/2022 | 28 | ORDER granting 27 Joint MOTION for Extension of Time Extend Certain Deadlines . The plaintiff's rebuttal expert report to be served by 12/28/2022; All expert depositions to be completed by 01/17/2023; and All dispositive motions and/or Daubert motions to be filed by 02/01/2023. Signed by Judge Charles A. Pannell, Jr. on 12/13/2022. (jkb) (Entered: 12/13/2022) |

| 02/01/2023 | 29 | MOTION for Summary Judgment with Brief In Support by Sig Sauer, Inc.. (Attachments: # 1 Brief Brief in Support of Motion, # 2 Statement of Material Facts Statement of Undisputed Material Facts, # 3 Exhibit Declaration of Defendant's Counsel, # 4 Exhibit Plaintiff's Complaint, # 5 Exhibit Robert Lang Deposition Excerpts, # 6 Exhibit Tertin Report, # 7 Exhibit Vigilante Report, # 8 Exhibit James Tertin Deposition, # 9 Exhibit William Vigilante Deposition, # 10 Exhibit Tertin Deposition in Slatowski, # 11 Exhibit Vigilante Deposition in Slatowski, # 12 Exhibit Derek Watkins Report, # 13 Exhibit ICE Paper, # 14 Exhibit Court Order in Frankenberry)(Horowitz, Andrew) ––Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.–– (Entered: 02/01/2023) |
| 02/01/2023 | 30 | MOTION to Exclude Evidence and Opinions of James Tertin with Brief In Support by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Declaration of Defendant's Counsel, # 2 Exhibit Plaintiff's Complaint, # 3 Exhibit Robert Lang Deposition Excerpts, # 4 Exhibit James Tertin Report, # 5 Exhibit William Vigilante Report, # 6 Exhibit James Tertin Deposition, # 7 Exhibit William Vigilante Deposition, # 8 Exhibit Tertin Deposition in Slatowski, # 9 Exhibit Vigilante Deposition in Slatowski, # 10 Exhibit Derek Watkins Report, # 11 Exhibit ICE Paper, # 12 Exhibit Court Order in Frankenberry)(Horowitz, Andrew) (Entered: 02/01/2023) |
| 02/01/2023 | 31 | MOTION to Exclude Evidence and Opinions of William Vigilante with Brief In Support by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Declaration of Defendant's Counsel, # 2 Exhibit Plaintiff's Complaint, # 3 Exhibit Robert Lang Deposition Excerpts, # 4 Exhibit James Tertin Report, # 5 Exhibit William Vigilante Report, # 6 Exhibit James Tertin Deposition, # 7 Exhibit William Vigilante Deposition, # 8 Exhibit Tertin Deposition in Slatowski, # 9 Exhibit Vigilante Deposition in Slatowski, # 10 Exhibit Derek Watkins Report, # 11 Exhibit ICE Paper, # 12 Exhibit Court Order in Frankenberry)(Horowitz, Andrew) (Entered: 02/01/2023) |
| 02/21/2023 | | Submission of 30 MOTION to Exclude Evidence and Opinions of James Tertin, 29 MOTION for Summary Judgment , 31 MOTION to Exclude Evidence and Opinions of William Vigilante, to District Judge Charles A. Pannell Jr.. (bnw) (Entered: 02/21/2023) |
| 02/22/2023 | 32 | RESPONSE re 29 MOTION for Summary Judgment filed by Robert Lang. (Attachments: # 1 Statement of Material Facts, # 2 Statement of Material Facts, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P)(Zimmerman, Robert) (Entered: 02/22/2023) |
| 02/22/2023 | 33 | NOTICE by Robert Lang *WITHDRAWAL OF PLAINTIFF'S RESPONSE TO DEFENDANT SIG SAUER, INC'S MOTION FOR SUMMARY JUDGEMENT* (Zimmerman, Robert) (Entered: 02/22/2023) |
| 02/22/2023 | 34 | RESPONSE re 30 MOTION to Exclude Evidence and Opinions of James Tertin filed by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Zimmerman, Robert) (Entered: 02/22/2023) |
| 02/22/2023 | 35 | RESPONSE re 31 MOTION to Exclude Evidence and Opinions of William Vigilante filed by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Zimmerman, |

| | | Robert) (Entered: 02/22/2023) |
|---|---|---|
| 02/22/2023 | 36 | RESPONSE re 29 MOTION for Summary Judgment *AMENDED* filed by Robert Lang. (Attachments: # 1 Statement of Material Facts, # 2 Statement of Material Facts, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O)(Zimmerman, Robert) (Entered: 02/22/2023) |
| 03/08/2023 | 37 | REPLY to Response to Motion re 29 MOTION for Summary Judgment filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Lang Deposition Excerpts, # 2 Exhibit Tertin Deposition Excerpts (Slatowski), # 3 Exhibit Vigilante Deposition Excerpts (Slatowski))(Horowitz, Andrew) (Entered: 03/08/2023) |
| 03/08/2023 | 38 | REPLY to Response to Motion re 31 MOTION to Exclude Evidence and Opinions of William Vigilante filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Post Article, # 2 Exhibit LA Sheriff's Report, # 3 Exhibit Watkins' Report, # 4 Exhibit Vigilante Depo Excerpts (Slatowski), # 5 Exhibit Vigilante Depo Excerpts, # 6 Exhibit Cayton Depo Excerpts, # 7 Exhibit Cayton Report)(Horowitz, Andrew) (Entered: 03/08/2023) |
| 03/08/2023 | 39 | REPLY BRIEF re 30 MOTION to Exclude Evidence and Opinions of James Tertin filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Post Article, # 2 Exhibit LA Sheriff's Report, # 3 Exhibit Watkins' Report, # 4 Exhibit Tertin Deposition Excerpts)(Horowitz, Andrew) (Entered: 03/08/2023) |
| 03/15/2023 | | Submission of 30 MOTION to Exclude Evidence and Opinions of James Tertin, 29 MOTION for Summary Judgment , 31 MOTION to Exclude Evidence and Opinions of William Vigilante, to District Judge Charles A. Pannell Jr.. (bnw) (Entered: 03/15/2023) |
| 03/15/2023 | | NOTICE of TELECONFERENCE–STATUS CONFERENCE: Status Conference set for 3/22/2023 at 01:30 PM in before Judge Charles A. Pannell Jr. (bnw) Modified on 3/15/2023 to edit text (bnw). (Entered: 03/15/2023) |
| 03/22/2023 | 40 | Minute Entry for proceedings held before Judge Charles A. Pannell, Jr.: Telephone Conference held on 3/22/2023. The court discussed the status of the parties' cases in other jurisdictions. The court directed the parties to notice the court of any Daubert motion rulings in other jurisdictions. (Court Reporter Penny Coudriet)(rsg) (Entered: 03/22/2023) |
| 03/28/2023 | 41 | ORDER REASSIGNING CASE. Case reassigned to Judge Eleanor L. Ross for all further proceedings. Judge Charles A. Pannell, Jr. no longer assigned to case. NOTICE TO ALL COUNSEL OF RECORD: The Judge designation in the civil action number assigned to this case has been changed to 1:21–cv–04196–ELR. Please make note of this change in order to facilitate the docketing of pleadings in this case. Signed by Judge Charles A. Pannell, Jr. on 03/28/2023. (rsg) (Entered: 03/29/2023) |
| 03/29/2023 | | Submission of 29 MOTION for Summary Judgment, 30 MOTION to Exclude Evidence and Opinions of James Tertin, 31 MOTION to Exclude Evidence and Opinions of William Vigilante, to District Judge Eleanor L. Ross. (rsg) (Entered: 03/29/2023) |
| 03/29/2023 | 42 | NOTICE FROM THE COURT: INSTRUCTIONS FOR CIVIL CASES ASSIGNED TO THE HONORABLE ELEANOR L. ROSS. (mlb) (Entered: 03/29/2023) |
| 03/29/2023 | | |

| | | |
|---|---|---|
| | | Clerk's Certificate of Mailing to Attorneys Daniel Ceisler and Robert Zimmerman as to Robert Lang re 42 Order. (mlb) (Entered: 03/29/2023) |
| 09/13/2023 | 43 | NOTICE of Supplemental Authority re 31 MOTION to Exclude Evidence and Opinions of William Vigilante with Brief In Support by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Herman Order)(Horowitz, Andrew) Modified to edit event text on 9/15/2023 (ces). (Entered: 09/13/2023) |
| 09/15/2023 | 44 | ORDER: The Court ORDERS Plaintiff Robert Lang to file any response he may have to Defendant's "Notice of Supplemental Authority" no later than September 20, 2023. The Court further ORDERS that Defendant is not permitted to file a reply to any response Plaintiff may file. Signed by Judge Eleanor L. Ross on 9/15/23. (ces) (Entered: 09/18/2023) |
| 09/19/2023 | 45 | RESPONSE re 43 NOTICE of Supplemental Authority 31 MOTION to Exclude Evidence and Opinions of William Vigilante filed by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Zimmerman, Robert) Modified to edit text on 9/19/2023 (ces). (Entered: 09/19/2023) |
| 09/28/2023 | 46 | ORDER: The Court GRANTS IN PART AND DENIES IN PART Defendant's "Rule 702 Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert, James Tertin." 30 . The Court likewise GRANTS IN PART AND DENIES IN PART Defendant's "Rule 702 Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert William Vigilante." 31 . Next, the Court GRANTS IN PART AND DENIES IN PART Defendant's "Motion for Summary Judgment." 29 . The Court ENTERS JUDGMENT in favor of Defendant on each of Plaintiff's claims to the extent those claims are based on Defendant's failure to equip the Gun with a manual thumb safety and GRANTS Defendant's summary judgment motion to the extent it seeks that relief. The Court DENIES the motion in all respects. Finally, the Court ORDERS the Parties to, within thirty (30) days of the date of this order, file a proposed consolidated pretrial order. Signed by Judge Eleanor L. Ross on 9/28/23. (ces) (Entered: 09/28/2023) |
| 10/18/2023 | 47 | Joint MOTION for Extension of Time for Deadline for Filing Proposed Consolidated Pretrial Order by Sig Sauer, Inc.. (Horowitz, Andrew) (Entered: 10/18/2023) |
| 10/19/2023 | 48 | ORDER granting 47 Motion for Extension of Time for Filing Proposed Consolidated Pretrial Order. The deadline for the parties to file a proposed consolidated pretrial order is extended to November 30, 2023. Signed by Judge Eleanor L. Ross on 10/19/23. (ces) (Entered: 10/20/2023) |
| 10/19/2023 | | Set/Reset Scheduling Order Deadlines: Proposed Consolidated Pretrial Order due by 11/30/2023. (ces) (Entered: 10/20/2023) |
| 11/30/2023 | 49 | Proposed Pretrial Order *Consolidated* by Robert Lang. (Attachments: # 1 Exhibit Pltf Voir Dire General, # 2 Exhibit Def Voir Dire Legal Qualification, # 3 Exhibit Pltf Voir Dire Specific, # 4 Exhibit Def Voir Dire General, # 5 Exhibit Pltf Statement of the Case, # 6 Exhibit Def Statement of the Case, # 7 Exhibit Pltf Proposed Stipulated Facts, # 8 Exhibit Def Proposed Stipulated Facts, # 9 Exhibit Pltf Witness List, # 10 Exhibit Def Witness List, # 11 Exhibit Pltf Evidence List, # 12 Exhibit Def Evidence List, # 13 Exhibit Pltf Trial Briefs, # 14 Exhibit Def Trial Briefs, # 15 Exhibit Pltf Verdict Form, # 16 Exhibit Def Verdict Form)(Zimmerman, Robert) (Entered: 11/30/2023) |
| 01/24/2024 | 50 | |

| | | |
|---|---|---|
| | | NOTICE SETTING TRIAL: This case is hereby set for a JURY TRIAL to begin on TUESDAY, JUNE 11, 2024 at 9:00 a.m. in Courtroom 1708, United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, GA 30303, before District Judge Eleanor L. Ross. The pretrial conference and motions in limine hearing is set for WEDNESDAY, MAY 8, 2024 at 10:00 a.m. in Courtroom 1708, United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, GA 30303. Any motions in limine are due WEDNESDAY, MARCH 27, 2024. Any responses to motions in limine and if not already submitted, proposed voir dire questions are due by WEDNESDAY, APRIL 10, 2024. Replies are due WEDNESDAY, APRIL 24, 2024. If not already submitted, the parties are directed to submit a joint proposed verdict form and any objections to voir dire questions by WEDNESDAY, APRIL 24, 2024; if the parties cannot agree on a verdict form, they are directed to submit separate verdict forms. (mlb) (Entered: 01/24/2024) |
| 01/24/2024 | | Clerk's Certificate of Mailing TO Attorneys Daniel Ceisler and Robert Zimmerman as to Robert Lang re 50 Notice setting Trial. (mlb) (Entered: 01/24/2024) |
| 03/27/2024 | 51 | MOTION in Limine TO PRECLUDE SIG SAUER EMPLOYEES OR EXPERT WITNESSES FROM TESTIFYING ABOUT CUSTOMER PREFERENCES REGARDING TABBED TRIGGER SAFETIES with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit A– Toner Testimony, # 2 Exhibit B–Farkas Testimony)(Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 52 | MOTION in Limine TO PRECLUDE ADMISSION OF ANY EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING LACK OR LIMITATION OF OTHER SIMILAR ACCIDENTS with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit A–Tokajer Deposition Excerpt, # 2 Exhibit B– Meyer Deposition Excerpt)(Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 53 | MOTION in Limine TO PRECLUDE EVIDENCE OF COMPLIANCE WITH DROP AND/OR ABUSE TESTING STANDARDS with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit A– SIG Answers to Plaintiffs RPDS)(Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 54 | MOTION in Limine TO PRECLUDE SIG SAUER FROM INTRODUCING OR ELICITING TESTIMONY FROM FACT WITNESSES ABOUT THEIR PERSONAL PREFERENCES OR OPINIONS REGARDING EXTERNAL SAFETIES with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit A– Lang Testimony, # 2 Exhibit B– Herman Testimony, # 3 Exhibit C– McCray Testimony, # 4 Exhibit D– Seckley Testimony, # 5 Exhibit E– Doffeny Testimony)(Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 55 | MOTION in Limine OMNIBUS with Brief In Support by Robert Lang. (Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 56 | MOTION in Limine TO ALLOW EVIDENCE OF OTHER SIMILAR INCIDENTS with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit A– OSI Spreadsheet, # 2 Exhibit B– OSI Videos, # 3 Exhibit C– Guay Trial Order, # 4 Exhibit D– OSI Detailed List)(Zimmerman, Robert) (Entered: 03/27/2024) |
| 03/27/2024 | 57 | MOTION in Limine MOTION IN LIMINE TO PRECLUDE ANY ARGUMENT THAT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT DATA SHOWS AN INCREASE IN ACCIDENTAL DISCHARGES FOLLOWING ITS ADOPTION OF THE P320 by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Dep of R. Lang, # 2 Exhibit Ex. B – Tertin Expert Report, # 3 Exhibit Ex. C – Vigilante Expert |

| | | |
|---|---|---|
| | | Report, # <u>4</u> Exhibit Ex. D – ICE)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>58</u> | MOTION in Limine TO PRECLUDE EVIDENCE OR TESTIMONY REGARDING DROP–FIRE DISCHARGE INCIDENTS by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Dep of R. Lang)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>59</u> | MOTION in Limine TO PRECLUDE EVIDENCE OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Lang Complaint, # <u>2</u> Exhibit Ex. B – Dep of R. Lang, # <u>3</u> Exhibit Ex. C – Slatowski Memo & Opinion 03.12.2024 [ECF 85])., # <u>4</u> Exhibit Ex. D – Dep of Tertin, # <u>5</u> Exhibit Ex. E – Dep of Vigilante, # <u>6</u> Exhibit Ex. F – Dep of D. Delgado, # <u>7</u> Exhibit Ex. G – Dep of C. Higgins, # <u>8</u> Exhibit Ex. H – Dep of M. Breedon, # <u>9</u> Exhibit Ex. I – Dep of J. Garth, # <u>10</u> Exhibit Ex. J – Dep of C. Chargualaf, # <u>11</u> Exhibit Ex. K – Dep of J. Halase, # <u>12</u> Exhibit Ex. L – Dep of M. Lingo, # <u>13</u> Exhibit Ex. M – Dep of J. Scoppa, # <u>14</u> Exhibit Ex. N – Knox Declaration, # <u>15</u> Exhibit Ex. O – Burmester Declaration, # <u>16</u> Exhibit Ex. P – Dep of Vigilante in Slatowski, # <u>17</u> Exhibit Ex. Q – Dep of Tertin in Slatowski, # <u>18</u> Exhibit Ex. R – Armed & Unready – The Washington Post, # <u>19</u> Exhibit Ex. S – Los Angeles Sheriff Report)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>60</u> | MOTION in Limine TO PRECLUDE PLAINTIFF FROM INTRODUCING EVIDENCE OBTAINED AFTER THE CLOSE OF DISCOVERY IN THIS CASE by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Dep of R. Lang, # <u>2</u> Exhibit Ex. B – Dep of Tertin)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>61</u> | MOTION in Limine TO PRECLUDE INFORMATION REGARDING THE P320 VOLUNTARY UPGRADE PROGRAM by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Dep of R. Lang, # <u>2</u> Exhibit Ex. B – VUP)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>62</u> | MOTION in Limine TO PRECLUDE ANY TESTIMONY OR SUGGESTION THAT THE P320 PISTOL CAN FIRE WITHOUT TRIGGER ACTUATION by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Dep of R. Lang, # <u>2</u> Exhibit Ex. B – Dep of Tertin, # <u>3</u> Exhibit Ex. C – Dep of Vigilante)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>63</u> | MOTION in Limine TO PRECLUDE VARIOUS EVIDENCE AND TRIAL CONDUCT by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Dep of R. Lang, # <u>2</u> Exhibit Ex. B – Dep of Tertin)(Woy, Jonathan) (Entered: 03/27/2024) |
| 03/27/2024 | <u>64</u> | MOTION in Limine TO PRECLUDE VIDEOS OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS by Sig Sauer, Inc.. (Attachments: # <u>1</u> Exhibit Ex. A – Complaint, # <u>2</u> Exhibit Ex. B – Dep of R. Lang, # <u>3</u> Exhibit Ex. C – Tertin Expert Report, # <u>4</u> Exhibit Ex. D – Vigilante Expert Report, # <u>5</u> Exhibit Ex. E – Dep of Vigilante in Slatowski, # <u>6</u> Exhibit Ex. F – Dep of Tertin in Slatowski, # <u>7</u> Exhibit Ex. G – Knox Declaration, # <u>8</u> Exhibit Ex. H – Burmester Affidavit, # <u>9</u> Exhibit Ex. I – Dep of Tertin, # <u>10</u> Exhibit Ex. J – Dep of Vigilante)(Woy, Jonathan) (Entered: 03/27/2024) |
| 04/10/2024 | <u>65</u> | RESPONSE in Opposition re <u>58</u> MOTION in Limine *To Preclude Evidence or Testimony Regarding Drop–Fire Discharge Incidents* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | <u>66</u> | |

| | | |
|---|---|---|
| | | RESPONSE in Opposition re 57 MOTION in Limine *To Preclude Any Argument That U.S. Immigration And Customs Enforcement Data Shows An Increase In Accidental Discharges Following Its Adoption Of The P320* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 67 | RESPONSE in Opposition re 64 MOTION in Limine *To Preclude Videos Of Other Alleged Incidents Involving Accidental Discharges Of P320 Model Pistols* filed by Robert Lang. (Zimmerman, Robert) Modified to remove capitalized text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 68 | RESPONSE in Opposition re 59 MOTION in Limine *To Preclude Evidence Of Other Alleged Incidents Involving Accidental Discharges Of P320 Model Pistols* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 69 | RESPONSE in Opposition re 61 MOTION in Limine *To Preclude Information Regarding The P320 Voluntary Upgrade Program* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 70 | RESPONSE in Opposition re 63 MOTION in Limine *To Preclude Various Evidence And Trial Conduct* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 71 | RESPONSE in Opposition re 60 MOTION in Limine *To Preclude Plaintiff From Introducing Evidence Obtained After The Close Of Discovery In This Case* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 72 | RESPONSE in Opposition re 62 MOTION in Limine *To Preclude Any Testimony Or Suggestion That The P320 Pistol Can Fire Without Trigger Actuation* filed by Robert Lang. (Zimmerman, Robert) Modified to remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 73 | Amended RESPONSE in Opposition re 57 MOTION in Limine *To Preclude Any Argument That U.S. Immigration And Customs Enforcement Data Shows An Increase In Accidental Discharges Following Its Adoption Of The P320* filed by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Zimmerman, Robert) Modified to edit text and remove all caps text on 4/10/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 74 | Proposed Voir Dire by Robert Lang. (Zimmerman, Robert) (Entered: 04/10/2024) |
| 04/10/2024 | 75 | RESPONSE in Opposition re 55 MOTION in Limine Omnibus filed by Sig Sauer, Inc. (Woy, Jonathan) Modified to remove all caps text on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 76 | RESPONSE in Opposition re 56 MOTION in Limine *To Allow Evidence Of Other Similar Incidents* filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex. A – Complaint, # 2 Exhibit Ex. B – Lang Dep, # 3 Exhibit Ex. C – Jinn Order [ECF. 78], # 4 Exhibit Ex. E – Hilton Order [ECF 65], # 5 Exhibit Ex. F – Mayes Order [ECF. 89], # 6 Exhibit Ex. G – Frankenberry Order [ECF 79], # 7 Exhibit Ex. H – Tertin Dep, # 8 Exhibit Ex. I – Vigilante Dep, # 9 Exhibit Ex. J – Lingo Dep, # 10 Exhibit Ex. K – Delgado Dep, # 11 Exhibit Ex. L – Higgins Dep, # 12 Exhibit Ex. M – Breedon Dep, # 13 Exhibit Ex. N – Garth Dep, # 14 Exhibit Ex. O – Chargualaf Dep, |

| | | |
|---|---|---|
| | | # 15 Exhibit Ex. P – Halase Dep, # 16 Exhibit Ex. Q – Scoppa Dep, # 17 Exhibit Ex. R – Herman Order [ECF 91], # 18 Exhibit Ex. S – Slatowski Memo [ECF. 85], # 19 Exhibit Ex. T – Knox Declration, # 20 Exhibit Ex. U – Burmester Declaration, # 21 Exhibit Ex. V – Viglinate Dep in Slatowski, # 22 Exhibit Ex. W – Tertin Dep in Slatowski, # 23 Exhibit Ex. X – Washington Post, # 24 Exhibit Ex. Y – LA Sheriff's Office)(Woy, Jonathan) Modified to remove all caps text on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 77 | RESPONSE in Opposition re 53 MOTION in Limine *To Preclude Evidence Of Compliance With Drop And/Or Abuse Testing Standards* filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex. A – Dep of R. Lang)(Woy, Jonathan) Modified to remove all caps text on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 78 | RESPONSE in Opposition re 54 MOTION in Limine *To Preclude Sig Sauer From Introducing Or Eliciting Testimony From Fact Witnesses About Their Personal Preferences Or Opinions Regarding External Safeties* filed by Sig Sauer, Inc. (Woy, Jonathan) Modified to remove all caps text on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 79 | RESPONSE in Opposition re 52 MOTION in Limine *To Preclude Admission Of Any Evidence, Testimony, Or Argument Regarding Lack Or Limitation Of Other Similar Accidents* filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex A – Complaint, # 2 Exhibit Ex. B – Dep of R. Lang, # 3 Exhibit Ex. C – Vigilante Report, # 4 Exhibit Ex. D – Tertin Report, # 5 Exhibit Ex. E – Tertin Dep, # 6 Exhibit Ex. F – Vigilante Dep in Slatowski, # 7 Exhibit Ex. G – Meyer Dep in Slatowski, # 8 Exhibit Ex. H – Meyer Dep in Ahern, # 9 Exhibit Ex. I – Toner Dep in Ahern)(Woy, Jonathan) Modified to remove all caps text and link to correct motion on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/10/2024 | 80 | RESPONSE in Opposition re 51 MOTION in Limine *To Preclude Sig Sauer Employees Or Expert Witnesses From Testifying About Customer Preferences Regarding Tabbed Trigger Safeties* filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex A – Complaint, # 2 Exhibit Ex. B – Dep of R. Lang, # 3 Exhibit Ex. C – Vigilante Report, # 4 Exhibit Ex. D – Tertin Report, # 5 Exhibit Ex. E – Toner Dep in Slatowski, # 6 Exhibit Ex. F – Toner Affidavit re Tabbed Trigger, # 7 Exhibit Ex. G – Farkas Dep in Powers)(Woy, Jonathan) Modified to remove all caps text on 4/12/2024 (ces). (Entered: 04/10/2024) |
| 04/24/2024 | 81 | REPLY to Response to Motion re 57 MOTION in Limine MOTION IN LIMINE TO PRECLUDE ANY ARGUMENT THAT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT DATA SHOWS AN INCREASE IN ACCIDENTAL DISCHARGES FOLLOWING ITS ADOPTION OF THE P320 filed by Sig Sauer, Inc.. (Woy, Jonathan) (Entered: 04/24/2024) |
| 04/24/2024 | 82 | REPLY BRIEF re 64 MOTION in Limine TO PRECLUDE VIDEOS OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS filed by Sig Sauer, Inc.. (Horowitz, Andrew) (Entered: 04/24/2024) |
| 04/24/2024 | | Submission of 57 MOTION in Limine MOTION IN LIMINE TO PRECLUDE ANY ARGUMENT THAT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT DATA SHOWS AN INCREASE IN ACCIDENTAL DISCHARGES FOLLOWING ITS ADOPTION OF THE P320, 64 MOTION in Limine TO PRECLUDE VIDEOS OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS, to District Judge Eleanor L. Ross. (mlb) (Entered: |

| | | 04/24/2024) |
|---|---|---|
| 04/24/2024 | 83 | REPLY to Response to Motion re 61 MOTION in Limine TO PRECLUDE INFORMATION REGARDING THE P320 VOLUNTARY UPGRADE PROGRAM filed by Sig Sauer, Inc.. (Woy, Jonathan) (Entered: 04/24/2024) |
| 04/24/2024 | 84 | REPLY to Response to Motion re 53 MOTION in Limine TO PRECLUDE EVIDENCE OF COMPLIANCE WITH DROP AND/OR ABUSE TESTING STANDARDS, 58 MOTION in Limine TO PRECLUDE EVIDENCE OR TESTIMONY REGARDING DROP–FIRE DISCHARGE INCIDENTS filed by Sig Sauer, Inc.. (Woy, Jonathan) (Entered: 04/24/2024) |
| 04/24/2024 | 85 | REPLY to Response to Motion re 59 MOTION in Limine TO PRECLUDE EVIDENCE OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS filed by Sig Sauer, Inc.. (Woy, Jonathan) (Entered: 04/24/2024) |
| 04/25/2024 | | Submission of 52 MOTION in Limine TO PRECLUDE ADMISSION OF ANY EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING LACK OR LIMITATION OF OTHER SIMILAR ACCIDENTS, 58 MOTION in Limine TO PRECLUDE EVIDENCE OR TESTIMONY REGARDING DROP–FIRE DISCHARGE INCIDENTS, 51 MOTION in Limine TO PRECLUDE SIG SAUER EMPLOYEES OR EXPERT WITNESSES FROM TESTIFYING ABOUT CUSTOMER PREFERENCES REGARDING TABBED TRIGGER SAFETIES, 54 MOTION in Limine TO PRECLUDE SIG SAUER FROM INTRODUCING OR ELICITING TESTIMONY FROM FACT WITNESSES ABOUT THEIR PERSONAL PREFERENCES OR OPINIONS REGARDING EXTERNAL SAFETIES, 56 MOTION in Limine TO ALLOW EVIDENCE OF OTHER SIMILAR INCIDENTS, 61 MOTION in Limine TO PRECLUDE INFORMATION REGARDING THE P320 VOLUNTARY UPGRADE PROGRAM, 63 MOTION in Limine TO PRECLUDE VARIOUS EVIDENCE AND TRIAL CONDUCT, 62 MOTION in Limine TO PRECLUDE ANY TESTIMONY OR SUGGESTION THAT THE P320 PISTOL CAN FIRE WITHOUT TRIGGER ACTUATION, 60 MOTION in Limine TO PRECLUDE PLAINTIFF FROM INTRODUCING EVIDENCE OBTAINED AFTER THE CLOSE OF DISCOVERY IN THIS CASE, 55 MOTION in Limine OMNIBUS, 59 MOTION in Limine TO PRECLUDE EVIDENCE OF OTHER ALLEGED INCIDENTS INVOLVING ACCIDENTAL DISCHARGES OF P320 MODEL PISTOLS, 53 MOTION in Limine TO PRECLUDE EVIDENCE OF COMPLIANCE WITH DROP AND/OR ABUSE TESTING STANDARDS, to District Judge Eleanor L. Ross. (mlb) (Entered: 04/25/2024) |
| 04/25/2024 | 86 | MOTION in Limine To Preclude Sig Sauer from Introducing the Police Report by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Bonham, Matthew) (Entered: 04/25/2024) |
| 05/03/2024 | 87 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on 5/8/24 at 10:00 a.m. and the week of 6/11/24 starting at 9:00 a.m. Signed by Judge Eleanor L. Ross on 5/3/24. (ces) (Entered: 05/03/2024) |
| 05/03/2024 | 88 | RESPONSE in Opposition re 86 MOTION in Limine To Preclude Sig Sauer from Introducing the Police Report filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Lang Dep, # 2 Exhibit Ex. B – Police Report, # 3 Exhibit Ex. C – Durden Dep, # 4 Exhibit Ex. D – Lawrence Dep)(Woy, Jonathan) (Entered: 05/03/2024) |

| 05/06/2024 | 89 | APPLICATION for Admission of Ryan Hurd Pro Hac Vice (Application fee $ 100, receipt number AGANDC–13413908).by Robert Lang. (Bonham, Matthew) <span style="color:red">Documents for this entry are not available for viewing outside the courthouse.</span> (Entered: 05/06/2024) |
|---|---|---|
| 05/06/2024 | | APPROVAL by Clerks Office re: 89 APPLICATION for Admission of Ryan Hurd Pro Hac Vice (Application fee $ 100, receipt number AGANDC–13413908). Attorney Ryan Hurd added appearing on behalf of Robert Lang. E–filing access may be requested after an order granting the application is entered. (rvb) (Entered: 05/06/2024) |
| 05/07/2024 | | MINUTE ORDER (by docket entry only) GRANTING 89 Application for Admission Pro Hac Vice by Ryan Hurd. Approved by District Judge Eleanor L. Ross on 5/7/24. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(mlb) (Entered: 05/07/2024) |
| 05/07/2024 | | Clerk's Certificate of Mailing (via email) to Attorney Ryan Hurd as to Robert Lang re Order on Application for Admission PHV. (mlb) (Entered: 05/07/2024) |
| 05/08/2024 | 90 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Pretrial Conference held on 5/8/2024. Attorneys for Plaintiff and Defendant were present for the Pretrial Conference. Court inquired about the parties that would be present (at counsel table) during trial and previous discussions regarding mediation. The length of the trial and potential witnesses were discussed. Court presented the parties with preliminary instructions, background jury questions, and a proposed factual basis that would be read to potential jurors. Court requested that the parties provide their proposed verdict form, in Word format, and proposed jury charges, by a date provided in the trial matters order. There was no request for additional juror strikes. The Court agreed to an hour for openings. Voir dire questions were discussed. Court explained the voir dire and peremptory strike process. Court heard arguments regarding an outstanding motion in limines and made rulings. Court will prepare an order memorializing the rulings rendered during the Pretrial Conference hearing. Hearing concluded. The trial is scheduled to begin June 11, 2024 at 9am. (Court Reporter Elizabeth Cohn)(ces) (Entered: 05/08/2024) |
| 05/09/2024 | 91 | ORDER ON TRIAL MATTERS: the Court GRANTS Plaintiff's Motions in Limine. 51 , 53 , 54 . The Court DENIES Plaintiff's Omnibus Motion in Limine. 55 . The Court GRANTS Defendant's Motions in Limine. 57 , 60 , 62 , 64 . The Court DENIES Defendant's Motions in Limine. 58 , 61 . The Court GRANTS IN PART AND DENIES IN PART Defendant's Omnibus Motion in Limine. 63 . The Court GRANTS IN PART AND DENIES IN PART Plaintiff's Motion in Limine 86 . Plaintiff's Motions in Limine 52 and 56 and Defendant's Motion in Limine 59 are UNDER ADVISEMENT. Signed by Judge Eleanor L. Ross on 5/9/2024. (tas) (Entered: 05/09/2024) |
| 05/15/2024 | 92 | RESPONSE in Support re 56 MOTION in Limine TO ALLOW EVIDENCE OF OTHER SIMILAR INCIDENTS filed by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V)(Zimmerman, Robert) (Entered: 05/15/2024) |

| | | |
|---|---|---|
| 05/22/2024 | 93 | RESPONSE in Opposition re 56 MOTION in Limine to Allow Evidence of Other Similar Incidents filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex. A – Lang Video (PLF00584))(Woy, Jonathan) Modified to remove all caps text on 5/24/2024 (ces). (Entered: 05/22/2024) |
| 05/28/2024 | 94 | MOTION in Limine To Preclude the Testimony of Katleen Lang by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Lang Dep, # 2 Exhibit Ex. B – P's Resp to SIG's ROGs, # 3 Exhibit Ex. C – Woodbury Dep)(Woy, Jonathan) (Entered: 05/28/2024) |
| 05/30/2024 | 95 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on June 10, 2024 at 9:00 a.m. Signed by Judge Eleanor L. Ross on 5/30/24. (ces) (Entered: 05/30/2024) |
| 05/30/2024 | 96 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on 6/10/24 at 9:00 a.m. Signed by Judge Eleanor L. Ross on 5/30/24. (ces) (Entered: 05/30/2024) |
| 05/30/2024 | 97 | Plaintiff's MOTION for Sequestration Under Rule 615 by Robert Lang. (Attachments: # 1 Exhibit 1)(Zimmerman, Robert) Modified to remove all caps text on 5/30/2024 (ces). (Entered: 05/30/2024) |
| 05/30/2024 | 98 | RESPONSE in Opposition re 94 MOTION in Limine To Preclude the Testimony of Katleen Lang filed by Robert Lang. (Attachments: # 1 Exhibit 1)(Zimmerman, Robert) (Entered: 05/30/2024) |
| 05/31/2024 | 99 | MOTION in Limine to Preclude Certain Irrelevant and Prejudicial Evidence or Argument Pertaining to Plaintiff's Pistol and Holster with Brief In Support by Robert Lang. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Zimmerman, Robert) Modified to remove all caps text on 6/3/2024 (ces). (Entered: 05/31/2024) |
| 05/31/2024 | 100 | TRIAL BRIEF by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. 1 – Qualifying Questions, # 2 Exhibit Ex. 2 – Revisions to Court's Statement of Case, # 3 Exhibit Ex. 3 – Meyer Dep in Slatowski, # 4 Exhibit Ex. 4 – Toner Dep in Ahern, # 5 Exhibit Ex. 5 – Lang Dep)(Woy, Jonathan) (Entered: 05/31/2024) |
| 05/31/2024 | 101 | MOTION for Hearing re 94 MOTION in Limine To Preclude the Testimony of Katleen Lang, 97 MOTION for Sequestration Under Rule 615, 99 MOTION in Limine to Preclude Certain Irrelevant and Prejudicial Evidence or Argument Pertaining to Plaintiff's Pistol and Holster by Sig Sauer, Inc. (Woy, Jonathan) Modified to remove all caps text on 6/3/2024 (ces). (Entered: 05/31/2024) |
| 05/31/2024 | 102 | MOTION for Order *to Bring Tangible Items (Weapons)* by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Proposed Order)(Woy, Jonathan) (Entered: 05/31/2024) |
| 05/31/2024 | 103 | RESPONSE in Opposition re 97 MOTION for Sequestration Under Rule 615 filed by Sig Sauer, Inc. (Attachments: # 1 Exhibit Proposed Order)(Woy, Jonathan) Modified to remove all caps text on 6/3/2024 (ces). (Entered: 05/31/2024) |
| 06/03/2024 | | MINUTE ORDER (by docket entry). The Request for a Motion for Hearing (by June 5) [Doc. 101] is hereby DENIED. As the Parties have elected to take depositions and file several motions after the Court's deadlines, the Court will rule on the motions as is practicable given its other assigned cases. Approved by District Judge Eleanor L. Ross on 6/3/24. (mlb) (Entered: 06/03/2024) |
| 06/03/2024 | | Clerk's Certificate of Mailing (via email) to Attorneys Daniel Ceisler and Robert Zimmerman as to Robert Lang re Order on Motion for Hearing. (mlb) (Entered: |

| | | 06/03/2024) |
|---|---|---|
| 06/04/2024 | 104 | Second Trial Matters ORDER: The Court's rulings on the Parties' motions in limine are Motion 52 to preclude admission of evidence is GRANTED. Motion 56 to allow evidence of other similar incidents is DENIED. MOTION 59 to preclude evidence of other alleged events is GRANTED. MOTION 94 to preclude testimony is DENIED. MOTION 97 for sequestration is DENIED. MOTION 99 to preclude certain evidence is GRANTED IN PART AND DENIED IN PART. MOTION 102 for weapons order is DENIED. The Court DIRECTS Plaintiff to immediately file his Trial Brief andcorresponding exhibits on the docket. Signed by Judge Eleanor L. Ross on 6/4/2024. (ajw) (Entered: 06/05/2024) |
| 06/05/2024 | 105 | TRIAL BRIEF by Robert Lang. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Zimmerman, Robert) (Entered: 06/05/2024) |
| 06/05/2024 | 106 | EXHIBITS admitted during the Video Deposition of John C. Cayton held on 1/23/2023 before the Honorable Judge Eleanor L. Ross. Filed by Sig Sauer, Inc.. Any objection to the validity of these exhibits must be filed by the next business day following the upload of exhibits. (Woy, Jonathan) (Entered: 06/05/2024) |
| 06/07/2024 | 107 | Amended MOTION for Order *to bring Tangible Items (Weapons)* by Sig Sauer, Inc. (Attachments: # 1 Exhibit Ex A – Cutaway Pistol, # 2 Text of Proposed Order Proposed Order)(Woy, Jonathan) Modified on 6/7/2024 (wrong judge initials on document, attorney to refile) (ces). (Entered: 06/07/2024) |
| 06/07/2024 | 108 | Amended MOTION for Order *to Bring Tangible Items (Weapons)* by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Cutaway Pistol, # 2 Text of Proposed Order Proposed Order)(Woy, Jonathan) (Entered: 06/07/2024) |
| 06/07/2024 | 109 | MOTION for Order *Tangible Weapons* by Robert Lang. (Zimmerman, Robert) (Entered: 06/07/2024) |
| 06/08/2024 | 110 | NOTICE by Sig Sauer, Inc. re 100 Trial Brief, *SIG's Amended deposition designation of John Cayotn* (Woy, Jonathan) (Entered: 06/08/2024) |
| 06/09/2024 | 111 | Amended MOTION to Amend *Motion for Order* by Robert Lang. (Attachments: # 1 Text of Proposed Order proposed Order)(Bonham, Matthew) (Entered: 06/09/2024) |
| 06/10/2024 | 112 | OBJECTION to 106 Sig Sauers Deposition Designations of Plaintiffs Non–Testifying, Consulting Expert John Cayton by Robert Lang. (Zimmerman, Robert) Modified docket text to link to correct entry on 6/10/2024 (ajw). (Entered: 06/10/2024) |
| 06/10/2024 | 113 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on 6/10/24 at 9:00 a.m. Signed by Judge Eleanor L. Ross on 6/10/24. (ces) (Entered: 06/10/2024) |
| 06/10/2024 | 114 | RESPONSE in Opposition re 108 Amended MOTION for Order *to Bring Tangible Items (Weapons)* filed by Robert Lang. (Zimmerman, Robert) (Entered: 06/10/2024) |
| 06/11/2024 | 115 | RESPONSE re 112 Objection *Sig Sauer, Inc.s Response to Plaintiffs Objections to Sig Sauers Deposition Designations of John Cayton* filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Cayton Deposition, # 2 Exhibit Ex. B – Cayton Deposition Exhibit No. 5, # 3 Exhibit Ex. C – Cayton Deposition Exhibit No. 6)(Woy, Jonathan) (Entered: 06/11/2024) |

| 06/11/2024 | 116 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on 6/11/24 at 9:00 a.m. Signed by Judge Eleanor L. Ross on 6/11/24. (ces) (Entered: 06/11/2024) |
|---|---|---|
| 06/11/2024 | 117 | ORDER granting 108 Amended Motion for Order to Bring Tangible Items (Weapons). Signed by Judge Eleanor L. Ross on 6/11/24. (ces) (Entered: 06/11/2024) |
| 06/11/2024 | 118 | ORDER granting 111 Motion for Weapons Order. Signed by Judge Eleanor L. Ross on 6/11/24. (ces) (Entered: 06/11/2024) |
| 06/11/2024 | 119 | Proposed Jury Instructions by Sig Sauer, Inc. . (Woy, Jonathan) (Entered: 06/11/2024) |
| 06/11/2024 | 123 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial Began 6/11/2024. Court called to order. Also present during the trial is Corporate Representative Timothy Lachance (with the Defense) and IT professional Charles "Chip" Davis (with the Defendant). Court addressed issues with the parties and made rulings. 107 Motion for Order DENIED as moot in light of ruling on 117 . 109 Motion for Order DENIED in light of ruling on 118 . 122 Motion in Limine DENIED. Potential jurors entered and the parties were introduced. Voir dire began. Forty–five (45) minute lunch break. Voir dire resumed. Jury selected and jurors released for the day with the usual precautions given by the Court. Court adjourned. Hearing not concluded. Court adjourned and will reconvene at June 12, 2024 at 9:00am. Jurors excused until the above time under the usual caution of the Court. (Court Reporter Elizabeth Cohn)(ces) (Entered: 06/12/2024) |
| 06/12/2024 | 120 | OBJECTION *TO TRIAL TESTIMONY OF EXPERT JAMES TERTIN* by Robert Lang. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Zimmerman, Robert) (Entered: 06/12/2024) |
| 06/12/2024 | 121 | Proposed Jury Instructions by Robert Lang . (Zimmerman, Robert) (Entered: 06/12/2024) |
| 06/12/2024 | 122 | MOTION in Limine *to Preclude Reference to Materials Identifying the P320 as a Double Action Pistol* with Brief In Support by Sig Sauer, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Woy, Jonathan) (Entered: 06/12/2024) |
| 06/12/2024 | 124 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial continued on 6/12/2024. Court called to order. Also present during the trial is Corporate Representative Timothy Lachance (with the Defense) and IT professional Charles "Chip" Davis (with the Defense). Court addressed issues with the parties and made rulings. Court addressed Defendants objections included in 120 . Objection #1 is sustained. Objection #2 is sustained. Objection #3 is overruled. Objection #4 is overruled. Jurors were sworn. Opening statements of the parties. Plaintiff witness Sean Toner was sworn and provided testimony. Plaintiff Exhibit #82 was ADMITTED. Joint exhibits # 4 and 8 were ADMITTED. One (1) hour lunch break. Witness Toner continued providing testimony. Defense exhibits # 26, 58 and 47 were ADMITTED. Plaintiff exhibit #s 76, 78, 82 and 123 were ADMITTED. Jurors released for the day with the usual precautions given by the Court. Hearing not concluded. Court adjourned and will reconvene at June 13, 2024 @ 9:00am. Jurors excused until the above time under the usual caution of the Court. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Elizabeth Cohn)(ces) (Entered: 06/13/2024) |
| 06/13/2024 | 125 | |

| | | |
|---|---|---|
| | | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial continued on 6/13/2024. Court called to order. Also present during the trial is Corporate Representative Timothy Lachance (with the Defense) and IT professional Charles "Chip" Davis (with the Defense). Plaintiff Robert Bryan Lang was sworn and provided testimony. Plaintiff exhibit #s 73, 136, 144, 150 were ADMITTED. Defense exhibit # 142 was ADMITTED. Joint exhibit #s 1, 2, 3, 5, 6, 10 were ADMITTED. One (1) hour lunch break. Plaintiff witness Dr. Michael Quakenbush was sworn, qualified as an expert in orthopedic trauma surgery and provided testimony. Plaintiff exhibit #s 152, 153 were ADMITTED. The video taped deposition of James Tertin was played in its entirety. Plaintiff exhibits introduced during the deposition were ADMITTED. Jurors released for the day with the usual precautions given by the Court. Court adjourned. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Elizabeth Cohn)(bgt) (Entered: 06/14/2024) |
| 06/14/2024 | 126 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial continued on 6/14/2024. Court called to order. Also present during the trial is Corporate Representative Timothy Lachance (with the Defense) and IT professional Charles "Chip" Davis (with the Defense). Plaintiff's witness Dr. William Vigilante was sworn, qualified as an expert, and provided testimony. Plaintiff exhibit #s 23, 31, 32, 33 and 40 were ADMITTED. The videotaped deposition of Dr. Samuel Romirowsky was played in its entirety. Plaintiff witness Dr. Romirowsky was deemed an expert in the area of Psychology. One (1) hour lunch break. Plaintiff witness Kathleen Lang was sworn and provided testimony. Plaintiff rests. Jurors were excused for the weekend with the usual precautions given by the Court. Court discussed outstanding issues. Hearing not concluded. Court adjourned and will reconvene at Monday, June 17, 2024 at 9:00am. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Elizabeth Cohn)(ces) (Entered: 06/17/2024) |
| 06/17/2024 | 128 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial continued on 6/17/2024. Court called to order. Also present during the trial is Corporate Representative Timothy Lachance (with the Defense) and IT professional Charles Chip Davis (with the Defense). Court took up issues with the parties and made rulings. Defense witnesses Officer Demetrius Durder and Derrick Watkins (qualified as an expert in the area of Firearms Design and Root Cause Analysis) were sworn and provided testimony. Defense ex #s 3, 4, 7, 13, 14, 24, 25, 27, 36, 37, 38,39, 42, 59, 67 (w/o audio), 68, 69, 70 were ADMITTED. Defense rests. Remaining exhibits ADMITTED. Jurors were excused for the day with the usual precautions given by the Court. Court discussed outstanding issues and made rulings. Formal charge conference. Hearing not concluded. Court adjourned and will reconvene at Tuesday, June 18, 2024 2 9:30am. Jurors excused until the above time under the usual caution of the Court. Exhibits retained to be forwarded to the Clerks Office. (Court Reporter Elizabeth Cohn)(ces) (Entered: 06/18/2024) |
| 06/18/2024 | 127 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM on June 11, 2024 through duration of trial at 9:00 a.m. Signed by Judge Eleanor L. Ross on 6/18/24. (ces) (Entered: 06/18/2024) |
| 06/18/2024 | 129 | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial continued on 6/18/2024. Court adjourned and will reconvene at June 20,2024 2 9:15am. Jurors excused until the above time under the usualcaution of the Court. (Court Reporter Elizabeth Cohn)(ajw) (Entered: 06/20/2024) |
| 06/18/2024 | 132 | Receipt for Oversized and Non–Documentary Exhibits from the Civil Jury Trial Held |

| | | |
|---|---|---|
| | | on June 11, 2024 re <u>123</u> Jury Trial. Reproduction of Joint Exhibits 1, 2, and 3; Plaintiff's exhibits 123, 136, and 142 due by July 3, 2024. (rlh) (Entered: 06/21/2024) |
| 06/20/2024 | | ORAL MOTION for Directed Verdict by Sig Sauer, Inc. (rlh) (Entered: 06/21/2024) |
| 06/20/2024 | <u>130</u> | Minute Entry for proceedings held before Judge Eleanor L. Ross: Jury Trial concluded on 6/20/2024. Deliberations resumed at 9:10am. One (1) hour lunch break. Verdict returned at 3:45pm. Defense made an oral motion for directed verdict as to punitive damages. After hearing arguments, Court GRANTED oral motion. Court adjourned.(Exhibits retained to be forwarded to the Clerks Office.). (Court Reporter Elizabeth Cohn)(rlh) (Entered: 06/21/2024) |
| 06/20/2024 | <u>131</u> | JURY VERDICT for Robert Bryan Lang in the amount of $2,350,963.43. (rlh) (Additional attachment(s) added on 6/27/2024: # <u>1</u> Corrected main document) (ajw). (Entered: 06/21/2024) |
| 06/24/2024 | <u>133</u> | JUDGMENT: It is ORDERED AND ADJUDGED that Plaintiff Robert Lang recover from Defendant Sig Sauer, Inc., a total of $2,350,963.43 in compensatory damages, and the costs of this action. Signed by Judge Eleanor L. Ross on 6/24/2024. ––Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist––(ajw) Modified on 6/25/2024 to edit text (rlh). (Entered: 06/24/2024) |
| 06/24/2024 | | Civil Case Terminated. (ajw) (Entered: 06/24/2024) |
| 06/25/2024 | <u>134</u> | EXHIBIT REPRODUCTION (JX1 (gun) JX2 (holster) JX3 (pants with belt) PX123 (safety tab) PX136 (casing) PX142 (bullet)). Related document: <u>123</u> Order on Motion for Order,,,,,,,, Order on Motion in Limine,,,, Jury Trial – Begun,,,, (Attachments: # <u>1</u> Exhibit Photograph of Joint Exhibit #1 (gun), # <u>2</u> Exhibit Photograph of Joint Exhibit #2 (holster), # <u>3</u> Exhibit Photograph of Joint Exhibit #3 (pants with belt), # <u>4</u> Exhibit Photograph of Plaintiffs Exhibit #123 (safety tab), # <u>5</u> Exhibit Photograph of Plaintiffs Exhibit #136 (casing), # <u>6</u> Exhibit Photograph of Plaintiffs Exhibit #142 (bullet))(Bonham, Matthew) (Entered: 06/25/2024) |
| 06/25/2024 | <u>136</u> | EXHIBITS AUDIO/VIDEO (Plaintiff's Exhibits: 31–33, 33, 40, 48–50, 56, 58, 60–61, 68, 119) admitted and retained at the <u>123</u> Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, <u>129</u> Jury Trial – Continued, <u>126</u> Jury Trial – Continued, <u>130</u> Order on Motion for Directed Verdict, Jury Trial – Concluded, <u>125</u> Jury Trial – Continued, <u>124</u> Jury Trial – Continued, <u>128</u> Jury Trial – Continued, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # <u>1</u> Pltf Exhs. 31–33, 40, 48–50, 56, 58, 60–61, 68, 119)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | <u>137</u> | EXHIBITS AUDIO/VIDEO (Defendant's Exhibits: 58 and 67) admitted and retained at the <u>123</u> Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, <u>129</u> Jury Trial – Continued, <u>126</u> Jury Trial – Continued, <u>130</u> Order on Motion for Directed Verdict, Jury Trial – Concluded, <u>125</u> Jury Trial – Continued, <u>124</u> Jury Trial – Continued, <u>128</u> Jury Trial – Continued, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # <u>1</u> Deft Ex. 58, # <u>2</u> Deft Ex. 67)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | <u>138</u> | EXHIBITS AUDIO/VIDEO (Joint Exhibit: 6) admitted and retained at the <u>123</u> Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, <u>129</u> Jury Trial – Continued, <u>126</u> Jury Trial – Continued, <u>130</u> Order on Motion for Directed Verdict, Jury Trial – Concluded, <u>125</u> Jury Trial – Continued, <u>124</u> Jury Trial – Continued, <u>128</u> Jury Trial – Continued, have been received from Courtroom Deputy and placed in the |

| | | |
|---|---|---|
| | | custody of the Records Clerks. (Attachments: # 1 Joint Ex. 6)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | 139 | EXHIBITS (Plaintiff's Exhibits: 23, 47, 73, 76, 78, 92, 127, 144, 149–150, 152–153) admitted and retained at the 123 Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, 126 Jury Trial – Continued, 125 Jury Trial – Continued, 124 Jury Trial – Continued, 128 Jury Trial – Continued, 129 Jury Trial – Continued, 130 Order on Motion for Directed Verdict, Jury Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks.. (Attachments: # 1 Pltf Ex. 23, # 2 Pltf Ex. 47, # 3 Pltf Ex. 73, # 4 Pltf Ex. 76, # 5 Pltf Ex. 78, # 6 Pltf Ex. 82, # 7 Pltf Ex. 96, # 8 Pltf Ex. 127, # 9 Pltf Ex. 144, # 10 Pltf Ex. 149, # 11 Pltf Ex. 150, # 12 Pltf Ex. 152, # 13 Pltf Ex. 153)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | 141 | EXHIBITS (Defendant's Exhibits: 3–4, 7, 13–14, 24–27, 36–39, 42, 44, 47, 59–60, 68–70) admitted and retained at the 123 Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, 126 Jury Trial – Continued, 125 Jury Trial – Continued, 124 Jury Trial – Continued, 128 Jury Trial – Continued, 129 Jury Trial – Continued, 130 Order on Motion for Directed Verdict, Jury Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Deft Ex. 3, # 2 Deft Ex. 4, # 3 Deft Ex. 7, # 4 Deft Ex. 13, # 5 Deft Ex. 14, # 6 Deft Ex. 24, # 7 Deft Ex. 25, # 8 Deft Ex. 26, # 9 Deft Ex. 27, # 10 Deft Ex. 36, # 11 Deft Ex. 37, # 12 Deft Ex. 38, # 13 Deft Ex. 39, # 14 Deft Ex. 42, # 15 Deft Ex. 44, # 16 Deft Ex. 47, # 17 Deft Ex. 59, # 18 Deft Ex. 60, # 19 Deft Ex. 68, # 20 Deft Ex. 69, # 21 Deft Ex. 70)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | 143 | EXHIBITS (Joint Exhibits: 1–3, 4–5, 8, 10) admitted and retained at the 123 Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, 126 Jury Trial – Continued, 125 Jury Trial – Continued, 124 Jury Trial – Continued, 128 Jury Trial – Continued, 129 Jury Trial – Continued, 130 Order on Motion for Directed Verdict, Jury Trial – Concluded, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Joint Ex. 1, # 2 Joint Ex. 2, # 3 Joint Ex. 3, # 4 Joint Ex. 4, # 5 Joint Ex. 5, # 6 Joint Ex. 8, # 7 Joint Ex. 10)(sct) (Entered: 06/27/2024) |
| 06/25/2024 | 145 | EXHIBITS (Court's Exhibits: 1–4) admitted and retained at the 123 Order on Motion for Order, Order on Motion in Limine, Jury Trial – Begun, 129 Jury Trial – Continued, 126 Jury Trial – Continued, 130 Order on Motion for Directed Verdict, Jury Trial – Concluded, 125 Jury Trial – Continued, 124 Jury Trial – Continued, 128 Jury Trial – Continued, have been received from Courtroom Deputy and placed in the custody of the Records Clerks. (Attachments: # 1 Court Ex. 1, # 2 Court Ex. 2, # 3 Court Ex. 3, # 4 Court Ex. 4)(sct) (Entered: 06/27/2024) |
| 06/26/2024 | 135 | MOTION for Entry of Prejudgment Interest by Robert Lang. (Attachments: # 1 Exhibit Exhibit 1 to Motion for Entry of Prejudgment Interest, # 2 Exhibit Exhibit 2 to Motion for Entry of Prejudgment Interest, # 3 Exhibit Exhibit 3 to Motion for Entry of Prejudgment Interest, # 4 Text of Proposed Order Exhibit 4 Proposed Order)(Bonham, Matthew) Modified docket text on 6/27/2024 (ajw). (Entered: 06/26/2024) |
| 06/27/2024 | 140 | NOTICE TO PLAINTIFF'S COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS from the civil jury trial held June 11–20, 2024 pursuant to Local Rule 79.1D. Re: 139 Exhibits, (sct) (Entered: 06/27/2024) |
| 06/27/2024 | 142 | |

| | | NOTICE TO DEFENDANT'S COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS from the civil jury trial held June 11–20, 2024 pursuant to Local Rule 79.1D. Re: 141 Exhibits, (sct) (Entered: 06/27/2024) |
|---|---|---|
| 06/27/2024 | 144 | NOTICE TO ALL (JOINT) COUNSEL OF RECORD regarding RECLAMATION AND DISPOSITION OF UNCLAIMED Documentary EXHIBITS from the civil jury trial June 11–20, 2024 pursuant to Local Rule 79.1D. Re: 143 Exhibits,(sct) (Entered: 06/27/2024) |
| 07/12/2024 | 146 | BILL OF COSTS by Robert Lang. (Attachments: # 1 Exhibit)(Zimmerman, Robert) (Entered: 07/12/2024) |
| 07/17/2024 | | Submission of 135 MOTION to Amend *Judgment for Entry of Prejudgment Interest* to District Judge Eleanor L. Ross. (mlb) (Entered: 07/17/2024) |
| 07/17/2024 | 147 | ORDER: The Court GRANTS the Plaintiffs Motion for Entry of Prejudgment Interest 135 . The Court ORDERS that the Clerk issue an amended judgment that adds $87,325.60 to the $2,350,963.43 amount in the June 24, 2024, Judgment. Signed by Judge Eleanor L. Ross on 07/17/2024. (ajw) (Entered: 07/18/2024) |
| 07/18/2024 | 148 | AMENDED CLERK'S JUDGMENT in favor of Plaintiff against Defendant (ajw)––Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist–– (Entered: 07/18/2024) |
| 07/22/2024 | 149 | MOTION for New Trial by Sig Sauer, Inc.. (Dennison, Kristen) (Entered: 07/22/2024) |
| 07/22/2024 | 150 | MOTION to Alter 133 Judgment, by Sig Sauer, Inc.. (Dennison, Kristen) (Entered: 07/22/2024) |
| 07/22/2024 | 151 | MOTION for Judgment as a Matter of Law by Sig Sauer, Inc.. (Dennison, Kristen) (Entered: 07/22/2024) |
| 07/26/2024 | 152 | NOTICE of Appearance by Naveen Ramachandrappa on behalf of Robert Lang (Ramachandrappa, Naveen) (Entered: 07/26/2024) |
| 07/26/2024 | 153 | NOTICE of Appearance by Matthew Sellers on behalf of Robert Lang (Sellers, Matthew) (Entered: 07/26/2024) |
| 07/26/2024 | 154 | Consent MOTION for Extension of Time to Extend His Deadlines to Respond to Defendant Sig Sauer, Inc.s Rule 50/59 Motions re: 151 MOTION for Judgment as a Matter of Law , 149 MOTION for New Trial , 150 MOTION to Alter 133 Judgment, by Robert Lang. (Attachments: # 1 Text of Proposed Order)(Ramachandrappa, Naveen) (Entered: 07/26/2024) |
| 07/26/2024 | 155 | ORDER: The Court GRANTS 154 Plaintiff Robert Lang's Motion to Extend His Deadlines to Respond to Defendant Sig Sauer, Inc. 's Rule 50/59 Motions. The Court ORDERS that Lang's new deadline to respond to Sig Sauer 's motions, see Doc. 149 , Doc. 150 , & Doc. 151 , shall be Monday, August 26, 2024. Signed by Judge Eleanor L. Ross on 07/26/2024. (ajw) (Entered: 07/26/2024) |
| 07/29/2024 | 156 | Costs Taxed in amount of $ 7,579.29 against Defendant (ajw) (Entered: 07/29/2024) |
| 08/08/2024 | 157 | NOTICE of Withdrawal of Co–Counsel for Defendant Sig Sauer, Inc. by Sig Sauer, Inc. (Woy, Jonathan) Modified docket text on 8/9/2024 (ajw). (Entered: 08/08/2024) |

| 08/12/2024 | 158 | BILL OF COSTS *SUPPLEMENTAL* by Robert Lang. (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B)(Hurd, Ryan) (Entered: 08/12/2024) |
|---|---|---|
| 08/13/2024 | 159 | NOTICE of filing Withdrawal of Motion by Robert Lang re 158 Bill of Costs (Hurd, Ryan) Modified docket text on 8/14/2024 (ajw). (Entered: 08/13/2024) |
| 08/13/2024 | 160 | Supplemental BILL OF COSTS by Robert Lang. (Attachments: # 1 Affidavit, # 2 Exhibit A, # 3 Exhibit B)(Hurd, Ryan) Modified docket text on 8/15/2024 (ajw). (Entered: 08/13/2024) |
| 08/13/2024 | | MINUTE ORDER (by docket entry only). The Court GRANTS Plaintiff's request to withdraw Plaintiff's Supplemental Bill of Costs. [See Docs. 158, 159]. Approved by District Judge Eleanor L. Ross on 8/13/24. (mlb) (Entered: 08/13/2024) |
| 08/23/2024 | 161 | Joint NOTICE and Stipulation of Transcripts of Videotaped Testimony Played at Trial by Robert Lang (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Zimmerman, Robert) Modified docket text on 8/23/2024 (ajw). (Entered: 08/23/2024) |
| 08/26/2024 | 162 | RESPONSE in Opposition re 151 MOTION for Judgment as a Matter of Law filed by Robert Lang. (Ramachandrappa, Naveen) (Entered: 08/26/2024) |
| 08/26/2024 | 163 | RESPONSE in Opposition re 149 MOTION for New Trial filed by Robert Lang. (Sellers, Matthew) (Entered: 08/26/2024) |
| 08/26/2024 | 164 | RESPONSE in Opposition re 150 MOTION to Alter 133 Judgment, filed by Robert Lang. (Attachments: # 1 Exhibit 1 – Verdict Form, # 2 Exhibit 2 – Appellate Opinion)(Sellers, Matthew) (Entered: 08/26/2024) |
| 08/27/2024 | 165 | TRANSCRIPT of Jury Trial Proceedings Volume 1 of 7 held on 6/11/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 166 | TRANSCRIPT of Jury Trial Proceedings Volume 2 of 7 held on 6/12/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 167 | TRANSCRIPT of Jury Trial Proceedings Volume 3 of 7 held on 6/13/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set |

| | | |
|---|---|---|
| | | for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 168 | TRANSCRIPT of Jury Trial Proceedings Volume 4 of 7 held on 6/14/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 169 | TRANSCRIPT of Jury Trial Proceedings Volume 5 of 7 held on 6/17/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 170 | TRANSCRIPT of Jury Trial Proceedings Volume 6 of 7 held on 6/18/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/27/2024 | 171 | TRANSCRIPT of Jury Trial Proceedings Volume 7 of 7 held on 6/20/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/17/2024. Redacted Transcript Deadline set for 9/27/2024. Release of Transcript Restriction set for 11/25/2024. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 08/27/2024) |
| 08/28/2024 | 172 | Costs Taxed in the amount of $12, 175.41 against Defendant. (ajw) (Entered: 08/28/2024) |
| 09/08/2024 | 173 | Consent MOTION to Extend Deadline for Defendant to file Reply Briefs in Support of Post–Trial Motions by Sig Sauer, Inc. (Attachments: # 1 Exhibit Proposed Order on Mtn to Extend Reply Deadlines)(Dennison, Kristen) Modified docket text on 9/9/2024 (ajw). (Entered: 09/08/2024) |
| 09/09/2024 | 174 | ORDER granting 173 Motion for Extension of Time to FileReply Briefs in Support of Post–Trial Motions. Defendants Reply Briefs in Support of Motion for New Trial Doc. 149 , Motion for a New Trial, or in the Alternative, Remittitur Doc. 150 , and |

| | | |
|---|---|---|
| | | Motion for Judgment as a Matter of Law Doc. 151 are due by September 23, 2024. Signed by Judge Eleanor L. Ross on 09/09/2024. (ajw) (Entered: 09/09/2024) |
| 09/23/2024 | 175 | REPLY to Response to Motion re 151 MOTION for Judgment as a Matter of Law filed by Sig Sauer, Inc.. (Dennison, Kristen) (Entered: 09/23/2024) |
| 09/23/2024 | 176 | REPLY to Response to Motion re 150 MOTION to Alter 133 Judgment, filed by Sig Sauer, Inc.. (Attachments: # 1 Exhibit Ex. A – Robinson Docket)(Dennison, Kristen) (Entered: 09/23/2024) |
| 09/23/2024 | 177 | REPLY to Response to Motion re 149 MOTION for New Trial filed by Sig Sauer, Inc.. (Dennison, Kristen) (Entered: 09/23/2024) |
| 09/24/2024 | | Submission of 149 MOTION for New Trial , 150 MOTION to Alter 133 Judgment, , and 151 MOTION for Judgment as a Matter of Law to District Judge Eleanor L. Ross. (mlb) (Entered: 09/24/2024) |
| 10/30/2024 | 178 | TRANSCRIPT of Pretrial Conference Proceedings held on 05/08/24, before Judge Eleanor L. Ross. Court Reporter/Transcriber Elizabeth G. Cohn. A full directory of court reporters and their contact information can be found at www.gand.uscourts.gov/court–reporter–directory. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/20/2024. Redacted Transcript Deadline set for 12/2/2024. Release of Transcript Restriction set for 1/28/2025. (Attachments: # 1 Notice of Filing Transcript) (egc) (Entered: 10/30/2024) |
| 02/06/2025 | 179 | ORDER: The Court DENIES Defendant Sig Sauer, Inc.'s Motion for a New Trial Doc. 149 ; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages Doc. 150 ; and Renewed Motion for Judgment as a Matter of Law Doc. 151 . Signed by Judge Eleanor L. Ross on 02/06/2025. (ajw) (Entered: 02/06/2025) |
| 03/07/2025 | 180 | NOTICE OF APPEAL as to 179 Order on Motion for New Trial,, Order on Motion to Alter Judgment,, Order on Motion for Judgment as a Matter of Law, by Sig Sauer, Inc.. Case Appealed to USCA – 11th Circuit. Filing fee $ 605, receipt number AGANDC–14126545. Transcript Order Form due on 3/21/2025 (Attachments: # 1 Exhibit Ex. A – Lang Order dated 02.06.2025)(Dennison, Kristen) (Entered: 03/07/2025) |

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ROBERT LANG,                              *
                                          *
            Plaintiff,                    *
                                          *
      v.                                  *        1:21-CV-04196-ELR
                                          *
SIG SAUER, INC.,                          *
                                          *
            Defendant.                    *
                                          *

_____

**ORDER**

_____

Presently before the Court are Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. The Court sets forth its reasoning and conclusions below.

## I.    Background

On December 11, 2018, Plaintiff Robert Lang's day began as usual. He showered, brushed his teeth, got dressed, placed his gun—a P320 pistol—into its holster, and clipped the holstered gun to his belt inside his waistband. Trial Tr. vol. 3 at 523:19–23; 524:15–16; 525:12–16. Then, he went to work, and at the end of the day, he came home to his wife and child. Id. at 525:22–25. After greeting them, he normally removed his holstered gun from his belt and stored it in a safe. Id. at 526:1–

8. However, that day, according to Plaintiff, when he reached down to remove his holstered gun, the gun unexpectedly fired as his index finger touched the clip of his holster. See id. at 528:12–16; 530:10–22. The bullet shot through his right thigh, causing him to experience "one of the most severe pains" he had ever experienced in his life. Id. at 531:21–532:4. Subsequently, Plaintiff initiated this lawsuit, alleging various claims against the manufacturer of his gun, Defendant Sig Sauer. See generally Compl. [Doc. 1-2]. In short, Plaintiff claims the P320 is defectively designed because it does not include a tabbed trigger and because Defendant failed to provide adequate warnings to its customers about the P320's risk of unintended discharges.[1]

Put simply, a tabbed trigger refers to a trigger with a projection or "tab" located on the face of the main trigger that needs to be pulled rearward simultaneously with the main trigger to fire the weapon. A tabbed trigger may be placed in the center of the main trigger, so that if the main trigger is pulled on the side, top, or bottom, the gun will not fire. Here, the crux of Plaintiff's claims is whether a tabbed trigger would have prevented the unintentional discharge of Plaintiff's P320 and his resulting injuries. In other words, was it reasonably foreseeable that the absence of a tabbed trigger on the P320 would result in

---

[1] At the summary judgment phase, the Court entered judgment in favor of Defendant on each of Plaintiff's claims to the extent that any claims were based on Defendant's failure to equip the P320 with a manual thumb safety. [Doc. 46 at 39–40].

Plaintiff's injuries? See Trial Tr. vol. 6 at 1029:6–25. The answer to that question depends, in part, on the design of the trigger and how and where the trigger on Plaintiff's gun was pulled on December 11, 2018.[2] The Parties agree that something caused the trigger to pull; however, they dispute what caused the trigger to pull. The Court summarizes the relevant trial testimony below.

## A.     Plaintiff's Testimony

Plaintiff testified that his gun was fully holstered when it fired, and his finger did not pull the trigger. In fact, it would have been impossible for him to do so because the trigger is fully covered and out of reach when the gun is holstered. See Trial Tr. vol. 3 at 506:1–2, 12–16; 537:11–12, 23–25; 538:9–14. Plaintiff also testified that the bullet "stovepiped" when it fired—which means that the bullet casing was jammed or "stuck" in the ejection port after the bullet fired. Id. at 531:1–4. Despite regular use, Plaintiff's P320 had never stovepiped before. See id. at 506:23–507:6.

## B.     Mr. Watkins's Testimony

Defendant's expert, Mr. Derek Watkins, testified that based on his inspection of Plaintiff's gun and holster, "the evidence in the holster is pretty conclusive that

---

[2] For instance, was the trigger pulled on the side or tip of the trigger, so that if the gun had included a tabbed trigger, the tab would not have been pulled and the gun would not have fired? Or was the was the trigger pulled squarely on its face, such that the gun would have discharged with or without a tabbed trigger?

the gun was discharged while partially withdrawn from the holster." Trial Tr. vol. 5 at 829:12–17. Mr. Watkins opined that it was "not possible" for Plaintiff's gun to have fired and caused the damage he observed on the holster while the gun was fully in the holster.[3] Id. at 998:21–24. Mr. Watkins based his opinion on two grounds. First, something must have pulled the trigger for the gun to fire. Id. at 830:8–9. Second, the damage to the holster was "localized onto one side of the holster." Id. at 833:21–25. According to Mr. Watkins, for the bullet to cause the off-center damage to the holster, the barrel of the gun had to be angled towards one side of the holster at the time of discharge. Id. If the gun had been fully holstered, the damage would not have been one-sided. See id. at 839:9–23. As a result, Mr. Watkins testified that there was no physical evidence in this case indicating that the trigger on Plaintiff's gun was pulled by anything other than Plaintiff's finger. Id. at 828:12–16. He also testified that there was no evidence of anything around Plaintiff's gun and holster that could have potentially contacted the trigger to pull it other than Plaintiff's fingers. Id. at 882:5–13.

## C.    Mr. Tertin's Testimony

Unlike Mr. Watkins, Plaintiff's expert, Mr. James Tertin did not examine Plaintiff's holster. Instead, Mr. Tertin, testified that it was his understanding that

---

[3] Mr. Watkins also testified that the holster was loose enough for Plaintiff's gun to fall out when turned upside down. Trial Tr. vol. 5 at 964:23–965:12.

Plaintiff's gun was fully holstered, and that as Plaintiff put his hand on the butt of the gun, it fired. Tertin Trial Dep. at 20:4–22 [Doc. 161-1]. He further explained that the fact that Plaintiff's gun stovepiped when it fired is "very significant" because stovepiping "indicate[s] that the gun was in the holster when it fired," thus corroborating Plaintiff's testimony.[4] Id. at 60:7–21.

Mr. Tertin testified that although he did not know what actuated the trigger, he did not think it was Plaintiff's finger. See id. at 81:13–82:16. Instead, Mr. Tertin explained that "we know that [Plaintiff's] pistol fired while it was in his holster, while he was taking it off. What caused that to fire, was it an object, was it the holster flexing as he was removing it, hitting the trigger on either side? We don't know." Id. at 64:16–22. Regardless of what contacted the trigger, Mr. Tertin testified that Plaintiff's pistol unintentionally firing would have been "highly improbable" with a tabbed trigger because "it would be nearly impossible for some object to get into

---

[4] Mr. Tertin explained that "stovepiping" is what a consumer would call a "jam." Tertin Trial Dep. at 59:2–5. When a user fires a pistol, the slide moves rearward, extracting a case from the chamber, and then ejecting the case from the firearm. Id. at 59:5–14. When a stovepipe occurs, the case does not cleanly eject, and the slide closes on it. Id. According to Mr. Tertin, a common cause of a stovepipe is that something slows the slide down so that it does not move back quickly enough or with enough force to eject the case. Id. at 59:16–19. Mr. Tertin explained that Plaintiff's gun may because the gun was holstered when it fired, and the holster supplies friction to both sides of the gun's slide as it moves rearward, causing it to slow down so that the fired case would not hit the ejector hard enough to be ejected. Id. at 60:7–21. However, Mr. Tertin did not inspect Plaintiff's holster. Id. at 71:14–17. Mr. Tertin acknowledged that other reasons, besides being in a holster, can cause a gun to stovepipe. Id. at 75:13–76:4.

5

that holster, turn the required amount, which is nearly 90 degrees, to squarely hit that tab and fire the pistol." <u>Id.</u> at 63:22–64:6.

Mr. Tertin also testified that he "truly believe[s]" that a tabbed trigger would have prevented Plaintiff's unintentional discharge "[a]ssuming [the] trigger was contacted on the side by . . . a foreign object or something." <u>Id.</u> at 64:7–13. Setting that assumption aside, Mr. Tertin acknowledged that he did not have an opinion about whether the object that pulled Plaintiff's trigger squarely contacted the front face of the trigger because there is "no way" he could determine that. <u>Id.</u> at 66:4–11. Consequently, Mr. Tertin could not "tell the jury the trigger was not pulled on the front face of the trigger" with absolute certainty. <u>Id.</u> at 66:12–15.

### D.    Dr. Vigilante's Testimony

Plaintiff's other expert, Dr. William Vigilante, largely testified about the risk-hazard analysis he conducted regarding the P320's design. <u>See</u> Trial Tr. vol. 4 at 680:14–684:2–4. For example, he explained how various types of inadvertent contact can cause a P320 trigger to acuate due to its lack of a tabbed trigger. He described that

> any pressure along the sides, along the top of the front, the bottom of the front, [or] the center of the front [of the P320 trigger], can result in the trigger actuating and discharging unintentionally. So the number of objects and scenarios where that could happen is innumerable. Certainly a finger grazing along the side of it can actuate it, where[as] it won't on a Glock [which has a tabbed trigger]. Certainly a piece of clothing has a higher likelihood of actuating [a P320 trigger] compared to a gun with a tabbed trigger. Any other foreign object that can

potentially get exposed to the trigger or come in contact with the trigger along the sides, the top, the front, the bottom, it doesn't really matter, it has [a] pretty (sic) likelihood of actuating it.

Id. at 702:20–703:9.

Dr. Vigilante demonstrated that the tip of a pencil can be used to cause a P320 trigger to actuate by pressing on the side, top, or bottom of the trigger. Id. at 703:24–704:3; 705:10–19; 706:1–14. He explained that a person's finger does not need to have direct contact on the face of a P320 trigger to actuate it. Id. at 696:14–16. Rather, one can actuate a P320 trigger "with pressure just on the side. Either side, one side. . . . So this means there's significantly more area of the trigger that is potentially exposed to inadvertent contact that can result in the trigger actuating, resulting in the round firing" and that creates an increased "risk of an inadvertent or accidental discharge." Id. at 696:16–697:2.

Like Mr. Tertin, Dr. Vigilante, did not examine Plaintiff's holster in this case, and he did "not reach[] an opinion as to what actuated the trigger, whether it was a foreign object or pressure on the side of the trigger from the holster and movement in the holster." Id. at 717:21–24; 719:8–13. He did however, testify that there were several possibilities for what occurred during the incident: either (1) an object contacted the trigger and moved upwards toward the grip; (2) a stationary object contacted the trigger and the gun moved downward onto it; (3) pressure was applied to the trigger by the side of the holster while the gun was moving rearward; or

7

(4) pressure was applied to the trigger by the side of the holster while the gun was moving forward.[5] Id. at 715:10–12; 716:9–21. He also testified that he believed that Plaintiff's P320 stovepiped because the gun was holstered when it discharged, causing friction on the slide; however, Dr. Vigilante did not conduct any testing to confirm his belief. Id. at 713:15–24.

Ultimately, based on Plaintiff's testimony about his gun being fully holstered and the police report related to Plaintiff's injuries (which also stated that the gun discharged within its holster), Dr. Vigilante, testified that "if the tabbed trigger safety was included on the Sig P320, . . . the subject incident most likely would not have occurred." Id. at 674:12–20; 709:3–4; 734:9–22.

## II.    Procedural History

This case was tried before a jury from June 11, 2024, through June 20, 2024. [Docs. 165–71]. The jury returned a verdict in favor of Plaintiff, which included the following findings:

- The P320 was defectively designed at the time it left Defendant's control because it did not possess a tabbed trigger, and the defective design caused harm to Plaintiff.

---

[5] Dr. Vigilante explained that the side of the holster can bend inwards and contact the side of the trigger. Trial Tr. vol. 4 at 717:25–718:10. However, he did not measure or conduct any testing to confirm whether any portion of Plaintiff's holster could in fact contact the trigger. Id. at 718:23–719:6.

- The P320 was defective because adequate warnings about the possibility of unintended discharges were not provided, and the absence of such warnings caused harm to Plaintiff.

- Defendant was negligent for selling the P320 without a tabbed trigger, and Defendant's negligence in the sale of the P320 caused harm to Plaintiff.

- Defendant was negligent for failing to warn customers of the risk of the P320 unintentional discharging, and Defendant's failure to warn customers of the risk of unintended discharges caused harm to Plaintiff.

[Doc. 131-1]. The jury awarded Plaintiff $2,350,963.43 in damages, which included:

| $50,963.43 | Stipulated past medical expenses |
|---|---|
| $1,610,000.00 | Past pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |
| $690,000.00 | Future pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |

[Id.] The Court entered judgment reflecting the jury verdict on June 24, 2024. [Doc. 133].

Defendant thereafter filed three motions: Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. Each motion has been fully briefed and is ripe for the Court's review. The Court begins with Defendant's Renewed Motion for Judgment as a Matter of Law.

III.     **Renewed Motion for Judgment as a Matter of Law**

A.     **Legal Standard**

Under Federal Rule of Civil Procedure 50, "[a] party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to find'" for the non-moving party. Chaney v. City of Orlando, Fla., 483 F.3d 1221, 1227 (11th Cir. 2007); Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). "Regardless of timing, however, in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney, 483 F.3d at 1227.

Thus, in ruling on Defendant's renewed motion under Rule 50(b) after the jury has rendered a verdict, this Court's sole consideration is to assess whether the jury's verdict is supported by sufficient evidence. Id.; see also Lipphardt, 267 F.3d at 1186. "Judgment as a matter of law for a defendant is appropriate, 'when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim.'" Cadle v. GEICO Gen. Ins. Co., 838 F.3d 1113, 1121 (11th Cir. 2016) (quoting Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1149 (11th Cir. 2005)). In assessing a

motion under Rule 50, the Court must review the evidence adduced at trial in the light most favorable to the non-movant. <u>Chaney</u>, 483 F.3d at 1222–23.

### B. Discussion

The Court first addresses Defendant's arguments related to Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger and then addresses Defendant's arguments related to Plaintiff's claim that the P320 is defective due to inadequate warnings.

> 1. <u>Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger.</u>

Defendant contends there is no legally sufficient evidentiary basis for a reasonable jury to find that the lack of a tabbed trigger on Plaintiff's P320 proximately caused Plaintiff's injuries.[6] Specifically, Defendant argues that the causation opinions of Mr. Tertin and Dr. Vigilante should have been excluded at trial as unreliable, and thus, no reasonable juror could have found in Plaintiff's favor because the evidence was insufficient to establish causation, an essential element of Plaintiff's claims.

---

[6] During trial, at the close of Plaintiff's case-in-chief, and again at the close of all evidence, Defendant moved for judgment as a matter of law, seeking: (1) to exclude the causation testimony and opinions of Plaintiff's experts, Mr. Tertin and Dr. Vigilante and, upon excluding that testimony, to dismiss Plaintiff's design defect claims for failure to establish causation; and (2) to dismiss Plaintiff's failure to warn claims as a matter of law for failure to establish causation. In its discretion, the Court denied Defendant's motions.

As a preliminary matter, the Court sets forth what expert testimony Plaintiff was required to present to the jury to prove his claims at trial. As summarized by the Eleventh Circuit,

> Under Georgia product liability law, a plaintiff must prove as part of his prima facie case that the defendant's product was the proximate cause of the injuries alleged. Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir.1985); Talley v. City Tank Corp., 158 Ga. App. 130, 279 S.E.2d 264, 269 (1981). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." Ogletree v. Navistar Int'l Transp. Corp., 245 Ga. App. 1, 3–4, 535 S.E.2d 545 (2000). In product liability cases, proof of causation generally requires reliable expert testimony which is "based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury." Rodrigues v. Georgia–Pacific Corp., 290 Ga. App. 442, 661 S.E.2d 141, 143 (2008) (emphasis added); see Maczko v. Employers Mut. Liab. Ins. Co., 116 Ga. App. 247, 157 S.E.2d 44, 46 (1967) ("The testimony must show at least a probable cause, as distinguished from a mere possible cause"). In the alternative, expert testimony stated only in terms of a "possible" cause may be sufficient if it is supplemented by probative non-expert testimony on causation. Rodrigues, 661 S.E.2d at 143.

Wilson v. Taser Int'l, Inc., 303 F. App'x 708, 715 (11th Cir. 2008). An opinion that is "suggestive only of the possibility of a causal relationship" between a product and alleged injuries "is deficient in showing with any certainty the probability" of proximate cause. See Maczko, 157 S.E. 2d at 47.

Defendant argues the evidence adduced at trial was insufficient because Plaintiff's experts' causation testimony was unreliable and therefore should have been excluded. The standard for "reliable expert testimony" is governed by Federal

Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals., Inc.</u>, 509 U.S. 579 (1993). Previously, at the summary judgment phase, Defendant argued that Mr. Tertin and Dr. Vigilante's opinions that the P320's lack of a tabbed trigger caused Plaintiff's injuries must be excluded due to lack of a reliable foundation. [<u>See, e.g.</u>, Doc. 46 at 20–21]. Defendant contended, in part, that Plaintiff's experts could not reliably testify that a tabbed trigger would have prevented Plaintiff's gun from firing because they did not know exactly what caused the gun to discharge. [<u>See</u> <u>id.</u> at 26]. The Court was unpersuaded and denied Defendant's motion to exclude Plaintiff's experts' testimony, finding that Plaintiff's experts adequately explained the bases for their opinion about the relationship between the lack of a tabbed trigger and Plaintiff's unintended discharge. [<u>Id.</u> at 27].

The Court declines to reconsider its ruling that Plaintiff's experts were qualified to provide expert testimony in this case. As previously explained, Plaintiff's experts "d[id] not need to identify the causes of the [i]ncident with certainty to testify regarding the same." [<u>Id.</u> at 29]; <u>see Waters v. AIG Claims, Inc.</u>, 608 F. Supp. 3d 1120, 1135 (M.D. Ala. 2022) ("[A]n expert is not required to address all alternative theories, nor would an expert's failure to do so be a sufficient basis for exclusion[.]"); <u>Diaz v. Carnival Corp.</u>, 544 F. Supp. 3d 1352, 1358 (S.D. Fla. 2021) (observing that "absolute certainty on causation is not required" for an expert to testify regarding the same); <u>Whelan v. Royal Caribbean Cruises Ltd.</u>, 976 F. Supp.

13

2d 1328, 1332 (S.D. Fla. 2013) (noting than "an expert need not rule out all possible alternative causes" or "decide on one cause in particular to the exclusion of all others"). Instead, the proper remedy to Defendant's critiques of Plaintiff's experts' testimony was to allow Defendant to vigorously cross-examine Plaintiff's experts and for the Court to carefully instruct the jury on Plaintiff's burden of proof, as was done at trial. See Daubert, 509 U.S. at 596.

Here, Defendant's expert opined that Plaintiff's gun was partially unholstered when it discharged, and that there was no evidence to conclude that anything other than Plaintiff's finger actuated the trigger. In contrast, Plaintiff's experts relied on Plaintiff's testimony and other facts suggesting that the gun was fully holstered when it discharged and that Plaintiff's finger did not pull the trigger. As a result, based on the likelihood that the trigger was pulled by a foreign object or the holster itself, Mr. Tertin concluded that it would have been "highly improbable" for Plaintiff's gun to have fired if it included a tabbed trigger. Put differently, although Mr. Tertin did not offer an opinion on precisely where or how the trigger was pulled, he essentially testified that it was "highly improbable" that it was pulled squarely on its face from within the holster. Viewing the evidence in the light most favorable to Plaintiff, this

14

is a legally sufficient evidentiary basis for a jury to find for Plaintiff.[7] See Chaney, 483 F.3d at 1222–23, 1227; Wilson, 303 F. App'x at 715 ("In product liability cases, proof of causation generally requires reliable expert testimony which is 'based, at the least, on the determination that there was *reasonable probability* that the negligence caused the injury.'" (emphasis in original)). It was the province of the jury to weigh the credibility of the Parties' conflicting testimony and choose what testimony to credit. See Wilson, 303 F. App'x at 715 ("As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases."). Accordingly, the Court denies Defendant's renewed motion as to Plaintiff's design defect claim.

2.  Plaintiff's claim that the P320 is defective due to inadequate warnings about the possibility of unintended discharges.

Defendant argues that Plaintiff's defect claim based on inadequate warnings also fails as a matter of law due to insufficient evidence of causation. As summarized by the Eleventh Circuit, "[i]n standard products liability cases premised on a failure to warn, Georgia law insists that a plaintiff show that the defendant had a duty to

---

[7] Defendant relies on Guinn v. AstraZeneca Pharamcy to argue that Plaintiff's experts were required to provide a reasonable explanation as why "any alternative cause suggested by the defense" was not the sole cause of Plaintiff's injuries. [See Doc. 151 at 14] (citing 602 F.3d 1245, 1253 (2010)). However, Defendant takes Guinn out of context. In that case, the Eleventh Circuit was discussing the requirements to offer expert testimony based on the scientifically accepted methodology of differential diagnosis—a methodology not applicable here. See Guinn, 602 F.3d at 1253.

warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). A manufacturer can breach its duty to warn by "failing to provide an adequate warning of the product's potential risks." Brown v. SharkNinja Operating, LLC, No. 1:22-CV-2896-MLB, 2024 WL 4269671, *11 (N.D. Ga. Sept. 20, 2024) (quoting Wilson Foods Corp. v. Turner, 460 S.E.2d 532 (Ga. Ct. App. 1995)).

"A breach of a duty to warn, however, must also be the cause of the injury about which the plaintiff complains, and the plaintiff must present evidence supporting a reasonable inference" that an adequate warning of the product's potential risks would have prevented the plaintiff's injuries. R & R Insulation Servs., Inc. v. Royal Indem. Co., 705 S.E.2d 223, 233 (Ga. Ct. App. 2010). Put differently, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." Id. "While proximate cause is an issue of fact normally reserved for the jury, Georgia law provides that the court may decide questions of proximate cause as a matter of law when the evidence is 'plain and undisputed.'" Hubbard v. Bayer HealthCare Pharms. Inc., 983 F.3d 1223, 1232 (11th Cir. 2020) (citation omitted).

At trial, Plaintiff argued that Defendant was negligent because it failed to warn its customers of the P320's "unreasonable risk" of unintended discharges. See, e.g.,

16

Trial Tr. vol. 6, 1062:4–9. By its instant motion, Defendant claims that Plaintiff

failed to present any evidence on the essential element of causation—specifically,

Defendant contends that there was no evidence adduced at trial that had Defendant

provided additional or different warnings, then Plaintiff would have done something

different that would have prevented the incident. [Doc. 151 at 20]. Plaintiff disagrees

and points to the following evidence:

- Plaintiff testified that prior to buying his P320 he "spent a lot of time on the company's website," "read reviews of the product" on various "gun-selling websites," and watched "many" videos and reviews about the gun on YouTube. Trial Tr. vol. 3 at 518:7–10.

- Plaintiff testified that he saw Defendant's advertising that the P320 "won't fire unless you want it to" and its "safety-without-compromise" promise. Id. 518:14–519:1. Plaintiff explained that based on that advertising, he felt that he "could trust" that the P320 "was going to be a safe one to carry." Id. at 519:3–6. He also testified that his impression was that the P320 was "being touted as one of the safest striker-fired pistols on the market to carry." Id. at 568.

- Plaintiff further testified that he did "not really" consider any other conceal-carry weapons when he was shopping because "based on what [he] saw on the website and in the reviews," the P320 "seemed like a very safe gun for [him] to carry. So [he] he chose the 320." Id. at 519:16–520:1.

Viewing this evidence in the light most favorable to Plaintiff, the Court finds

that there is sufficient evidence to prove causation for Plaintiff's failure to warn

claim. See Chaney, 483 F.3d at 1222–23, 1227. Drawing all inferences in Plaintiff's

favor, a reasonable jury could find that had Defendant adequately warned Plaintiff

that its design of the P320 created a heightened risk on unintended discharge,

17

Plaintiff would not have purchased the P320 and thus would not have been injured by it. [Doc. 162 at 19]. Accordingly, the Court denies Defendant's motion in its entirety. [Doc. 151].

## IV.  Motion for New Trial

### A.    Legal Standard

Federal Rule of Civil Procedure 59 provides that the Court "may on motion, grant a new trial on all or some of the issues" after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Granting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." Ewing v. Carnival Corp., No. 23-10883, 2024 WL 2764391, at *5 (11th Cir. May 30, 2024) (cleaned up).

"A losing party may also move for a new trial under Rule 59 on the grounds that 'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)). Thus, under Rule 59, a court may "in its discretion, grant a new

trial 'if in the court's opinion, the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence" which prevented the court from entering judgment as a matter of law under Rule 50. Id (quoting Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir.1984)) (cleaned up). Although a court cannot weigh evidence when confronted with a Rule 50 motion, in a motion for a new trial under Rule 59, the court "is free to weigh the evidence." Id. (citation omitted) "When independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." Id. (cleaned up).

As relevant here, an evidentiary error is not a basis to set aside a verdict if it "do[es] not affect any party's substantial rights." Fed. R. Civ. P. 61. "If one cannot say, with fair assurance, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1465 (11th Cir. 1994) (alterations accepted). The Eleventh Circuit has held that "the factors to consider in determining whether . . . substantial rights were affected [include] the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Id.

Various evidentiary issued raised by Defendant's motion implicate Federal Rules of Evidence 401, 402, and 403. It is axiomatic that for evidence to be admissible, it must be relevant to a claim or a defense asserted by the parties. <u>See</u> Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Civ. P. 402. Even relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### B.    Discussion

Defendant argues that the Court's following decisions constituted evidentiary errors: (1) the Court's denial of Defendant's motion *in limine* to exclude evidence of Defendant's Voluntary Upgrade Program [Doc. 149 at 12–15]; (2) the Court's denial of Defendant's motion *in limine* to exclude evidence referring to the P320 as a "double action" pistol [<u>Id.</u> at 16–17]; and (3) the Court's denial of Defendant's request for sanctions following Plaintiff's improper question to Defendant's expert about his total compensation in other unintended discharge cases. [<u>Id.</u> at 18–20]. The Court addresses each in turn.

### 1.   Evidence of the Voluntary Upgrade Program

A year prior to the manufacture of Plaintiff's P320 pistol, Defendant implemented a "Voluntary Upgrade Program," which included a design enhancement of a prior version of the P320 pistol. At the time, the P320 pistol "met and exceeded" various industry safety standards, which included standards that tested whether the gun was "drop safe"—i.e., whether the gun did not unintentionally discharge when dropped. [See Doc. 149 at 3]. However, the United States military and a private company called Omaha Outdoors independently tested the P320 and determined that it discharged when dropped at certain angles that were not included in the testing parameters defined by industry standards. Subsequently, Defendant reengineered certain components of the gun and offered the Voluntary Upgrade Program to allow P320 purchasers to "enhance" the drop safety of their P320s at no cost. [Id.] Plaintiff's P320 and all subsequent P320s include the upgraded design. [Id.]

Prior to trial, Defendant moved *in limine* to exclude evidence related to the Voluntary Upgrade Program as irrelevant and unfairly prejudicial. [Doc. 61]. Defendant argued that the evidence was irrelevant because it is undisputed that Plaintiff's P320 did not discharge from being dropped and that Plaintiff's P320 contained the upgraded design. Defendant also argued that the evidence was unfairly prejudicial because Plaintiff would attempt to use the evidence "to improperly

suggest to the jury that something is wrong with the P320" and that evidence of an unrelated alleged defective condition was likely to cause the jurors to "become confused and mistakenly associate the unrelated design enhancement with Plaintiff's alleged defect." [Id. at 61 at 5]. Plaintiff responded that the Voluntary Upgrade Program proves (1) Defendant's "capability to recognize and respond to dangerous defects of its products"; (2) Defendant's "ability to remedy a potential harm, even when it is not forced to do so"; and (3) Defendant's "reluctance to recall the P320." [Doc. 69 at 2–3]. Plaintiff stated that to the extent any risk of prejudice or confusion existed, such risk could be mitigated with limiting instructions. [Id.] Defendant replied that it has never suggested that it is incapable of identifying and remedying defects in its products and that evidence of the Voluntary Upgrade Program "would be duplicative and unfairly prejudicial." [Id. at 1–2].

At the pretrial conference, the Court denied Defendant's motion and found that Plaintiff could introduce evidence about the Voluntary Upgrade Program. See Pretrial Conf. Tr. at 77:1–18; 85:2–87:20 [Doc. 178]; [see also Doc. 91]. The Court based its decision on Defendant's representations that Defendant may introduce some evidence related to drop safety at trial; however, the Court noted that if Defendant's evidence "changes, and there's another objection," the Court would

change its ruling.[8] Id. at 87:15–20; see also id. at 87:8–12. Defendant did not request any limiting instructions related to the issue. At that time, the Court also granted Plaintiff's motion *in limine* to preclude evidence of the P320's compliance with industry standards, which related to certain testing data that Defendant had not produced in discovery because it was purportedly irrelevant to Plaintiff's defect theory at the time. Id. at 86:24–87; [Doc. 53].

At trial, Plaintiff referenced events related to the Voluntary Upgrade Program during opening statements, telling the jury that:

> We'll prove that Sig knew of another problem involving the P320 trigger and didn't want to fix it. Sig knew, you'll hear, that the gun could fire if it was dropped. But they tried to hide it from the public. Now, you'll hear that when the public found out about it through [an] Omaha Outdoors report, Sig Sauer scrambled.

---

[8] During the pretrial conference, the Court asked Defendant why it wanted to introduce evidence related to drop safety, given that it was undisputed that this is not a drop safety case. See Pretrial Conf. Tr. at 81:16–82:3. Defendant stated that a "a lot depends on where we go with respect to that argument, as to the purpose of a tabbed trigger." Id. at 81:14–25. According to Defendant, "the only way drop safety comes into the case is, again, our position that a tabbed trigger is put on by other manufacturers to allow them to pass drop testing. And that's the purpose of a tabbed trigger. That's why they used it. And the 320 didn't need it." Id. at 82:14–83:3. In response, Plaintiff argued that if Defendant could argue that the P320 did not need a tabbed trigger because it is drop safe, Plaintiff should be able to introduce evidence of the Voluntary Upgrade Program to (1) show that the P320's design initially failed to "stop drop fires" and (2) prevent the jury from believing the gun is "drop fire proof." Id. at 84:1–14. The Court said that it did not want "this to become a drop case, because it's not." Id. at 85:12–14. However, the Court stated, if Defendant were to introduce limited evidence about the gun's purported drop safety, doing so may open the door for Plaintiff to introduce limited evidence about the Voluntary Upgrade Program based on "how far the door is opened, if it is, in fact." Id. at 85:12–22. Defendant appeared to agree, responding that "a lot of [this] depends on how this evidence come comes in and how far the door is opened, if at all," while also noting that Plaintiff's gun was manufactured after the upgrade, and no evidence had been presented that the post-upgrade pistol had any defect related to drop safety. Id. at 85:24–86:9.

Trial Tr. vol. 2 at 277:8–13; see also id. at 296:10–13 ("They did not want to issue that first recall. And, ladies and gentlemen, they don't want to issue another one. Rather than protect its customers, you'll hear that Sig is more concerned about protecting itself."). Plaintiff's counsel further argued, "You'll hear that they lied about the P320. . . . You'll hear that they told the public that the gun was drop safe when it wasn't." Id. at 291:19, 292:2–3.

After opening statements and outside of the presence of the jury, Defendant argued that Plaintiff's opening statement opened the door for Defendant to introduce evidence that the P320 exceeded industry standards for drop safety.[9] See id. 371. Because Plaintiff described the Voluntary Upgrade Program as a "recall" and told the jury that Defendant lied to the public about the P320 being "drop safe when it wasn't," Defendant argued that it would be significantly prejudiced if it could not

---

[9] Defendant did not otherwise raise any objection regarding the nature of Plaintiff's substantive discussion of the Voluntary Upgrade Program despite that the fact that Plaintiff had arguably departed from the Court's ruling that permitted Plaintiff to introduce limited information about the Voluntary Upgrade Program if Defendant opened the door by introducing evidence about the gun's drop safety. See supra n.9. It is not this Court's place to speculate on a Party's trial strategy, but the Court nevertheless notes "there are a number of good reasons why skilled trial counsel may make a tactical decision" not to raise a specific objection. See Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993). Here, it may have been Defendant's view that it was more strategic to argue that the door had opened for it to introduce evidence of the P320's compliance with industry standards than to object or seek curative instructions related to Plaintiff's statements about the Voluntary Upgrade Program. See id. at 1128–29 (noting that trial counsel may choose not to object at trial when an "improper argument may open the door to a response that will be of more value than a sustained objection" and explaining that timely objections are required because counsel may not later claim error only when the result of their strategic choices is "unsatisfactory").

explain that the Voluntary Upgrade Program was, in fact, voluntary because the P320 met and exceeded industry safety standards related to drop safety.[10] Id. at 371–72. The Court agreed, finding that Plaintiff had opened the door and Defendant was permitted to ask questions about industry standards. Id. at 380:16–18.

After that, Plaintiff called Defendant's engineer, Mr. Sean Toner, as his first witness. Plaintiff elicited the following testimony about the events leading up to the Voluntary Upgrade Program:

- In February 2017, the United States military tested the P320s to determine if they were drop safe. Id. at 413:21–414:4. The military tested the pistol in ways that were "above and beyond" the military's protocol for drop safety, and they determined that the P320 unintentionally fired when dropped at a certain angle that Defendant had not tested. Id. at 414:1–13. The military asked Defendant "to see" if Defendant could improve the P320. Id. Defendant then gave the military a P320 with a redesigned firing mechanism. Id. at 414:19–24. Defendant also began working on a "production solution" for all of its guns related to the issue. Id. at 416:21–24. Meanwhile, between February 2017 and August 2017, Defendant continued to sell the original, unmodified version of the P320 to the public. Id. at 414:22–25.

- Separately, in August 2017, Omaha Outdoors identified another drop fire issue with the P320. After that, Defendant "accelerated their timeline" to offer the public "the enhanced version" of the P320 through the Voluntary Upgrade Program. Id. at 416:1–417:15. Mr. Toner was unsure of the exact time frame

---

[10] Defendant's arguments were also partly based on Plaintiff's use of a demonstrative during Plaintiff's opening statement that the Parties had conferred about. It was Defendant's understanding that Plaintiff planned to show the entire document during his opening statement; however, Plaintiff only showed the headline of the document, which stated, "Sig Sauer issues voluntary upgrade of P320 pistol." The rest of the document, which Defendant had assumed would be shown, stated that the P320 met various industry standards for drop safety, thus arguably opening the door to Defendant to introduce evidence related to those standards. See Trial Tr. vol. 2 at 300:6–304:21. Based on the Parties' prior agreement about the document, the Court initially denied Defendant's request to discuss the safety standards in its opening statement but permitted Defendant to raise the issue again after opening statements. See id. at 302:15–21.

between Omaha Outdoors's testing and Defendant's announcement of the Voluntary Upgrade Program, but Mr. Toner testified that "it was pretty quick." Id. at 428:15–17.

During closing arguments, Plaintiff's counsel relied on the Voluntary Upgrade Program to argue that Defendant "recalled their trigger once, but only after the public learned it wasn't safe. They didn't do it on their own. They didn't even do it when they were told the first time. It was when the public learned." Trial Tr. vol. 6 at 1045:2–5. Plaintiff's counsel told the jury that Defendant "continued selling a dangerous gun to the public for six months and then issued a voluntary recall. They continued selling a bad gun to the public in 2017, in February until August." Id. at 1060:19–22. Plaintiff's counsel concluded his initial closing statement by telling the jury that "the reason we need to do this, Sig will not change unless they are told to. And you will have that chance to tell them." Id. at 1069:5–7.

In Defendant's closing argument, Defendant's counsel told the jury:

This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components. it had everything the military had in the internal components. it had all of that. If he wanted it with a manual safety, he could have gotten it.

Id. at 1080:1–8.

Plaintiff's counsel then again relied on evidence related to the Voluntary Upgrade Program in his rebuttal closing:

26

Sig still doesn't get it. Do not let history repeat itself. If the military forces them to change the trigger, they'll fix an unintended discharge problem for the military. When a gun seller warns the public, and only after the public knows, Sig Sauer will fix an unintended discharge problem for the public. . . .

The public could not count on Sig Sauer to fix a safety concern that they knew could injure or kill. They kept selling the gun anyway knowing it could unintentionally discharge, for six months and injure a user or an innocent bystander, an adult or a child. They continued to sell it until they were called out in public. . . .

They have proven when it comes to looking out for its customers, you cannot count on Sig. And, ladies and gentlemen, we are now counting on you. We're counting on you to provide a loud and just verdict that Sig Sauer can hear all the way up in New Hampshire.

Id. at 1103:5–10; 1106:25–1107:5; 1108:14–18.

By its instant motion for a new trial, Defendant argues that the Court's decision to admit evidence about the Voluntary Upgrade Program was in error and caused substantial prejudice to Defendant. [Doc. 149 at 12]. Defendant asserts that the evidence was irrelevant, because even if evidence of the Voluntary Upgrade Program showed that Defendant possessed the "capability" to quickly implement a design change related to a now-resolved drop safety issue with the P320, such evidence bears no relevance to Plaintiff's present design defect claims related to a tabbed trigger. And even if it were relevant, such testimony should have been excluded due to the risk of confusing the jury and as unfairly prejudicial.

In response, Plaintiff contends the Voluntary Upgrade Program is relevant as "direct evidence" that Defendant is "capable of recognizing defects with its products

and taking action to fix them." [Doc. 163 at 4]. Plaintiff also claims that Mr. Toner's testimony that Defendant made changes to the P320 related to the Voluntary Upgrade Program "pretty quick" could show the jury that Defendant should have recognized and remedied the risk of unintended discharges while doing additional testing on the P320. [Id.] In reply, Defendant argues that Plaintiff's characterization of the use of the Voluntary Upgrade Program at trial is a "mastery of revisionist history" because Plaintiff never used evidence of the Voluntary Upgrade Program to show that Defendant had the ability to recognize defects in its products and fix them. [Doc. 177 at 1]. Instead, Plaintiff used evidence of the Voluntary Upgrade Program "as a tool to invoke fear in the jury, telling the jury that if it did not 'send a message'" to Defendant because the Voluntary Upgrade Program "shows that [Defendant] will not fix a problem unless the public demands it." [Doc. 177 at 2].

Upon review and consideration, the Court concludes that it was not an error to deny Defendant's motion to preclude evidence of the Voluntary Upgrade Program. Rule 401 broadly defines relevant evidence as evidence that "has *any* tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); see United States v. Macrina, 109 F.4th 1341, 1349 (11th Cir. 2024) ("The standard for what constitutes relevant evidence is a low one." (citation omitted)). Here, the Voluntary Upgrade

Program evidences the feasibility of Defendant modifying the P320's trigger, which is relevant to the risk-utility analysis of Plaintiff's design defect claim.

Further, Federal Rule of Civil Procedure 403 does not require the exclusion of the Voluntary Upgrade Program. "'Rule 403 is an "extraordinary remedy' that the district court 'should invoke sparingly, and the balance should be struck in favor of admissibility.'" Macrina, 109 F.4th at 1349 (citation omitted). Under Rule 403, the Court "look[s] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. Here, Plaintiff readily testified that he never dropped his P320; thus, there was little likelihood of confusion between Plaintiff's alleged defect and the drop safety issue that precipitated the Voluntary Upgrade Program. To the extent Defendant argues that evidence of the Voluntary Upgrade Program was unfairly prejudicial because Plaintiff's counsel used it to craft a "send a message" theme throughout Plaintiff's opening statement and closing arguments, Defendant did not object to Plaintiff's remarks or seek a curative instruction during trial.[11]

---

[11] The Court notes that Defendant moved *in limine* to preclude any commentary or suggestion regarding "sending a message" to Defendant or the community before trial. [Doc. 63 at 12]. The Court denied Defendant's motion, noting that it was lacked specificity for the Court to consider in the abstract and would have to be considered in the context in which the evidence was offered. Pretrial Conf. Tr. at 103:7–18; see Roberts v. AAA Cooper Transportation, Inc., No. 2:17-CV-00232-RWS, 2021 WL 9031229, at *2 (N.D. Ga. Aug. 27, 2021). Defendant did not raise the issue again.

Even if the testimony at issue was erroneously admitted, a new trial should be granted only if Defendant shows that its substantial rights were affected. See Fed. R. Civ. P. 61; Pearson v. Fulton Cnty., Georgia, No. 1:08-CV-3758-WCO, 2011 WL 13183218, at *10 (N.D. Ga. Sept. 23, 2011), aff'd sub nom. Fulton Cnty., Ga. v. Pearson, 502 F. App'x 816 (11th Cir. 2012). To determine whether a party's substantial rights were affected, the Court considers "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Ad-Vantage Tel., 37 F.3d at 1465.

Here, the Voluntary Upgrade Program did not implicate a "closely disputed question." See Ewing, 2024 WL 2764391, at *1. Rather, it is entirely undisputed that Plaintiff's P320 did not contain any alleged defects related to drop safety or the Voluntary Upgrade Program. Indeed, Plaintiff himself testified that he never saw any materials about the Voluntary Upgrade Program and that he never dropped his P320. Trial Tr. vol. 3 at 567:14–568:3, 577:8–12. Further, Plaintiff's counsel never argued or suggested that Plaintiff's P320 was defective due to any drop safety concerns related to the Voluntary Upgrade Program. It is also undisputed that Plaintiff used a post-upgrade P320 pistol—which is a fact that Defendant highlighted during closing arguments. See, e.g., Trial Tr. vol. 5 at 1080:1–8 ("This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary

30

Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components.").

Further, and as discussed above, to the extent Defendant argues that its substantial rights were implicated by Plaintiff's counsel's focus on the Voluntary Upgrade Program to urge the jury to improperly "send a message" to Defendant with its verdict, Defendant did not object to Plaintiff's counsel's "send a message" theme during trial or seek a curative instruction. In light of the Eleventh Circuit's reluctance "to set aside a jury verdict because of an argument made by counsel during closing arguments" and the "general rule" that "a timely objection is necessary to bring to the district court's attention errors in counsel's arguments," the Court finds that Defendant has failed to meet its burden to show that its substantial rights were affected by Court admitting evidence of the Voluntary Upgrade Program. See F.D.I.C. v. Stahl, 89 F.3d 1510, 1519–20 (11th Cir. 1996); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128 (11th Cir. 1993).

2.    Evidence of references to the P320 as a "double action" pistol

Plaintiff reviewed various materials before purchasing his P320; however, none of those materials identified the P320 as a double action pistol. Nevertheless, Plaintiff elicited testimony about instances when Defendant's marketing materials and Defendant's lead engineer referred to the P320 as a double action pistol rather

than a single action pistol. Defendant contends that the Court's decision to allow such testimony was an evidentiary error that affected Defendant's substantial rights.

As relevant here, Plaintiff's initial trial exhibit list was filed on November 30, 2023. [Doc. 48-11]. Apparently, Defendant took issue with the overbreadth of Plaintiff's list and "raised the issue with Plaintiff's counsel several times." [Doc. 149 at 6]. However, Defendant did not raise the issue with the Court. On May 30, 2024, Plaintiff provided a draft of what eventual became Plaintiff's final exhibit list, and by that time, the March 27, 2024 deadline for filing motions *in limine* had passed. [See Doc. 122-5]. A week and a half later, on June 11, 2024, after jury selection, Defendant informed the Court that, based on Plaintiff's updated exhibit list, Defendant anticipated that Plaintiff would improperly seek to introduce evidence of materials identifying the P320 as a double action pistol. The Court indicated that any requests to preclude evidence were untimely but permitted Defendant to file a motion for the Court's consideration. See Trial Tr. vol. 1 at 229:11–232:2. The Court expressed concern that Defendant had not previously raised the issue despite filing various other motions *in limine* between May 31, 2024 and June 11, 2024. See id.

The next day, on the morning of opening statements, Defendant filed its Motion to Preclude References to Materials Identifying the P320 as a Double Action Pistol. [Doc. 122]. After confirming that Defendant had been aware of the issues

raised in the motion since May 30, 2024, the Court denied Defendant's motion and opening statements commenced. See Trial Tr. vol. 2 at 263:12–15.

By its instant motion, Defendant contends that the Court erred by allowing Plaintiff to introduce evidence referring to the P320 as a double action pistol because it was irrelevant and used as an "inflammatory attack" on Defendant's credibility, thus warranting a new trial. [Doc. 149 at 17]. The Court disagrees for at least three reasons. First, the Court acted within its discretion by denying Defendant's motion as untimely. See United States v. Fernetus, 838 F. App'x 426, 432–33 (11th Cir. 2020) ("The district court acted within its discretion in denying [the defendant's] motion on timeliness grounds, and we will not consider the merits of his motion to suppress at this stage."). Second, regardless of timeliness, the evidence was relevant to explaining the Defendant's design choices of the P320 and the credibility of Defendant's design engineer. And third, even assuming it was an error to admit this evidence, the Court discerns no basis to find that Defendant's substantial rights were affected. Accordingly, the Court is unmoved by Defendant's argument to grant a new trial on this basis.

3.   Plaintiff's question to Defendant's expert about his total compensation in unintended discharge cases.

Prior to trial, the Court granted Defendant's motion *in limine* to preclude evidence of other unintended discharge incidents at trial after extensive briefing on the issue. [Doc. 104]. During trial, in violation of the Court's ruling, Plaintiff's

counsel asked Mr. Watkins, "How much money has your company billed to date with respect to Sig Sauer unintended discharge cases?" Trial Tr. vol. 5 at 974:25–975:3. Defendant objected, and the Court heard the Parties outside of the presence of the jury. The jury reentered, and the Court stated:

> Ladies and gentlemen, I'll remind you just briefly, from the beginning, during my preliminary instructions, I said the following: if I should sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate what the answer might have been, nor should you draw any inferences or conclusions from the question itself. And so I have sustained an objection, and we'll move forward to the next question.

See id. at 987:11–23. Plaintiff's counsel then asked Mr. Watkins, "Sir, how much has your company billed to date in its litigation work for Sig Sauer?" Id. He responded, "I don't know. I do not know," and Plaintiff's counsel continued to cross-examine him. Id.

Defendant contends that the Court's curative instruction was inadequate and compounded the prejudice of Plaintiff's violation of the Court's ruling that prohibited evidence of other unintended discharge cases. Defendant argues that the Court should have instead prohibited Plaintiff from asking Mr. Watkins about *any* compensation that he had received from Defendant in any other matter besides this case, which was the sanction Defendant requested during trial. [See Doc. 149 at 18–19]; Trial Tr. vol. 5 at 981:11–15.

34

The Court is unmoved by Defendant's arguments. The Court presumes "that jurors follow the instructions" given by the Court, and so the Court presumes that the jurors followed the Court's instruction not to "draw any inferences or conclusions" from Plaintiff's question to Mr. Watkins. See <u>Macrina</u>, 109 F.4th at 1350. Additionally, as the Court said during trial, based on the Party's representations and the Court's observations during trial, the Court does not believe that Plaintiff's counsel intended to violate the Court's prior ruling when he asked the subject question. See Trial Tr. vol. 5 at 984:16–24. Finally, the Court identifies no other reason to conclude that Plaintiff's question or the Court's curative instructions caused Defendant substantial prejudice. As the Court explained to the Parties, although the Parties knew how much time and litigation effort was expended on the issue of other similar incidents of unintended discharges, the jury did not have such context and was unlikely to be swayed by a single stray reference to other unintended discharge cases. See <u>id.</u> at 982:15–23. Accordingly, the Court declines to grant a new trial based on its denial of Defendant's requested sanctions.

In sum, even considering the cumulative effect of these purported evidentiary errors, the Court finds that Defendant has not met its burden of showing that its substantial rights were affected during trial. Accordingly, the Court denies Defendant's motion for a new trial. [Doc. 149].

35

## V. Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages

Lastly, Defendant moves for a new trial on damages, or in the alternative, remittitur, because the jury's award is excessive, Plaintiff's arguments incited the jury to award excessive damages, and the purported *per diem* award is punitive. [Doc. 150 at 10].

### A. Legal Standard

In addition to the above-discussed basis for granting a new trial under Rule 59(a)(1)(A), a party may move for a new trial on the grounds that "the verdict is against the weight of the evidence" or "the damages are excessive." McGinnis, Inc., 817 F.3d at 1254 (citation omitted). At this stage, the trial judge is "free to weigh the evidence." Id.

Alternatively, under Rule 59, a party may move to alter the judgment through a remittitur. Id. at 59(e). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999). "As a general rule, 'a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'" Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1266 (11th Cir. 2008) (citation omitted).

**B.    Discussion**

Defendant argues that the jury's verdict of $2,350,963.43 in compensatory damages is excessive, particularly because it is 46 times greater than Plaintiff's past medical expenses. [Doc. 150 at 1]. Defendant largely repackages its arguments raised in its Motion for a New Trial, arguing that various evidentiary errors— including admission of the Voluntary Upgrade Program, discussion of the P320 as a double action pistol, and the Court allowing Plaintiff's counsel to ask Defendant's expert questions about compensation—impermissibly swayed the jury and mandate a new trial on damages. See supra Part IV. However, for the same reasons discussed

above, Defendant has not met its burden to show that it is entitled to a new trial based

on those purported errors.[12]

Thus, the only issue that remains is whether the jury's verdict exceeds "the

outer limit of proof," in which case the Court must order a new trial or remit the

verdict. See Rodriguez, 518 F.3d at 1266; see also Edwards v. Sears, Roebuck &

---

[12] Defendant appears to argue that it is entitled to a new trial if the damages award is found to be so excessive that it must be the result of passion or prejudice. [See Doc. 150 at 8]. However, Defendant relies on an Eleventh Circuit opinion that applies Florida law not at issue here. [Id.]; see Bravo v. United States, 532 F.3d 1154, 1161 (11th Cir. 2008). Thus, the Court need not elaborate upon its analysis discussed supra Part IV. Nevertheless, the Court notes that its conclusion is bolstered by its instructions to the jury, which were not objected to by either Party, that the jury's decision "must not be influenced in any way by either sympathy for or prejudice against any party." Trial Tr. vol. 6 at 1024:3–6; see United States v. Roy, 855 F.3d 1133, 1186 (11th Cir. 2017) ("[W]e must presume that juries follow their instructions." (emphasis added)); see also Cephus v. CSX Transportation, Inc., 771 F. App'x 883, 893 (11th Cir. 2019). Additionally, Defendant devotes much of its instant motion to objections related to Plaintiff's use of suggested per diem rates for the jury to calculate damages during closing arguments. Defendant argues that the Court failed to take necessary precautions so that Plaintiff would "not inflame the jury" with such per diem calculations. [See, e.g., Doc. 150 at 19]. However, Defendant did not object to Plaintiff's per diem calculations at trial and "thus failed to give the [C]ourt an opportunity to sustain the objection and provide immediately a curative instruction." See Cephus, 771 F. App'x at 895; see also Ruiz v. Wing, 991 F.3d 1130, 1141 (11th Cir. 2021) ("A party must raise an objection to errors in the opposing party's argument."); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993) ("Requiring timely objection prohibits counsel from 'sandbagging' the court by remaining silent and then, if the result is unsatisfactory, claiming error")). Further, while the Court is cognizant that it "must use care" to ensure that any argument for per diem damages will not "result in an excessive verdict," the Court provided such necessary "safeguards" here by twice instructing the jury that any argument by either Party's counsel was not evidence. Trial Tr. vol. 6 at 1024:20–24 ("As I said before, you must consider only the evidence that I have admitted in the case. . . . Anything the lawyers say is not evidence and is not binding on you" (emphasis added)); id. at 1134:1–10 (instructing the jury that "the arguments and anything the lawyers say is not evidence" after the jury requested to view the Parties' closing arguments and presentation slides during their deliberations); id. at 1024:3–4 ("your decision must be based only on the evidence presented here" (emphasis added)); see Showan v. Pressdee, 922 F.3d 1211, 1220 & n.8 (11th Cir. 2019); Roy, 855 F.3d at 1186; cf. Foradori v. Harris, 523 F.3d 477, 511 (5th Cir. 2008) ("[W]e have never held that a district court which allows an objected-to unit-of-time argument must sua sponte give an unrequested cautionary instruction in order to avoid reversible error.").

Co., 512 F.2d 276, 283 (5th Cir. 1975)[13] (explaining that where there has been no

"prejudicial error in the course of a trial," but the verdict is excessive, remittitur is

the "proper remedy").

Under Georgia law,[14] "an award of damages is only excessive if it is 'so

exorbitant and flagrantly outrageous as to shock the moral sense,' or if it is

unsupported by the evidence." Meader By & Through Long v. United States, 881

F.2d 1056, 1060 (11th Cir. 1989) (quoting Valdosta Housing Auth. v. Finnessee,

287 S.E.2d 569, 571 (Ga. Ct. App. 1981)). The "moral sense" or "the 'conscience'

to be considered is not the personal or individual conscience of any particular judicial

officer; rather, it is the judicial conscience, which is always offended by jury verdicts

that are so irrational as to be the apparent result of bias, corruption, or prejudice."

Rockdale Hosp., LLC v. Evans, 834 S.E.2d 77, 81 (Ga. 2019). Moreover, when as

here, a significant amount of an award is for pain and suffering damages, such award

> is governed by no other standard than the enlightened conscience of
> impartial jurors. And the defendant has a heavy burden . . . to establish
> that such a damage award is excessive. In particular, appellate courts
> should be hesitant to second-guess verdicts where the damage award is

---

[13] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[14] In reviewing a compensatory damages award on a state law claim, the Court evaluates the propriety of the award under state law. Kerrivan v. R.J. Reynolds Tobacco Co., 953 F.3d 1196, 1204 n.6 (11th Cir. 2020); see also Faulkner v. W. Elec. Co., 98 F.R.D. 282, 283–84 (N.D. Ga. 1983) ("In the Eleventh Circuit the question of whether or not to grant a new trial or order remittitur in a diversity case is not governed solely by federal law, but instead presents a mixed issue of state and federal law.").

based in any significant part on pain and suffering. Therefore, for this Court to overturn the jury's verdict, it must be so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake by the jurors.

Georgia Trails & Rentals, Inc. v. Rogers, 855 S.E.2d 103, 116–17 (Ga. Ct. App. 2021). In determining whether a verdict is excessive, "it is appropriate to compare the award with awards in similar cases."[15] Meader, 881 at 1060 n.10.

Here, Defendant argues that the outer limit of the law necessitates a reduction of Plaintiff's pain and suffering award from $2,300,000 to $500,000, bringing the total jury award to $550,963.43. In support, Defendant cites various cases upholding pain and suffering awards that are approximately ten times plaintiff's past medical expenses or specific damages. [See Doc. 150 at 11–15]. However, the mere fact that some cases have upheld such awards does not necessarily create a ceiling for other pain and suffering awards or suggest that pain and suffering awards should be limited to a certain multiplier of specific damages. Indeed, the Court of Appeals of Georgia has outright rejected such a proposition. See Smith v. Crump, 476 S.E.2d 817, 821 (Ga. Ct. App. 1996) ("Under Georgia law, pain and suffering in the past,

---

[15] In Chrysler Group, LLC v. Walden, the Court of Appeals of Georgia stated that "no cases are exactly alike, so it may not be relevant to merely compare cases." 792 S.E.2d 754, 768 (Ga. Ct. App. 2016). The case was appealed, and the Georgia Supreme Court was poised to address whether the Court of Appeals "erred in failing to consider prior awards in similar cases to determine whether the remitted award of damages was excessive." See Chrysler Grp., LLC v. Walden, 812 S.E.2d 244, 248 (Ga. 2018). However, upon "review of the record and full briefing," the Supreme Court of Georgia "conclude[d] that this issue does not warrant [its] review." Id. at 255 n.6.

present, and future are measured by the enlightened conscience of a fair and impartial jury. There exists no rule or yardstick against which damages for pain and suffering are to be measured, as suggested by the appellant, who would have such damages as some multiple of special damage.").

Upon review and consideration, the Court finds no justification to set aside or remit the jury's verdict.[16] Moody v. Dykes, 496 S.E.2d 907, 912 (Ga. 1998) (noting that the threshold to set aside a jury verdict is "extremely high"). The jury made its award "in its enlightened conscience" and based upon proper evidence. Id. Although

---

[16] The Court acknowledges that the jury's award for past pain and suffering is strikingly similar to Plaintiff's counsel's *per diem* argument. Plaintiff's counsel suggested an award of $1,600,000 for past pain and suffering based on his suggested *per diem* calculations, which were partly tied to Defendant's expert's hourly rates. See Trial Tr. vol. 5 at 1066:18–22, 1067:13–1068:1. The jury awarded $1,610,000. In contrast, when it came to future pain and suffering, the jury deviated from Plaintiff's counsel's suggestion—awarding $690,000 instead of the suggested amount of $925,000. See id. at 1068:2–7. While the similarity of the verdict raises an inference that the jury's verdict was influenced by Plaintiff's counsel's argument, the Eleventh Circuit decisively instructs that the court "must" presume the jury followed the Courts instructions that nothing Plaintiff's counsel said was evidence and that the jury reached its verdict solely based on the admitted evidence in this case. See Roy, 855 F.3d at 1186–87 ("We can, should, and must presume that the jury followed [the court's] instructions[.]"); Trial Tr. vol. 6 at 1024:20–24; 1134:1–10 (the Court's instructions). This presumption is supported by the fact that the jury did not wholesale adopt Plaintiff's counsel's suggested verdict, but it instead awarded a lower amount of damages for future pain and suffering—which aligns with Plaintiff's testimony that many of his physical and emotional difficulties have improved over time. See, e.g., Trial Tr. vol. 3 at 554:1–16; 557:22–25; 559:5–13; 586:20–25. Thus, given the Court's instructions in this case, the Court concludes that the similarity between the Plaintiff's counsel's *per diem* closing argument and the jury's award does not render the verdict "so irrational as to be the apparent result of bias, corruption," or "gross mistake." See Rockdale Hosp., 834 S.E.2d at 81; Georgia Trails, 855 S.E.2d at 117; see also Showan, 922 F.3d at 1220 (noting that *per diem* arguments are governed by federal procedure and "the district court has complete discretion to disallow the argument or to allow it subject to safeguards").

the precise basis for the jury's decision can never be known, there is extensive

evidence supporting the jury's verdict. For example,

- The unintentional discharge left "a gaping hole on [Plaintiff's] right thigh." Trial Tr. vol. 3 at 531:24. He found the wound "when [his] finger dropped into" the hole, and he felt "one of the most severe pains" he had "ever felt in [his] life." Id. at 531:24–532:4. The jury saw a photo of the wound. [See Doc. 147-3]. The jury heard that the bullet in the gun "expanded" on impact "and tore the muscle and every bit of tissue and shot it out of the front of [his] thigh." Trial Tr. vol. 3 at 540:19–541:3. Yet despite the pain, Plaintiff was concerned not about himself, but "what could have happened" when his two-year old son came up to hug him moments before, and "that bullet could have been in his head." Id. at 532:18–24.

- Plaintiff's wife called 911, and Plaintiff waited what "felt like an eternity" for them to arrive. Id. at 536:12. The first responders took Plaintiff to the hospital, where he "suffered for a good bit" until "they were able to give pain medication to [him]." Id. at 539:14–24. And because "[t]here wasn't any tissue to suture," Plaintiff could do little but bandage the wound. Id. at 542:15–24. The pain "started getting worse and worse and worse." Id. at 544:1–2.

- Plaintiff was eventually discharged, but a few days later, he "spiked a 102-degree fever" and returned to the emergency room because he contracted sepsis. Id. at 545:4–11. The doctors "feared that [he] might not make it." Id. at 545:11. The bullet wound pain didn't "even compare to the pain of that infection," which Plaintiff testified felt like "a burning pain across [his] entire body that was just so relentless and never-ending. . . . [N]o matter what pain medication they gave [him], nothing would give [him] comfort." Id. at 545:13–19. He didn't sleep "for days" because it was so "unbearable." Id. at 545:19–20. He spent three days in the ICU and longer in the hospital in a "regular room" in the days leading up to Christmas. Id. at 545:22–23.

- Plaintiff wanted to get back home to spend Christmas with his son. His doctors ultimately agreed to let him leave if he went "to an outpatient infectious disease doctor to continue" antibiotic treatments. Id. at 546:3–8. Plaintiff also had to self-administer "high-powered IV antibiotics" to himself at home. Id. at 548:5–6. The antibiotics caused "throwing up, nausea, other stomach ailments that were pretty miserable on top of the pain." Id. at 548:21–22. Because of all this, Plaintiff was "physically unable to get" to enjoy Christmas

42

with his family, and he could not "experience Christmas at all in the way that [he] wanted to" or that his "son wanted [him] to be able to." Id. at 550:8–22.

- Plaintiff had a slow recovery. His wound "bled for six months . . . because of that severe infection that [he] contracted." Id. at 552:15–18. To help the wound heal, he had to undergo "debriding," "chemically burning any dead tissue from the surrounding area of the wound so that new tissue can begin to grow." Id. at 549:2–6. Plaintiff called it "one of the most excruciating things [he's] ever felt in [his] life" as his doctors "use[d] some sort of acid and literally just burn and boil that dead tissue." Id. at 549:8–11. And once his doctors used the acid, they "use[d] special tools [to] cut and scrape that burnt tissue off." Id. at 549:12–13. That went on "for weeks and weeks to try to get that wound to close up." Id. at 549:15–16. Plaintiff was "basically bedridden through that entire process" due to the pain. Id. at 549:25–550:1.

- While this went on, Plaintiff could not get around because he "couldn't bear hardly any weight on his leg." Id. at 551:2–10. He "couldn't drive," so his mother or wife had to take him to medical appointments. Id. at 551:6–7. He had to use crutches for six months. Id. at 551:18–20. He couldn't work, so his employer gave him a leave of absence. Id. at 551:11–17.

- After the crutches, Plaintiff started "doing physical therapy," and he "also went to using a cane" for a year after he got off crutches. Id. at 551:23–552:2. The injury changed "the way that [he] walk[ed] . . . pretty dramatically," because he "favor[ed] the other leg." Id. at 552:2–4. The change to his gait gave him "foot problems" and "pain associated with that as well." Id. at 552:4–7.

- Plaintiff also testified about the impact on his mental health. He "definitely suffered from PTSD" and "had extreme heightened anxiety." Id. at 553:9–10. He has "reoccurring nightmares constantly about that bullet striking [his] son." Id. at 554:10–11. Plaintiff still "struggle[s]" with nightmares, although they are "better now" and do not happen as often as they did in the beginning when he would have them "every single night for months and months and months." Id. at 554:11–16. Plaintiff's anxiety affected his work and "[l]oud noises would make [him] jump." Id. at 553:16–18. For "two years after the incident," he was unable to be "present there mentally for [his] son." Id. at 557:17–19. The incident "robbed [Plaintiff] of a lot of time with" his son. Id. at 557:14.

43

- Additionally, although Plaintiff testified that he no longer experiences any physical limitations as a result of the incident, he suffers nerve damage that "is never going to go away." Trial Tr. vol. 3 at 554:2, 586:20–25. This nerve damage includes "electrical pains" that "randomly shoot" "from the vicinity of [his] wounds all the way up into [his hip]" and "kind of feel" like he is "being struck again." Id. at 554:1–11, 559:11–13. Plaintiff also still has no "feeling on the actual wounds themselves." Id. at 556:17.

Thus, based on this evidence, the Court finds that the jury's verdict is not "so exorbitant and flagrantly outrageous as to shock the moral sense" or "create a *clear* implication of bias, prejudice, or gross mistake by the jurors." Meader, 881 F.2d at 1060; Georgia Trails, 855 S.E.2d at 117 (Ga. Ct. App. 2021) (emphasis added). Accordingly, the Court denies Defendant's motion. [Doc. 150].

## VI.    Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151].

**SO ORDERED**, this 6th day of February, 2025.

_Eleanor L. Ross_

Eleanor L. Ross
United States District Judge
Northern District of Georgia

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

—————————————————— :
                              :
ROBERT LANG,                  :
                              :
                Plaintiff,   : Civil Action No. 1:21-cv-04196
                              :
    vs.                         :
                              :
SIG SAUER, INC.,         :
                              : Honorable Eleanor L. Ross
              Defendant.  :
——————————————————:

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that Sig Sauer, Inc., defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the final Order entered on February 6, 2025. A true and correct copy of the verdict at issue is attached hereto as Exhibit A.

Respectfully submitted,

LITTLETON JOYCE UGHETTA & KELLY LLP

BY: /s/ *Kristen E. Dennison*
      Kristen E. Dennison, Esq.
      2460 N Courtenay Pkwy, Suite 204
      Merritt Island, FL  32953
      Tel: (321) 574-0280
      Fax: (321) 574-4054
      kristen.dennison@littletonjoyce.com

## <u>CERTIFICATE OF SERVICE</u>

I, Kristen E. Dennison, do hereby certify that a true and correct copy of the foregoing Notice of Appeal was served upon all parties by electronic filing on March 7, 2025.

LITTLETON JOYCE UGHETTA & KELLY LLP

BY: <u>*/s/ Kristen E. Dennison*</u>
  Kristen E. Dennison, Esq.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBERT LANG, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 1:21-CV-04196-ELR |
| | * | |
| SIG SAUER, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

## ORDER

_____

Presently before the Court are Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. The Court sets forth its reasoning and conclusions below.

## I.    Background

On December 11, 2018, Plaintiff Robert Lang's day began as usual. He showered, brushed his teeth, got dressed, placed his gun—a P320 pistol—into its holster, and clipped the holstered gun to his belt inside his waistband. Trial Tr. vol. 3 at 523:19–23; 524:15–16; 525:12–16. Then, he went to work, and at the end of the day, he came home to his wife and child. Id. at 525:22–25. After greeting them, he normally removed his holstered gun from his belt and stored it in a safe. Id. at 526:1–

8. However, that day, according to Plaintiff, when he reached down to remove his holstered gun, the gun unexpectedly fired as his index finger touched the clip of his holster. See id. at 528:12–16; 530:10–22. The bullet shot through his right thigh, causing him to experience "one of the most severe pains" he had ever experienced in his life. Id. at 531:21–532:4. Subsequently, Plaintiff initiated this lawsuit, alleging various claims against the manufacturer of his gun, Defendant Sig Sauer. See generally Compl. [Doc. 1-2]. In short, Plaintiff claims the P320 is defectively designed because it does not include a tabbed trigger and because Defendant failed to provide adequate warnings to its customers about the P320's risk of unintended discharges.[1]

    Put simply, a tabbed trigger refers to a trigger with a projection or "tab" located on the face of the main trigger that needs to be pulled rearward simultaneously with the main trigger to fire the weapon. A tabbed trigger may be placed in the center of the main trigger, so that if the main trigger is pulled on the side, top, or bottom, the gun will not fire. Here, the crux of Plaintiff's claims is whether a tabbed trigger would have prevented the unintentional discharge of Plaintiff's P320 and his resulting injuries. In other words, was it reasonably foreseeable that the absence of a tabbed trigger on the P320 would result in

---

[1] At the summary judgment phase, the Court entered judgment in favor of Defendant on each of Plaintiff's claims to the extent that any claims were based on Defendant's failure to equip the P320 with a manual thumb safety. [Doc. 46 at 39–40].

Plaintiff's injuries? <u>See</u> Trial Tr. vol. 6 at 1029:6–25. The answer to that question depends, in part, on the design of the trigger and how and where the trigger on Plaintiff's gun was pulled on December 11, 2018.[2] The Parties agree that something caused the trigger to pull; however, they dispute what caused the trigger to pull. The Court summarizes the relevant trial testimony below.

### A.    Plaintiff's Testimony

Plaintiff testified that his gun was fully holstered when it fired, and his finger did not pull the trigger. In fact, it would have been impossible for him to do so because the trigger is fully covered and out of reach when the gun is holstered. <u>See</u> Trial Tr. vol. 3 at 506:1–2, 12–16; 537:11–12, 23–25; 538:9–14. Plaintiff also testified that the bullet "stovepiped" when it fired—which means that the bullet casing was jammed or "stuck" in the ejection port after the bullet fired. <u>Id.</u> at 531:1–4. Despite regular use, Plaintiff's P320 had never stovepiped before. <u>See id.</u> at 506:23–507:6.

### B.    Mr. Watkins's Testimony

Defendant's expert, Mr. Derek Watkins, testified that based on his inspection of Plaintiff's gun and holster, "the evidence in the holster is pretty conclusive that

---

[2] For instance, was the trigger pulled on the side or tip of the trigger, so that if the gun had included a tabbed trigger, the tab would not have been pulled and the gun would not have fired? Or was the was the trigger pulled squarely on its face, such that the gun would have discharged with or without a tabbed trigger?

the gun was discharged while partially withdrawn from the holster." Trial Tr. vol. 5 at 829:12–17. Mr. Watkins opined that it was "not possible" for Plaintiff's gun to have fired and caused the damage he observed on the holster while the gun was fully in the holster.[3] Id. at 998:21–24. Mr. Watkins based his opinion on two grounds. First, something must have pulled the trigger for the gun to fire. Id. at 830:8–9. Second, the damage to the holster was "localized onto one side of the holster." Id. at 833:21–25. According to Mr. Watkins, for the bullet to cause the off-center damage to the holster, the barrel of the gun had to be angled towards one side of the holster at the time of discharge. Id. If the gun had been fully holstered, the damage would not have been one-sided. See id. at 839:9–23. As a result, Mr. Watkins testified that there was no physical evidence in this case indicating that the trigger on Plaintiff's gun was pulled by anything other than Plaintiff's finger. Id. at 828:12–16. He also testified that there was no evidence of anything around Plaintiff's gun and holster that could have potentially contacted the trigger to pull it other than Plaintiff's fingers. Id. at 882:5–13.

## C.    Mr. Tertin's Testimony

Unlike Mr. Watkins, Plaintiff's expert, Mr. James Tertin did not examine Plaintiff's holster. Instead, Mr. Tertin, testified that it was his understanding that

---

[3] Mr. Watkins also testified that the holster was loose enough for Plaintiff's gun to fall out when turned upside down. Trial Tr. vol. 5 at 964:23–965:12.

4

Plaintiff's gun was fully holstered, and that as Plaintiff put his hand on the butt of the gun, it fired. Tertin Trial Dep. at 20:4–22 [Doc. 161-1]. He further explained that the fact that Plaintiff's gun stovepiped when it fired is "very significant" because stovepiping "indicate[s] that the gun was in the holster when it fired," thus corroborating Plaintiff's testimony.[4] Id. at 60:7–21.

Mr. Tertin testified that although he did not know what actuated the trigger, he did not think it was Plaintiff's finger. See id. at 81:13–82:16. Instead, Mr. Tertin explained that "we know that [Plaintiff's] pistol fired while it was in his holster, while he was taking it off. What caused that to fire, was it an object, was it the holster flexing as he was removing it, hitting the trigger on either side? We don't know." Id. at 64:16–22. Regardless of what contacted the trigger, Mr. Tertin testified that Plaintiff's pistol unintentionally firing would have been "highly improbable" with a tabbed trigger because "it would be nearly impossible for some object to get into

---

[4] Mr. Tertin explained that "stovepiping" is what a consumer would call a "jam." Tertin Trial Dep. at 59:2–5. When a user fires a pistol, the slide moves rearward, extracting a case from the chamber, and then ejecting the case from the firearm. Id. at 59:5–14. When a stovepipe occurs, the case does not cleanly eject, and the slide closes on it. Id. According to Mr. Tertin, a common cause of a stovepipe is that something slows the slide down so that it does not move back quickly enough or with enough force to eject the case. Id. at 59:16–19. Mr. Tertin explained that Plaintiff's gun may because the gun was holstered when it fired, and the holster supplies friction to both sides of the gun's slide as it moves rearward, causing it to slow down so that the fired case would not hit the ejector hard enough to be ejected. Id. at 60:7–21. However, Mr. Tertin did not inspect Plaintiff's holster. Id. at 71:14–17. Mr. Tertin acknowledged that other reasons, besides being in a holster, can cause a gun to stovepipe. Id. at 75:13–76:4.

5

that holster, turn the required amount, which is nearly 90 degrees, to squarely hit that tab and fire the pistol." Id. at 63:22–64:6.

Mr. Tertin also testified that he "truly believe[s]" that a tabbed trigger would have prevented Plaintiff's unintentional discharge "[a]ssuming [the] trigger was contacted on the side by . . . a foreign object or something." Id. at 64:7–13. Setting that assumption aside, Mr. Tertin acknowledged that he did not have an opinion about whether the object that pulled Plaintiff's trigger squarely contacted the front face of the trigger because there is "no way" he could determine that. Id. at 66:4–11. Consequently, Mr. Tertin could not "tell the jury the trigger was not pulled on the front face of the trigger" with absolute certainty. Id. at 66:12–15.

### D.    Dr. Vigilante's Testimony

Plaintiff's other expert, Dr. William Vigilante, largely testified about the risk-hazard analysis he conducted regarding the P320's design. See Trial Tr. vol. 4 at 680:14–684:2–4. For example, he explained how various types of inadvertent contact can cause a P320 trigger to acuate due to its lack of a tabbed trigger. He described that

> any pressure along the sides, along the top of the front, the bottom of the front, [or] the center of the front [of the P320 trigger], can result in the trigger actuating and discharging unintentionally. So the number of objects and scenarios where that could happen is innumerable. Certainly a finger grazing along the side of it can actuate it, where[as] it won't on a Glock [which has a tabbed trigger]. Certainly a piece of clothing has a higher likelihood of actuating [a P320 trigger] compared to a gun with a tabbed trigger. Any other foreign object that can

6

potentially get exposed to the trigger or come in contact with the trigger along the sides, the top, the front, the bottom, it doesn't really matter, it has [a] pretty (sic) likelihood of actuating it.

Id. at 702:20–703:9.

Dr. Vigilante demonstrated that the tip of a pencil can be used to cause a P320 trigger to actuate by pressing on the side, top, or bottom of the trigger. Id. at 703:24– 704:3; 705:10–19; 706:1–14. He explained that a person's finger does not need to have direct contact on the face of a P320 trigger to actuate it. Id. at 696:14–16. Rather, one can actuate a P320 trigger "with pressure just on the side. Either side, one side. . . . So this means there's significantly more area of the trigger that is potentially exposed to inadvertent contact that can result in the trigger actuating, resulting in the round firing" and that creates an increased "risk of an inadvertent or accidental discharge." Id. at 696:16–697:2.

Like Mr. Tertin, Dr. Vigilante, did not examine Plaintiff's holster in this case, and he did "not reach[] an opinion as to what actuated the trigger, whether it was a foreign object or pressure on the side of the trigger from the holster and movement in the holster." Id. at 717:21–24; 719:8–13. He did however, testify that there were several possibilities for what occurred during the incident: either (1) an object contacted the trigger and moved upwards toward the grip; (2) a stationary object contacted the trigger and the gun moved downward onto it; (3) pressure was applied to the trigger by the side of the holster while the gun was moving rearward; or

7

(4) pressure was applied to the trigger by the side of the holster while the gun was moving forward.[5] Id. at 715:10–12; 716:9–21. He also testified that he believed that Plaintiff's P320 stovepiped because the gun was holstered when it discharged, causing friction on the slide; however, Dr. Vigilante did not conduct any testing to confirm his belief. Id. at 713:15–24.

Ultimately, based on Plaintiff's testimony about his gun being fully holstered and the police report related to Plaintiff's injuries (which also stated that the gun discharged within its holster), Dr. Vigilante, testified that "if the tabbed trigger safety was included on the Sig P320, . . . the subject incident most likely would not have occurred." Id. at 674:12–20; 709:3–4; 734:9–22.

## II.    Procedural History

This case was tried before a jury from June 11, 2024, through June 20, 2024. [Docs. 165–71]. The jury returned a verdict in favor of Plaintiff, which included the following findings:

- The P320 was defectively designed at the time it left Defendant's control because it did not possess a tabbed trigger, and the defective design caused harm to Plaintiff.

---

[5] Dr. Vigilante explained that the side of the holster can bend inwards and contact the side of the trigger. Trial Tr. vol. 4 at 717:25–718:10. However, he did not measure or conduct any testing to confirm whether any portion of Plaintiff's holster could in fact contact the trigger. Id. at 718:23–719:6.

- The P320 was defective because adequate warnings about the possibility of unintended discharges were not provided, and the absence of such warnings caused harm to Plaintiff.

- Defendant was negligent for selling the P320 without a tabbed trigger, and Defendant's negligence in the sale of the P320 caused harm to Plaintiff.

- Defendant was negligent for failing to warn customers of the risk of the P320 unintentional discharging, and Defendant's failure to warn customers of the risk of unintended discharges caused harm to Plaintiff.

[Doc. 131-1]. The jury awarded Plaintiff $2,350,963.43 in damages, which included:

| $50,963.43 | Stipulated past medical expenses |
|---|---|
| $1,610,000.00 | Past pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |
| $690,000.00 | Future pain and suffering, disability, physical impairment, mental anguish, inconvenience, and loss of enjoyment of life |

[Id.] The Court entered judgment reflecting the jury verdict on June 24, 2024. [Doc. 133].

Defendant thereafter filed three motions: Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151]. Each motion has been fully briefed and is ripe for the Court's review. The Court begins with Defendant's Renewed Motion for Judgment as a Matter of Law.

9

## III.    Renewed Motion for Judgment as a Matter of Law

### A.    Legal Standard

Under Federal Rule of Civil Procedure 50, "[a] party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to find'" for the non-moving party. Chaney v. City of Orlando, Fla., 483 F.3d 1221, 1227 (11th Cir. 2007); Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001). "Regardless of timing, however, in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." Chaney, 483 F.3d at 1227.

Thus, in ruling on Defendant's renewed motion under Rule 50(b) after the jury has rendered a verdict, this Court's sole consideration is to assess whether the jury's verdict is supported by sufficient evidence. Id.; see also Lipphardt, 267 F.3d at 1186. "Judgment as a matter of law for a defendant is appropriate, 'when there is insufficient evidence to prove an element of the claim, which means that no jury reasonably could have reached a verdict for the plaintiff on that claim.'" Cadle v. GEICO Gen. Ins. Co., 838 F.3d 1113, 1121 (11th Cir. 2016) (quoting Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1149 (11th Cir. 2005)). In assessing a

10

motion under Rule 50, the Court must review the evidence adduced at trial in the light most favorable to the non-movant. Chaney, 483 F.3d at 1222–23.

### B.    Discussion

The Court first addresses Defendant's arguments related to Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger and then addresses Defendant's arguments related to Plaintiff's claim that the P320 is defective due to inadequate warnings.

> 1.    Plaintiff's claim that the P320 is defectively designed due to its lack of a tabbed trigger.

Defendant contends there is no legally sufficient evidentiary basis for a reasonable jury to find that the lack of a tabbed trigger on Plaintiff's P320 proximately caused Plaintiff's injuries.[6] Specifically, Defendant argues that the causation opinions of Mr. Tertin and Dr. Vigilante should have been excluded at trial as unreliable, and thus, no reasonable juror could have found in Plaintiff's favor because the evidence was insufficient to establish causation, an essential element of Plaintiff's claims.

---

[6] During trial, at the close of Plaintiff's case-in-chief, and again at the close of all evidence, Defendant moved for judgment as a matter of law, seeking: (1) to exclude the causation testimony and opinions of Plaintiff's experts, Mr. Tertin and Dr. Vigilante and, upon excluding that testimony, to dismiss Plaintiff's design defect claims for failure to establish causation; and (2) to dismiss Plaintiff's failure to warn claims as a matter of law for failure to establish causation. In its discretion, the Court denied Defendant's motions.

As a preliminary matter, the Court sets forth what expert testimony Plaintiff was required to present to the jury to prove his claims at trial. As summarized by the Eleventh Circuit,

> Under Georgia product liability law, a plaintiff must prove as part of his prima facie case that the defendant's product was the proximate cause of the injuries alleged. Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir.1985); Talley v. City Tank Corp., 158 Ga. App. 130, 279 S.E.2d 264, 269 (1981). "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." Ogletree v. Navistar Int'l Transp. Corp., 245 Ga. App. 1, 3–4, 535 S.E.2d 545 (2000). In product liability cases, proof of causation generally requires reliable expert testimony which is "based, at the least, on the determination that there was a *reasonable probability* that the negligence caused the injury." Rodrigues v. Georgia–Pacific Corp., 290 Ga. App. 442, 661 S.E.2d 141, 143 (2008) (emphasis added); see Maczko v. Employers Mut. Liab. Ins. Co., 116 Ga. App. 247, 157 S.E.2d 44, 46 (1967) ("The testimony must show at least a probable cause, as distinguished from a mere possible cause"). In the alternative, expert testimony stated only in terms of a "possible" cause may be sufficient if it is supplemented by probative non-expert testimony on causation. Rodrigues, 661 S.E.2d at 143.

Wilson v. Taser Int'l, Inc., 303 F. App'x 708, 715 (11th Cir. 2008). An opinion that is "suggestive only of the possibility of a causal relationship" between a product and alleged injuries "is deficient in showing with any certainty the probability" of proximate cause. See Maczko, 157 S.E. 2d at 47.

Defendant argues the evidence adduced at trial was insufficient because Plaintiff's experts' causation testimony was unreliable and therefore should have been excluded. The standard for "reliable expert testimony" is governed by Federal

12

Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals., Inc.</u>, 509 U.S. 579 (1993). Previously, at the summary judgment phase, Defendant argued that Mr. Tertin and Dr. Vigilante's opinions that the P320's lack of a tabbed trigger caused Plaintiff's injuries must be excluded due to lack of a reliable foundation. [<u>See, e.g.</u>, Doc. 46 at 20–21]. Defendant contended, in part, that Plaintiff's experts could not reliably testify that a tabbed trigger would have prevented Plaintiff's gun from firing because they did not know exactly what caused the gun to discharge. [<u>See id.</u> at 26]. The Court was unpersuaded and denied Defendant's motion to exclude Plaintiff's experts' testimony, finding that Plaintiff's experts adequately explained the bases for their opinion about the relationship between the lack of a tabbed trigger and Plaintiff's unintended discharge. [<u>Id.</u> at 27].

The Court declines to reconsider its ruling that Plaintiff's experts were qualified to provide expert testimony in this case. As previously explained, Plaintiff's experts "d[id] not need to identify the causes of the [i]ncident with certainty to testify regarding the same." [<u>Id.</u> at 29]; <u>see Waters v. AIG Claims, Inc.</u>, 608 F. Supp. 3d 1120, 1135 (M.D. Ala. 2022) ("[A]n expert is not required to address all alternative theories, nor would an expert's failure to do so be a sufficient basis for exclusion[.]"); <u>Diaz v. Carnival Corp.</u>, 544 F. Supp. 3d 1352, 1358 (S.D. Fla. 2021) (observing that "absolute certainty on causation is not required" for an expert to testify regarding the same); <u>Whelan v. Royal Caribbean Cruises Ltd.</u>, 976 F. Supp.

13

2d 1328, 1332 (S.D. Fla. 2013) (noting than "an expert need not rule out all possible alternative causes" or "decide on one cause in particular to the exclusion of all others"). Instead, the proper remedy to Defendant's critiques of Plaintiff's experts' testimony was to allow Defendant to vigorously cross-examine Plaintiff's experts and for the Court to carefully instruct the jury on Plaintiff's burden of proof, as was done at trial. See Daubert, 509 U.S. at 596.

Here, Defendant's expert opined that Plaintiff's gun was partially unholstered when it discharged, and that there was no evidence to conclude that anything other than Plaintiff's finger actuated the trigger. In contrast, Plaintiff's experts relied on Plaintiff's testimony and other facts suggesting that the gun was fully holstered when it discharged and that Plaintiff's finger did not pull the trigger. As a result, based on the likelihood that the trigger was pulled by a foreign object or the holster itself, Mr. Tertin concluded that it would have been "highly improbable" for Plaintiff's gun to have fired if it included a tabbed trigger. Put differently, although Mr. Tertin did not offer an opinion on precisely where or how the trigger was pulled, he essentially testified that it was "highly improbable" that it was pulled squarely on its face from within the holster. Viewing the evidence in the light most favorable to Plaintiff, this

14

is a legally sufficient evidentiary basis for a jury to find for Plaintiff.[7] See Chaney, 483 F.3d at 1222–23, 1227; Wilson, 303 F. App'x at 715 ("In product liability cases, proof of causation generally requires reliable expert testimony which is 'based, at the least, on the determination that there was *reasonable probability* that the negligence caused the injury.'" (emphasis in original)). It was the province of the jury to weigh the credibility of the Parties' conflicting testimony and choose what testimony to credit. See Wilson, 303 F. App'x at 715 ("As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases."). Accordingly, the Court denies Defendant's renewed motion as to Plaintiff's design defect claim.

    2.    Plaintiff's claim that the P320 is defective due to inadequate warnings about the possibility of unintended discharges.

Defendant argues that Plaintiff's defect claim based on inadequate warnings also fails as a matter of law due to insufficient evidence of causation. As summarized by the Eleventh Circuit, "[i]n standard products liability cases premised on a failure to warn, Georgia law insists that a plaintiff show that the defendant had a duty to

---

[7] Defendant relies on Guinn v. AstraZeneca Pharamcy to argue that Plaintiff's experts were required to provide a reasonable explanation as why "any alternative cause suggested by the defense" was not the sole cause of Plaintiff's injuries. [See Doc. 151 at 14] (citing 602 F.3d 1245, 1253 (2010)). However, Defendant takes Guinn out of context. In that case, the Eleventh Circuit was discussing the requirements to offer expert testimony based on the scientifically accepted methodology of differential diagnosis—a methodology not applicable here. See Guinn, 602 F.3d at 1253.

15

warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). A manufacturer can breach its duty to warn by "failing to provide an adequate warning of the product's potential risks." Brown v. SharkNinja Operating, LLC, No. 1:22-CV-2896-MLB, 2024 WL 4269671, *11 (N.D. Ga. Sept. 20, 2024) (quoting Wilson Foods Corp. v. Turner, 460 S.E.2d 532 (Ga. Ct. App. 1995)).

"A breach of a duty to warn, however, must also be the cause of the injury about which the plaintiff complains, and the plaintiff must present evidence supporting a reasonable inference" that an adequate warning of the product's potential risks would have prevented the plaintiff's injuries. R & R Insulation Servs., Inc. v. Royal Indem. Co., 705 S.E.2d 223, 233 (Ga. Ct. App. 2010). Put differently, "the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." Id. "While proximate cause is an issue of fact normally reserved for the jury, Georgia law provides that the court may decide questions of proximate cause as a matter of law when the evidence is 'plain and undisputed.'" Hubbard v. Bayer HealthCare Pharms. Inc., 983 F.3d 1223, 1232 (11th Cir. 2020) (citation omitted).

At trial, Plaintiff argued that Defendant was negligent because it failed to warn its customers of the P320's "unreasonable risk" of unintended discharges. See, e.g.,

Trial Tr. vol. 6, 1062:4–9. By its instant motion, Defendant claims that Plaintiff failed to present any evidence on the essential element of causation—specifically, Defendant contends that there was no evidence adduced at trial that had Defendant provided additional or different warnings, then Plaintiff would have done something different that would have prevented the incident. [Doc. 151 at 20]. Plaintiff disagrees and points to the following evidence:

- Plaintiff testified that prior to buying his P320 he "spent a lot of time on the company's website," "read reviews of the product" on various "gun-selling websites," and watched "many" videos and reviews about the gun on YouTube. Trial Tr. vol. 3 at 518:7–10.

- Plaintiff testified that he saw Defendant's advertising that the P320 "won't fire unless you want it to" and its "safety-without-compromise" promise. Id. 518:14–519:1. Plaintiff explained that based on that advertising, he felt that he "could trust" that the P320 "was going to be a safe one to carry." Id. at 519:3–6. He also testified that his impression was that the P320 was "being touted as one of the safest striker-fired pistols on the market to carry." Id. at 568.

- Plaintiff further testified that he did "not really" consider any other conceal-carry weapons when he was shopping because "based on what [he] saw on the website and in the reviews," the P320 "seemed like a very safe gun for [him] to carry. So [he] he chose the 320." Id. at 519:16–520:1.

Viewing this evidence in the light most favorable to Plaintiff, the Court finds that there is sufficient evidence to prove causation for Plaintiff's failure to warn claim. See Chaney, 483 F.3d at 1222–23, 1227. Drawing all inferences in Plaintiff's favor, a reasonable jury could find that had Defendant adequately warned Plaintiff that its design of the P320 created a heightened risk on unintended discharge,

17

Plaintiff would not have purchased the P320 and thus would not have been injured by it. [Doc. 162 at 19]. Accordingly, the Court denies Defendant's motion in its entirety. [Doc. 151].

## IV.   Motion for New Trial

### A.   Legal Standard

Federal Rule of Civil Procedure 59 provides that the Court "may on motion, grant a new trial on all or some of the issues" after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Granting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." Ewing v. Carnival Corp., No. 23-10883, 2024 WL 2764391, at *5 (11th Cir. May 30, 2024) (cleaned up).

"A losing party may also move for a new trial under Rule 59 on the grounds that 'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)). Thus, under Rule 59, a court may "in its discretion, grant a new

18

trial 'if in the court's opinion, the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence" which prevented the court from entering judgment as a matter of law under Rule 50. Id (quoting Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir.1984)) (cleaned up). Although a court cannot weigh evidence when confronted with a Rule 50 motion, in a motion for a new trial under Rule 59, the court "is free to weigh the evidence." Id. (citation omitted) "When independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." Id. (cleaned up).

As relevant here, an evidentiary error is not a basis to set aside a verdict if it "do[es] not affect any party's substantial rights." Fed. R. Civ. P. 61. "If one cannot say, with fair assurance, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 37 F.3d 1460, 1465 (11th Cir. 1994) (alterations accepted). The Eleventh Circuit has held that "the factors to consider in determining whether . . . substantial rights were affected [include] the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Id.

19

Various evidentiary issued raised by Defendant's motion implicate Federal Rules of Evidence 401, 402, and 403. It is axiomatic that for evidence to be admissible, it must be relevant to a claim or a defense asserted by the parties. See Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Civ. P. 402. Even relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**B.    Discussion**

Defendant argues that the Court's following decisions constituted evidentiary errors: (1) the Court's denial of Defendant's motion *in limine* to exclude evidence of Defendant's Voluntary Upgrade Program [Doc. 149 at 12–15]; (2) the Court's denial of Defendant's motion *in limine* to exclude evidence referring to the P320 as a "double action" pistol [Id. at 16–17]; and (3) the Court's denial of Defendant's request for sanctions following Plaintiff's improper question to Defendant's expert about his total compensation in other unintended discharge cases. [Id. at 18–20]. The Court addresses each in turn.

20

1.    Evidence of the Voluntary Upgrade Program

A year prior to the manufacture of Plaintiff's P320 pistol, Defendant implemented a "Voluntary Upgrade Program," which included a design enhancement of a prior version of the P320 pistol. At the time, the P320 pistol "met and exceeded" various industry safety standards, which included standards that tested whether the gun was "drop safe"—i.e., whether the gun did not unintentionally discharge when dropped. [See Doc. 149 at 3]. However, the United States military and a private company called Omaha Outdoors independently tested the P320 and determined that it discharged when dropped at certain angles that were not included in the testing parameters defined by industry standards. Subsequently, Defendant reengineered certain components of the gun and offered the Voluntary Upgrade Program to allow P320 purchasers to "enhance" the drop safety of their P320s at no cost. [Id.] Plaintiff's P320 and all subsequent P320s include the upgraded design. [Id.]

Prior to trial, Defendant moved *in limine* to exclude evidence related to the Voluntary Upgrade Program as irrelevant and unfairly prejudicial. [Doc. 61]. Defendant argued that the evidence was irrelevant because it is undisputed that Plaintiff's P320 did not discharge from being dropped and that Plaintiff's P320 contained the upgraded design. Defendant also argued that the evidence was unfairly prejudicial because Plaintiff would attempt to use the evidence "to improperly

21

suggest to the jury that something is wrong with the P320" and that evidence of an unrelated alleged defective condition was likely to cause the jurors to "become confused and mistakenly associate the unrelated design enhancement with Plaintiff's alleged defect." [Id. at 61 at 5]. Plaintiff responded that the Voluntary Upgrade Program proves (1) Defendant's "capability to recognize and respond to dangerous defects of its products"; (2) Defendant's "ability to remedy a potential harm, even when it is not forced to do so"; and (3) Defendant's "reluctance to recall the P320." [Doc. 69 at 2–3]. Plaintiff stated that to the extent any risk of prejudice or confusion existed, such risk could be mitigated with limiting instructions. [Id.] Defendant replied that it has never suggested that it is incapable of identifying and remedying defects in its products and that evidence of the Voluntary Upgrade Program "would be duplicative and unfairly prejudicial." [Id. at 1–2].

At the pretrial conference, the Court denied Defendant's motion and found that Plaintiff could introduce evidence about the Voluntary Upgrade Program. See Pretrial Conf. Tr. at 77:1–18; 85:2–87:20 [Doc. 178]; [see also Doc. 91]. The Court based its decision on Defendant's representations that Defendant may introduce some evidence related to drop safety at trial; however, the Court noted that if Defendant's evidence "changes, and there's another objection," the Court would

change its ruling.[8] Id. at 87:15–20; see also id. at 87:8–12. Defendant did not request any limiting instructions related to the issue. At that time, the Court also granted Plaintiff's motion *in limine* to preclude evidence of the P320's compliance with industry standards, which related to certain testing data that Defendant had not produced in discovery because it was purportedly irrelevant to Plaintiff's defect theory at the time. Id. at 86:24–87; [Doc. 53].

At trial, Plaintiff referenced events related to the Voluntary Upgrade Program during opening statements, telling the jury that:

> We'll prove that Sig knew of another problem involving the P320 trigger and didn't want to fix it. Sig knew, you'll hear, that the gun could fire if it was dropped. But they tried to hide it from the public. Now, you'll hear that when the public found out about it through [an] Omaha Outdoors report, Sig Sauer scrambled.

---

[8] During the pretrial conference, the Court asked Defendant why it wanted to introduce evidence related to drop safety, given that it was undisputed that this is not a drop safety case. See Pretrial Conf. Tr. at 81:16–82:3. Defendant stated that a "a lot depends on where we go with respect to that argument, as to the purpose of a tabbed trigger." Id. at 81:14–25. According to Defendant, "the only way drop safety comes into the case is, again, our position that a tabbed trigger is put on by other manufacturers to allow them to pass drop testing. And that's the purpose of a tabbed trigger. That's why they used it. And the 320 didn't need it." Id. at 82:14–83:3. In response, Plaintiff argued that if Defendant could argue that the P320 did not need a tabbed trigger because it is drop safe, Plaintiff should be able to introduce evidence of the Voluntary Upgrade Program to (1) show that the P320's design initially failed to "stop drop fires" and (2) prevent the jury from believing the gun is "drop fire proof." Id. at 84:1–14. The Court said that it did not want "this to become a drop case, because it's not." Id. at 85:12–14. However, the Court stated, if Defendant were to introduce limited evidence about the gun's purported drop safety, doing so may open the door for Plaintiff to introduce limited evidence about the Voluntary Upgrade Program based on "how far the door is opened, if it is, in fact." Id. at 85:12–22. Defendant appeared to agree, responding that "a lot of [this] depends on how this evidence come comes in and how far the door is opened, if at all," while also noting that Plaintiff's gun was manufactured after the upgrade, and no evidence had been presented that the post-upgrade pistol had any defect related to drop safety. Id. at 85:24–86:9.

Trial Tr. vol. 2 at 277:8–13; see also id. at 296:10–13 ("They did not want to issue

that first recall. And, ladies and gentlemen, they don't want to issue another one.

Rather than protect its customers, you'll hear that Sig is more concerned about

protecting itself."). Plaintiff's counsel further argued, "You'll hear that they lied

about the P320. . . . You'll hear that they told the public that the gun was drop safe

when it wasn't." Id. at 291:19, 292:2–3.

After opening statements and outside of the presence of the jury, Defendant

argued that Plaintiff's opening statement opened the door for Defendant to introduce

evidence that the P320 exceeded industry standards for drop safety.[9] See id. 371.

Because Plaintiff described the Voluntary Upgrade Program as a "recall" and told

the jury that Defendant lied to the public about the P320 being "drop safe when it

wasn't," Defendant argued that it would be significantly prejudiced if it could not

---

[9] Defendant did not otherwise raise any objection regarding the nature of Plaintiff's substantive
discussion of the Voluntary Upgrade Program despite that the fact that Plaintiff had arguably
departed from the Court's ruling that permitted Plaintiff to introduce limited information about the
Voluntary Upgrade Program if Defendant opened the door by introducing evidence about the gun's
drop safety. See supra n.9. It is not this Court's place to speculate on a Party's trial strategy, but
the Court nevertheless notes "there are a number of good reasons why skilled trial counsel may
make a tactical decision" not to raise a specific objection. See Oxford Furniture Companies, Inc.
v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993). Here, it may have
been Defendant's view that it was more strategic to argue that the door had opened for it to
introduce evidence of the P320's compliance with industry standards than to object or seek
curative instructions related to Plaintiff's statements about the Voluntary Upgrade Program. See
id. at 1128–29 (noting that trial counsel may choose not to object at trial when an "improper
argument may open the door to a response that will be of more value than a sustained objection"
and explaining that timely objections are required because counsel may not later claim error only
when the result of their strategic choices is "unsatisfactory").

explain that the Voluntary Upgrade Program was, in fact, voluntary because the P320 met and exceeded industry safety standards related to drop safety.[10] Id. at 371–72. The Court agreed, finding that Plaintiff had opened the door and Defendant was permitted to ask questions about industry standards. Id. at 380:16–18.

After that, Plaintiff called Defendant's engineer, Mr. Sean Toner, as his first witness. Plaintiff elicited the following testimony about the events leading up to the Voluntary Upgrade Program:

- In February 2017, the United States military tested the P320s to determine if they were drop safe. Id. at 413:21–414:4. The military tested the pistol in ways that were "above and beyond" the military's protocol for drop safety, and they determined that the P320 unintentionally fired when dropped at a certain angle that Defendant had not tested. Id. at 414:1–13. The military asked Defendant "to see" if Defendant could improve the P320. Id. Defendant then gave the military a P320 with a redesigned firing mechanism. Id. at 414:19–24. Defendant also began working on a "production solution" for all of its guns related to the issue. Id. at 416:21–24. Meanwhile, between February 2017 and August 2017, Defendant continued to sell the original, unmodified version of the P320 to the public. Id. at 414:22–25.

- Separately, in August 2017, Omaha Outdoors identified another drop fire issue with the P320. After that, Defendant "accelerated their timeline" to offer the public "the enhanced version" of the P320 through the Voluntary Upgrade Program. Id. at 416:1–417:15. Mr. Toner was unsure of the exact time frame

---

[10] Defendant's arguments were also partly based on Plaintiff's use of a demonstrative during Plaintiff's opening statement that the Parties had conferred about. It was Defendant's understanding that Plaintiff planned to show the entire document during his opening statement; however, Plaintiff only showed the headline of the document, which stated, "Sig Sauer issues voluntary upgrade of P320 pistol." The rest of the document, which Defendant had assumed would be shown, stated that the P320 met various industry standards for drop safety, thus arguably opening the door to Defendant to introduce evidence related to those standards. See Trial Tr. vol. 2 at 300:6–304:21. Based on the Parties' prior agreement about the document, the Court initially denied Defendant's request to discuss the safety standards in its opening statement but permitted Defendant to raise the issue again after opening statements. See id. at 302:15–21.

between Omaha Outdoors's testing and Defendant's announcement of the Voluntary Upgrade Program, but Mr. Toner testified that "it was pretty quick." Id. at 428:15–17.

During closing arguments, Plaintiff's counsel relied on the Voluntary Upgrade Program to argue that Defendant "recalled their trigger once, but only after the public learned it wasn't safe. They didn't do it on their own. They didn't even do it when they were told the first time. It was when the public learned." Trial Tr. vol. 6 at 1045:2–5. Plaintiff's counsel told the jury that Defendant "continued selling a dangerous gun to the public for six months and then issued a voluntary recall. They continued selling a bad gun to the public in 2017, in February until August." Id. at 1060:19–22. Plaintiff's counsel concluded his initial closing statement by telling the jury that "the reason we need to do this, Sig will not change unless they are told to. And you will have that chance to tell them." Id. at 1069:5–7.

In Defendant's closing argument, Defendant's counsel told the jury:

This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components. it had everything the military had in the internal components. it had all of that. If he wanted it with a manual safety, he could have gotten it.

Id. at 1080:1–8.

Plaintiff's counsel then again relied on evidence related to the Voluntary Upgrade Program in his rebuttal closing:

26

Sig still doesn't get it. Do not let history repeat itself. If the military forces them to change the trigger, they'll fix an unintended discharge problem for the military. When a gun seller warns the public, and only after the public knows, Sig Sauer will fix an unintended discharge problem for the public. . . .

The public could not count on Sig Sauer to fix a safety concern that they knew could injure or kill. They kept selling the gun anyway knowing it could unintentionally discharge, for six months and injure a user or an innocent bystander, an adult or a child. They continued to sell it until they were called out in public. . . .

They have proven when it comes to looking out for its customers, you cannot count on Sig. And, ladies and gentlemen, we are now counting on you. We're counting on you to provide a loud and just verdict that Sig Sauer can hear all the way up in New Hampshire.

Id. at 1103:5–10; 1106:25–1107:5; 1108:14–18.

By its instant motion for a new trial, Defendant argues that the Court's decision to admit evidence about the Voluntary Upgrade Program was in error and caused substantial prejudice to Defendant. [Doc. 149 at 12]. Defendant asserts that the evidence was irrelevant, because even if evidence of the Voluntary Upgrade Program showed that Defendant possessed the "capability" to quickly implement a design change related to a now-resolved drop safety issue with the P320, such evidence bears no relevance to Plaintiff's present design defect claims related to a tabbed trigger. And even if it were relevant, such testimony should have been excluded due to the risk of confusing the jury and as unfairly prejudicial.

In response, Plaintiff contends the Voluntary Upgrade Program is relevant as "direct evidence" that Defendant is "capable of recognizing defects with its products

27

and taking action to fix them." [Doc. 163 at 4]. Plaintiff also claims that Mr. Toner's testimony that Defendant made changes to the P320 related to the Voluntary Upgrade Program "pretty quick" could show the jury that Defendant should have recognized and remedied the risk of unintended discharges while doing additional testing on the P320. [Id.] In reply, Defendant argues that Plaintiff's characterization of the use of the Voluntary Upgrade Program at trial is a "mastery of revisionist history" because Plaintiff never used evidence of the Voluntary Upgrade Program to show that Defendant had the ability to recognize defects in its products and fix them. [Doc. 177 at 1]. Instead, Plaintiff used evidence of the Voluntary Upgrade Program "as a tool to invoke fear in the jury, telling the jury that if it did not 'send a message'" to Defendant because the Voluntary Upgrade Program "shows that [Defendant] will not fix a problem unless the public demands it." [Doc. 177 at 2].

Upon review and consideration, the Court concludes that it was not an error to deny Defendant's motion to preclude evidence of the Voluntary Upgrade Program. Rule 401 broadly defines relevant evidence as evidence that "has *any* tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); see United States v. Macrina, 109 F.4th 1341, 1349 (11th Cir. 2024) ("The standard for what constitutes relevant evidence is a low one." (citation omitted)). Here, the Voluntary Upgrade

28

Program evidences the feasibility of Defendant modifying the P320's trigger, which is relevant to the risk-utility analysis of Plaintiff's design defect claim.

Further, Federal Rule of Civil Procedure 403 does not require the exclusion of the Voluntary Upgrade Program. "'Rule 403 is an "extraordinary remedy' that the district court 'should invoke sparingly, and the balance should be struck in favor of admissibility.'" Macrina, 109 F.4th at 1349 (citation omitted). Under Rule 403, the Court "look[s] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. Here, Plaintiff readily testified that he never dropped his P320; thus, there was little likelihood of confusion between Plaintiff's alleged defect and the drop safety issue that precipitated the Voluntary Upgrade Program. To the extent Defendant argues that evidence of the Voluntary Upgrade Program was unfairly prejudicial because Plaintiff's counsel used it to craft a "send a message" theme throughout Plaintiff's opening statement and closing arguments, Defendant did not object to Plaintiff's remarks or seek a curative instruction during trial.[11]

---

[11] The Court notes that Defendant moved *in limine* to preclude any commentary or suggestion regarding "sending a message" to Defendant or the community before trial. [Doc. 63 at 12]. The Court denied Defendant's motion, noting that it was lacked specificity for the Court to consider in the abstract and would have to be considered in the context in which the evidence was offered. Pretrial Conf. Tr. at 103:7–18; see Roberts v. AAA Cooper Transportation, Inc., No. 2:17-CV-00232-RWS, 2021 WL 9031229, at *2 (N.D. Ga. Aug. 27, 2021). Defendant did not raise the issue again.

Even if the testimony at issue was erroneously admitted, a new trial should be granted only if Defendant shows that its substantial rights were affected. See Fed. R. Civ. P. 61; Pearson v. Fulton Cnty., Georgia, No. 1:08-CV-3758-WCO, 2011 WL 13183218, at *10 (N.D. Ga. Sept. 23, 2011), aff'd sub nom. Fulton Cnty., Ga. v. Pearson, 502 F. App'x 816 (11th Cir. 2012). To determine whether a party's substantial rights were affected, the Court considers "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." Ad-Vantage Tel., 37 F.3d at 1465.

Here, the Voluntary Upgrade Program did not implicate a "closely disputed question." See Ewing, 2024 WL 2764391, at *1. Rather, it is entirely undisputed that Plaintiff's P320 did not contain any alleged defects related to drop safety or the Voluntary Upgrade Program. Indeed, Plaintiff himself testified that he never saw any materials about the Voluntary Upgrade Program and that he never dropped his P320. Trial Tr. vol. 3 at 567:14–568:3, 577:8–12. Further, Plaintiff's counsel never argued or suggested that Plaintiff's P320 was defective due to any drop safety concerns related to the Voluntary Upgrade Program. It is also undisputed that Plaintiff used a post-upgrade P320 pistol—which is a fact that Defendant highlighted during closing arguments. See, e.g., Trial Tr. vol. 5 at 1080:1–8 ("This is not about the voluntary upgrade, folks. I mean, we spent so much time on the Voluntary

30

Upgrade Program. That was instituted the year before Mr. Lang bought his pistol. He bought an upgraded pistol. It had all the upgraded components.").

Further, and as discussed above, to the extent Defendant argues that its substantial rights were implicated by Plaintiff's counsel's focus on the Voluntary Upgrade Program to urge the jury to improperly "send a message" to Defendant with its verdict, Defendant did not object to Plaintiff's counsel's "send a message" theme during trial or seek a curative instruction. In light of the Eleventh Circuit's reluctance "to set aside a jury verdict because of an argument made by counsel during closing arguments" and the "general rule" that "a timely objection is necessary to bring to the district court's attention errors in counsel's arguments," the Court finds that Defendant has failed to meet its burden to show that its substantial rights were affected by Court admitting evidence of the Voluntary Upgrade Program. See F.D.I.C. v. Stahl, 89 F.3d 1510, 1519–20 (11th Cir. 1996); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128 (11th Cir. 1993).

2.    Evidence of references to the P320 as a "double action" pistol

Plaintiff reviewed various materials before purchasing his P320; however, none of those materials identified the P320 as a double action pistol. Nevertheless, Plaintiff elicited testimony about instances when Defendant's marketing materials and Defendant's lead engineer referred to the P320 as a double action pistol rather

31

than a single action pistol. Defendant contends that the Court's decision to allow such testimony was an evidentiary error that affected Defendant's substantial rights.

As relevant here, Plaintiff's initial trial exhibit list was filed on November 30, 2023. [Doc. 48-11]. Apparently, Defendant took issue with the overbreadth of Plaintiff's list and "raised the issue with Plaintiff's counsel several times." [Doc. 149 at 6]. However, Defendant did not raise the issue with the Court. On May 30, 2024, Plaintiff provided a draft of what eventual became Plaintiff's final exhibit list, and by that time, the March 27, 2024 deadline for filing motions *in limine* had passed. [See Doc. 122-5]. A week and a half later, on June 11, 2024, after jury selection, Defendant informed the Court that, based on Plaintiff's updated exhibit list, Defendant anticipated that Plaintiff would improperly seek to introduce evidence of materials identifying the P320 as a double action pistol. The Court indicated that any requests to preclude evidence were untimely but permitted Defendant to file a motion for the Court's consideration. See Trial Tr. vol. 1 at 229:11–232:2. The Court expressed concern that Defendant had not previously raised the issue despite filing various other motions *in limine* between May 31, 2024 and June 11, 2024. See id.

The next day, on the morning of opening statements, Defendant filed its Motion to Preclude References to Materials Identifying the P320 as a Double Action Pistol. [Doc. 122]. After confirming that Defendant had been aware of the issues

raised in the motion since May 30, 2024, the Court denied Defendant's motion and opening statements commenced. See Trial Tr. vol. 2 at 263:12–15.

By its instant motion, Defendant contends that the Court erred by allowing Plaintiff to introduce evidence referring to the P320 as a double action pistol because it was irrelevant and used as an "inflammatory attack" on Defendant's credibility, thus warranting a new trial. [Doc. 149 at 17]. The Court disagrees for at least three reasons. First, the Court acted within its discretion by denying Defendant's motion as untimely. See United States v. Fernetus, 838 F. App'x 426, 432–33 (11th Cir. 2020) ("The district court acted within its discretion in denying [the defendant's] motion on timeliness grounds, and we will not consider the merits of his motion to suppress at this stage."). Second, regardless of timeliness, the evidence was relevant to explaining the Defendant's design choices of the P320 and the credibility of Defendant's design engineer. And third, even assuming it was an error to admit this evidence, the Court discerns no basis to find that Defendant's substantial rights were affected. Accordingly, the Court is unmoved by Defendant's argument to grant a new trial on this basis.

3.    Plaintiff's question to Defendant's expert about his total compensation in unintended discharge cases.

Prior to trial, the Court granted Defendant's motion in limine to preclude evidence of other unintended discharge incidents at trial after extensive briefing on the issue. [Doc. 104]. During trial, in violation of the Court's ruling, Plaintiff's

33

counsel asked Mr. Watkins, "How much money has your company billed to date with respect to Sig Sauer unintended discharge cases?" Trial Tr. vol. 5 at 974:25–975:3. Defendant objected, and the Court heard the Parties outside of the presence of the jury. The jury reentered, and the Court stated:

> Ladies and gentlemen, I'll remind you just briefly, from the beginning, during my preliminary instructions, I said the following: if I should sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate what the answer might have been, nor should you draw any inferences or conclusions from the question itself. And so I have sustained an objection, and we'll move forward to the next question.

See id. at 987:11–23. Plaintiff's counsel then asked Mr. Watkins, "Sir, how much has your company billed to date in its litigation work for Sig Sauer?" Id. He responded, "I don't know. I do not know," and Plaintiff's counsel continued to cross-examine him. Id.

Defendant contends that the Court's curative instruction was inadequate and compounded the prejudice of Plaintiff's violation of the Court's ruling that prohibited evidence of other unintended discharge cases. Defendant argues that the Court should have instead prohibited Plaintiff from asking Mr. Watkins about *any* compensation that he had received from Defendant in any other matter besides this case, which was the sanction Defendant requested during trial. [See Doc. 149 at 18–19]; Trial Tr. vol. 5 at 981:11–15.

34

The Court is unmoved by Defendant's arguments. The Court presumes "that jurors follow the instructions" given by the Court, and so the Court presumes that the jurors followed the Court's instruction not to "draw any inferences or conclusions" from Plaintiff's question to Mr. Watkins. See Macrina, 109 F.4th at 1350. Additionally, as the Court said during trial, based on the Party's representations and the Court's observations during trial, the Court does not believe that Plaintiff's counsel intended to violate the Court's prior ruling when he asked the subject question. See Trial Tr. vol. 5 at 984:16–24. Finally, the Court identifies no other reason to conclude that Plaintiff's question or the Court's curative instructions caused Defendant substantial prejudice. As the Court explained to the Parties, although the Parties knew how much time and litigation effort was expended on the issue of other similar incidents of unintended discharges, the jury did not have such context and was unlikely to be swayed by a single stray reference to other unintended discharge cases. See id. at 982:15–23. Accordingly, the Court declines to grant a new trial based on its denial of Defendant's requested sanctions.

In sum, even considering the cumulative effect of these purported evidentiary errors, the Court finds that Defendant has not met its burden of showing that its substantial rights were affected during trial. Accordingly, the Court denies Defendant's motion for a new trial. [Doc. 149].

35

**V.    Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages**

Lastly, Defendant moves for a new trial on damages, or in the alternative, remittitur, because the jury's award is excessive, Plaintiff's arguments incited the jury to award excessive damages, and the purported *per diem* award is punitive. [Doc. 150 at 10].

**A.    Legal Standard**

In addition to the above-discussed basis for granting a new trial under Rule 59(a)(1)(A), a party may move for a new trial on the grounds that "the verdict is against the weight of the evidence" or "the damages are excessive." McGinnis, Inc., 817 F.3d at 1254 (citation omitted). At this stage, the trial judge is "free to weigh the evidence." Id.

Alternatively, under Rule 59, a party may move to alter the judgment through a remittitur. Id. at 59(e). "A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999). "As a general rule, 'a remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds the amount established by the evidence.'" Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1266 (11th Cir. 2008) (citation omitted).

**B.    Discussion**

Defendant argues that the jury's verdict of $2,350,963.43 in compensatory damages is excessive, particularly because it is 46 times greater than Plaintiff's past medical expenses. [Doc. 150 at 1]. Defendant largely repackages its arguments raised in its Motion for a New Trial, arguing that various evidentiary errors—including admission of the Voluntary Upgrade Program, discussion of the P320 as a double action pistol, and the Court allowing Plaintiff's counsel to ask Defendant's expert questions about compensation—impermissibly swayed the jury and mandate a new trial on damages. See supra Part IV. However, for the same reasons discussed

37

above, Defendant has not met its burden to show that it is entitled to a new trial based on those purported errors.[12]

Thus, the only issue that remains is whether the jury's verdict exceeds "the outer limit of proof," in which case the Court must order a new trial or remit the verdict. See Rodriguez, 518 F.3d at 1266; see also Edwards v. Sears, Roebuck &

---

[12] Defendant appears to argue that it is entitled to a new trial if the damages award is found to be so excessive that it must be the result of passion or prejudice. [See Doc. 150 at 8]. However, Defendant relies on an Eleventh Circuit opinion that applies Florida law not at issue here. [Id.]; see Bravo v. United States, 532 F.3d 1154, 1161 (11th Cir. 2008). Thus, the Court need not elaborate upon its analysis discussed supra Part IV. Nevertheless, the Court notes that its conclusion is bolstered by its instructions to the jury, which were not objected to by either Party, that the jury's decision "must not be influenced in any way by either sympathy for or prejudice against any party." Trial Tr. vol. 6 at 1024:3–6; see United States v. Roy, 855 F.3d 1133, 1186 (11th Cir. 2017) ("[W]e must presume that juries follow their instructions." (emphasis added)); see also Cephus v. CSX Transportation, Inc., 771 F. App'x 883, 893 (11th Cir. 2019). Additionally, Defendant devotes much of its instant motion to objections related to Plaintiff's use of suggested per diem rates for the jury to calculate damages during closing arguments. Defendant argues that the Court failed to take necessary precautions so that Plaintiff would "not inflame the jury" with such per diem calculations. [See, e.g., Doc. 150 at 19]. However, Defendant did not object to Plaintiff's per diem calculations at trial and "thus failed to give the [C]ourt an opportunity to sustain the objection and provide immediately a curative instruction." See Cephus, 771 F. App'x at 895; see also Ruiz v. Wing, 991 F.3d 1130, 1141 (11th Cir. 2021) ("A party must raise an objection to errors in the opposing party's argument."); Oxford Furniture Companies, Inc. v. Drexel Heritage Furnishings, Inc., 984 F.2d 1118, 1128–29 (11th Cir. 1993) ("Requiring timely objection prohibits counsel from 'sandbagging' the court by remaining silent and then, if the result is unsatisfactory, claiming error")). Further, while the Court is cognizant that it "must use care" to ensure that any argument for per diem damages will not "result in an excessive verdict," the Court provided such necessary "safeguards" here by twice instructing the jury that any argument by either Party's counsel was not evidence. Trial Tr. vol. 6 at 1024:20–24 ("As I said before, you must consider only the evidence that I have admitted in the case. . . . Anything the lawyers say is not evidence and is not binding on you" (emphasis added)); id. at 1134:1–10 (instructing the jury that "the arguments and anything the lawyers say is not evidence" after the jury requested to view the Parties' closing arguments and presentation slides during their deliberations); id. at 1024:3–4 ("your decision must be based only on the evidence presented here" (emphasis added)); see Showan v. Pressdee, 922 F.3d 1211, 1220 & n.8 (11th Cir. 2019); Roy, 855 F.3d at 1186; cf. Foradori v. Harris, 523 F.3d 477, 511 (5th Cir. 2008) ("[W]e have never held that a district court which allows an objected-to unit-of-time argument must sua sponte give an unrequested cautionary instruction in order to avoid reversible error.").

Co., 512 F.2d 276, 283 (5th Cir. 1975)[13] (explaining that where there has been no "prejudicial error in the course of a trial," but the verdict is excessive, remittitur is the "proper remedy").

Under Georgia law,[14] "an award of damages is only excessive if it is 'so exorbitant and flagrantly outrageous as to shock the moral sense,' or if it is unsupported by the evidence." Meader By & Through Long v. United States, 881 F.2d 1056, 1060 (11th Cir. 1989) (quoting Valdosta Housing Auth. v. Finnessee, 287 S.E.2d 569, 571 (Ga. Ct. App. 1981)). The "moral sense" or "the 'conscience' to be considered is not the personal or individual conscience of any particular judicial officer; rather, it is the judicial conscience, which is always offended by jury verdicts that are so irrational as to be the apparent result of bias, corruption, or prejudice." Rockdale Hosp., LLC v. Evans, 834 S.E.2d 77, 81 (Ga. 2019). Moreover, when as here, a significant amount of an award is for pain and suffering damages, such award

> is governed by no other standard than the enlightened conscience of impartial jurors. And the defendant has a heavy burden . . . to establish that such a damage award is excessive. In particular, appellate courts should be hesitant to second-guess verdicts where the damage award is

---

[13] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[14] In reviewing a compensatory damages award on a state law claim, the Court evaluates the propriety of the award under state law. Kerrivan v. R.J. Reynolds Tobacco Co., 953 F.3d 1196, 1204 n.6 (11th Cir. 2020); see also Faulkner v. W. Elec. Co., 98 F.R.D. 282, 283–84 (N.D. Ga. 1983) ("In the Eleventh Circuit the question of whether or not to grant a new trial or order remittitur in a diversity case is not governed solely by federal law, but instead presents a mixed issue of state and federal law.").

based in any significant part on pain and suffering. Therefore, for this
Court to overturn the jury's verdict, it must be so flagrantly excessive
or inadequate, in light of the evidence, as to create a clear implication
of bias, prejudice, or gross mistake by the jurors.

Georgia Trails & Rentals, Inc. v. Rogers, 855 S.E.2d 103, 116–17 (Ga. Ct. App.

2021). In determining whether a verdict is excessive, "it is appropriate to compare

the award with awards in similar cases."[15] Meader, 881 at 1060 n.10.

Here, Defendant argues that the outer limit of the law necessitates a reduction

of Plaintiff's pain and suffering award from $2,300,000 to $500,000, bringing the

total jury award to $550,963.43. In support, Defendant cites various cases upholding

pain and suffering awards that are approximately ten times plaintiff's past medical

expenses or specific damages. [See Doc. 150 at 11–15]. However, the mere fact that

some cases have upheld such awards does not necessarily create a ceiling for other

pain and suffering awards or suggest that pain and suffering awards should be

limited to a certain multiplier of specific damages. Indeed, the Court of Appeals of

Georgia has outright rejected such a proposition. See Smith v. Crump, 476 S.E.2d

817, 821 (Ga. Ct. App. 1996) ("Under Georgia law, pain and suffering in the past,

---

[15] In Chrysler Group, LLC v. Walden, the Court of Appeals of Georgia stated that "no cases are
exactly alike, so it may not be relevant to merely compare cases." 792 S.E.2d 754, 768 (Ga. Ct.
App. 2016). The case was appealed, and the Georgia Supreme Court was poised to address whether
the Court of Appeals "erred in failing to consider prior awards in similar cases to determine
whether the remitted award of damages was excessive." See Chrysler Grp., LLC v. Walden, 812
S.E.2d 244, 248 (Ga. 2018). However, upon "review of the record and full briefing," the Supreme
Court of Georgia "conclude[d] that this issue does not warrant [its] review." Id. at 255 n.6.

40

present, and future are measured by the enlightened conscience of a fair and impartial jury. There exists no rule or yardstick against which damages for pain and suffering are to be measured, as suggested by the appellant, who would have such damages as some multiple of special damage.").

Upon review and consideration, the Court finds no justification to set aside or remit the jury's verdict.[16] <u>Moody v. Dykes</u>, 496 S.E.2d 907, 912 (Ga. 1998) (noting that the threshold to set aside a jury verdict is "extremely high"). The jury made its award "in its enlightened conscience" and based upon proper evidence. <u>Id.</u> Although

---

[16] The Court acknowledges that the jury's award for past pain and suffering is strikingly similar to Plaintiff's counsel's *per diem* argument. Plaintiff's counsel suggested an award of $1,600,000 for past pain and suffering based on his suggested *per diem* calculations, which were partly tied to Defendant's expert's hourly rates. <u>See</u> Trial Tr. vol. 5 at 1066:18–22, 1067:13–1068:1. The jury awarded $1,610,000. In contrast, when it came to future pain and suffering, the jury deviated from Plaintiff's counsel's suggestion—awarding $690,000 instead of the suggested amount of $925,000. <u>See id.</u> at 1068:2–7. While the similarity of the verdict raises an inference that the jury's verdict was influenced by Plaintiff's counsel's argument, the Eleventh Circuit decisively instructs that the court "must" presume the jury followed the Courts instructions that nothing Plaintiff's counsel said was evidence and that the jury reached its verdict solely based on the admitted evidence in this case. <u>See</u> <u>Roy</u>, 855 F.3d at 1186–87 ("We can, should, and must presume that the jury followed [the court's] instructions[.]"); Trial Tr. vol. 6 at 1024:20–24; 1134:1–10 (the Court's instructions). This presumption is supported by the fact that the jury did not wholesale adopt Plaintiff's counsel's suggested verdict, but it instead awarded a lower amount of damages for future pain and suffering—which aligns with Plaintiff's testimony that many of his physical and emotional difficulties have improved over time. <u>See, e.g.</u>, Trial Tr. vol. 3 at 554:1–16; 557:22–25; 559:5–13; 586:20–25. Thus, given the Court's instructions in this case, the Court concludes that the similarity between the Plaintiff's counsel's *per diem* closing argument and the jury's award does not render the verdict "so irrational as to be the apparent result of bias, corruption," or "gross mistake." <u>See</u> <u>Rockdale Hosp.</u>, 834 S.E.2d at 81; <u>Georgia Trails</u>, 855 S.E.2d at 117; <u>see also</u> <u>Showan</u>, 922 F.3d at 1220 (noting that *per diem* arguments are governed by federal procedure and "the district court has complete discretion to disallow the argument or to allow it subject to safeguards").

the precise basis for the jury's decision can never be known, there is extensive evidence supporting the jury's verdict. For example,

- The unintentional discharge left "a gaping hole on [Plaintiff's] right thigh." Trial Tr. vol. 3 at 531:24. He found the wound "when [his] finger dropped into" the hole, and he felt "one of the most severe pains" he had "ever felt in [his] life." Id. at 531:24–532:4. The jury saw a photo of the wound. [See Doc. 147-3]. The jury heard that the bullet in the gun "expanded" on impact "and tore the muscle and every bit of tissue and shot it out of the front of [his] thigh." Trial Tr. vol. 3 at 540:19–541:3. Yet despite the pain, Plaintiff was concerned not about himself, but "what could have happened" when his two-year old son came up to hug him moments before, and "that bullet could have been in his head." Id. at 532:18–24.

- Plaintiff's wife called 911, and Plaintiff waited what "felt like an eternity" for them to arrive. Id. at 536:12. The first responders took Plaintiff to the hospital, where he "suffered for a good bit" until "they were able to give pain medication to [him]." Id. at 539:14–24. And because "[t]here wasn't any tissue to suture," Plaintiff could do little but bandage the wound. Id. at 542:15–24. The pain "started getting worse and worse and worse." Id. at 544:1–2.

- Plaintiff was eventually discharged, but a few days later, he "spiked a 102-degree fever" and returned to the emergency room because he contracted sepsis. Id. at 545:4–11. The doctors "feared that [he] might not make it." Id. at 545:11. The bullet wound pain didn't "even compare to the pain of that infection," which Plaintiff testified felt like "a burning pain across [his] entire body that was just so relentless and never-ending. . . . [N]o matter what pain medication they gave [him], nothing would give [him] comfort." Id. at 545:13–19. He didn't sleep "for days" because it was so "unbearable." Id. at 545:19–20. He spent three days in the ICU and longer in the hospital in a "regular room" in the days leading up to Christmas. Id. at 545:22–23.

- Plaintiff wanted to get back home to spend Christmas with his son. His doctors ultimately agreed to let him leave if he went "to an outpatient infectious disease doctor to continue" antibiotic treatments. Id. at 546:3–8. Plaintiff also had to self-administer "high-powered IV antibiotics" to himself at home. Id. at 548:5–6. The antibiotics caused "throwing up, nausea, other stomach ailments that were pretty miserable on top of the pain." Id. at 548:21–22. Because of all this, Plaintiff was "physically unable to get" to enjoy Christmas

with his family, and he could not "experience Christmas at all in the way that [he] wanted to" or that his "son wanted [him] to be able to." Id. at 550:8–22.

• Plaintiff had a slow recovery. His wound "bled for six months . . . because of that severe infection that [he] contracted." Id. at 552:15–18. To help the wound heal, he had to undergo "debriding," "chemically burning any dead tissue from the surrounding area of the wound so that new tissue can begin to grow." Id. at 549:2–6. Plaintiff called it "one of the most excruciating things [he's] ever felt in [his] life" as his doctors "use[d] some sort of acid and literally just burn and boil that dead tissue." Id. at 549:8–11. And once his doctors used the acid, they "use[d] special tools [to] cut and scrape that burnt tissue off." Id. at 549:12–13. That went on "for weeks and weeks to try to get that wound to close up." Id. at 549:15–16. Plaintiff was "basically bedridden through that entire process" due to the pain. Id. at 549:25–550:1.

• While this went on, Plaintiff could not get around because he "couldn't bear hardly any weight on his leg." Id. at 551:2–10. He "couldn't drive," so his mother or wife had to take him to medical appointments. Id. at 551:6–7. He had to use crutches for six months. Id. at 551:18–20. He couldn't work, so his employer gave him a leave of absence. Id. at 551:11–17.

• After the crutches, Plaintiff started "doing physical therapy," and he "also went to using a cane" for a year after he got off crutches. Id. at 551:23–552:2. The injury changed "the way that [he] walk[ed] . . . pretty dramatically," because he "favor[ed] the other leg." Id. at 552:2–4. The change to his gait gave him "foot problems" and "pain associated with that as well." Id. at 552:4–7.

• Plaintiff also testified about the impact on his mental health. He "definitely suffered from PTSD" and "had extreme heightened anxiety." Id. at 553:9–10. He has "reoccurring nightmares constantly about that bullet striking [his] son." Id. at 554:10–11. Plaintiff still "struggle[s]" with nightmares, although they are "better now" and do not happen as often as they did in the beginning when he would have them "every single night for months and months and months." Id. at 554:11–16. Plaintiff's anxiety affected his work and "[l]oud noises would make [him] jump." Id. at 553:16–18. For "two years after the incident," he was unable to be "present there mentally for [his] son." Id. at 557:17–19. The incident "robbed [Plaintiff] of a lot of time with" his son. Id. at 557:14.

43

- Additionally, although Plaintiff testified that he no longer experiences any physical limitations as a result of the incident, he suffers nerve damage that "is never going to go away." Trial Tr. vol. 3 at 554:2, 586:20–25. This nerve damage includes "electrical pains" that "randomly shoot" "from the vicinity of [his] wounds all the way up into [his hip]" and "kind of feel" like he is "being struck again." Id. at 554:1–11, 559:11–13. Plaintiff also still has no "feeling on the actual wounds themselves." Id. at 556:17.

Thus, based on this evidence, the Court finds that the jury's verdict is not "so exorbitant and flagrantly outrageous as to shock the moral sense" or "create a *clear* implication of bias, prejudice, or gross mistake by the jurors." Meader, 881 F.2d at 1060; Georgia Trails, 855 S.E.2d at 117 (Ga. Ct. App. 2021) (emphasis added). Accordingly, the Court denies Defendant's motion. [Doc. 150].

## VI.  Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Sig Sauer, Inc.'s Motion for a New Trial [Doc. 149]; Motion for New Trial, or in the alternative, Remittitur on Compensatory Damages [Doc. 150]; and Renewed Motion for Judgment as a Matter of Law [Doc. 151].

**SO ORDERED**, this 6th day of February, 2025.


_____
Eleanor L. Ross
United States District Judge
Northern District of Georgia

44